**FILED**

JUN 2 8 2002

LARRY W. PROPES, CLERK
COLUMBIA, S. C.

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF SOUTH CAROLINA

_____
                                        )
IN RE SAFETY-KLEEN CORP.      )    Consol. Case No. 3-00-1145 17
BONDHOLDERS LITIGATION     )
_____)

# LEAD PLAINTIFFS' MEMORANDUM OF LAW
# IN SUPPORT OF MOTION FOR CLASS CERTIFICATION

MCCUTCHEN, BLANTON, RHODES
 & JOHNSON, LLP
Pope D. Johnson, III
Federal I.D. No. 2206
P.O. Drawer 11209
Columbia, SC  29211-1209
(803) 799-9791
Local Counsel for Lead Plaintiffs

GRANT & EISENHOFER, P.A.
Stuart M. Grant
Megan D. McIntyre
Diane Zilka
1220 Market Street, Suite 500
Wilmington, DE   19801
(302) 622-7000
Lead Counsel for Lead Plaintiffs

214

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.      The Defendants' Fraudulent Scheme . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

II.     The Issuance of the Bonds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    Plaintiffs and the Class Members Purchase the
        Bonds in Reliance on the Defendants' False and Misleading Statements . . . . . . . . . . . . 7

IV.     The Truth Begins to Emerge . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

I.      Legal Standards Applicable to Motions for Class Certification . . . . . . . . . . . . . . . . . . 9

II.     This Action Satisfies The Standards For Class Certification Under
        Rule 23(a) of the Federal Rules of Civil Procedure . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      The Members Of The Class Are So Numerous That Joinder
                Of All Members Is Impracticable . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.      This Action Involves Questions Of Law And Fact Common To
                Lead Plaintiffs And The Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

        C.      Lead Plaintiffs' Claims Are Typical Of The Class . . . . . . . . . . . . . . . . . . . . 15

        D.      The Lead Plaintiffs Will Adequately Protect
                The Interests Of The Class . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

III.    The Standards For Class Certification Under Federal
        Rule of Civil Procedure 23(b)(3) Have Been Met . . . . . . . . . . . . . . . . . . . . . . . . . 17

        A.      Common Questions Of Law Or Fact Predominate . . . . . . . . . . . . . . . . . . . . 18

        B.      The Class Action Is Superior To Other Available Methods of Adjudication . . . 21

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

i

# TABLE OF AUTHORITIES

## CASES

In re A.H. Robins Co.,
  880 F.2d 709 (4th Cir. 1989) ...................................................................................... 9

In re Alexander Grant & Co. Litig.,
  110 F.R.D. 528 (S.D. Fla. 1986) ............................................................................... 19

Amchem Prods. v. Windsor,
  521 U.S. 591 (1997) .................................................................................................... 19

In re Amerifirst Sec. Litig.,
  139 F.R.D. 423 (S.D. Fla. 1991) ............................................................................... 11

Appleyard v. Wallace,
  754 F.2d 955 (11th Cir. 1985) .................................................................................... 16

In re Badger Mountain Irr. Dist. Sec. Litig.,
  143 F.R.D. 693 (W.D. Wash.1992) ........................................................................... 16

Black v. Rhone-Poulenc, Inc.,
  173 F.R.D. 156 (S.D. W. Va. 1996) ............................................................................ 9

Blackie v. Barrack,
  524 F.2d 891 (9th Cir. 1975) ...................................................................................... 14

Bogosian v. Gulf Oil Corp.,
  561 F.2d 434 (3d Cir. 1977) ....................................................................................... 19

Broussard v. Meineke Discount Muffler Shops, Inc.,
  155 F.3d 331 (4th Cir.1998) ....................................................................................... 12

Brown v. Eckerd Drugs, Inc.,
  663 F.2d 1268 (4th Cir. 1981),
  vacated on other grounds 457 U.S. 1128 (1982) ....................................................... 13

Central Wesleyan College v. W.R. Grace & Co.,
  143 F.R.D. 628 (D.S.C.1992), aff'd, 6 F.3d 177 (4th Cir.1993) ............................... 12

Chisolm v. TranSouth Fin. Corp.,
  184 F.R.D. 556 (E.D. Va. 1999) ................................................................................ 18

Chisolm v. TranSouth Fin. Corp.,
  194 F.R.D. 538 (E.D. Va. 2000) ................................................................................ 13

Connett v. Justus Enterprises,
    1991 WL 13076 (D. Kan. Jan. 24, 1991) .................................................................. 20

Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n,
    375 F.2d 648 (4th Cir.1967) ..................................................................................... 10

Eisenberg  v. Gagnon,
    766 F.2d 770 (3d Cir. 1985) ..................................................................................... 21

Feldman v. Lifton,
    64 F.R.D. 539 (S.D.N.Y. 1974) ............................................................................... 21

Ganesh, L.L.C. v. Computer Learning Centers, Inc.,
    183 F.R.D. 487 (E.D. Va. 1998) .......................................................... 12, 14, 16, 17, 18

General Tel. Co. v. Falcon,
    457 U.S. 147 (1982) ................................................................................................. 15

Green v. Wolf Corp.,
    406 F.2d 291 (2d Cir. 1968), cert. denied, 395 U.S. 977 (1969) ........................ 20, 21

Hansen v. Landaker,
    2000 WL 1803936 (Ohio Ct. App. Dec. 7, 2000) ..................................................... 10

Helfand v. Cenco ,
    80 F.R.D. 1 (N.D. Ill. 1977) ................................................................................ 20, 21

Holsey v. Armour & Co.,
    743 F.2d 199 (4th Cir. 1984) ................................................................................... 12

Kelley v. Norfolk & Western Ry. Co.,
    584 F.2d 34 (4th Cir. 1978) ..................................................................................... 11

Kirkpatrick v. J.C. Bradford & Co .,
    827 F.2d 718 (11th Cir. 1987) ............................................................................ 20, 22

In re Kirschner Med. Corp. Securities Litig.,
    139 F.R.D. 74 (D. Md. 1991) ................................................................ 2, 9, 11, 14, 15

Lienhart v. Dryvit Systems, Inc.,
    255 F.3d 138 (4th Cir. 2001) ..................................................................................... 2

Longman v. Food Lion, Inc.,
    1994 WL 686624 (M.D.N.C. Oct. 17, 1994) .............................................. 2, 9, 14, 16

Lubin v. Sybedon Corp.,
    688 F. Supp. 1425 (S.D. Cal. 1988) ........................................................................ 20

In re MDC Holdings Sec. Litig.,
   754 F. Supp. 785 (S.D. Cal. 1990) ...................................................................... 15, 19

Peoples v. Wendover Funding, Inc.,
   179 F.R.D. 492 (D. Md. 1998) ................................................................................ 11

Ross v. Bank South, N.A.,
   837 F.2d 980 (11th Cir. 1988)
   vacated and reheard without addressing class cert.,
   885 F.2d 723 (11th Cir. 1989) .................................................................................. 9

Schneider v. Traweek,
   1990 WL 132716 (C.D. Cal. July 31, 1990) ........................................................... 21

Seiden v. Nicholson,
   69 F.R.D. 681 (N.D. Ill. 1976) ............................................................................... 21

Simpson v. Specialty Retail Concepts,
   149 F.R.D. 94 (M.D.N.C. 1993) ................................................... 9, 11, 14, 15, 16, 19

South Carolina Nat'l Bank v. Stone,
   139 F.R.D. 325 (D.S.C. 1991) ............................................................ 9, 14, 15, 16, 19

In re Southeast Hotel Properties Ltd. Partnership Investor Litig.,
   151 F.R.D. 597 (W.D.N.C. 1993) ............................................... 9, 11, 14, 15, 18, 20

Stastny v. Southern Bell Tel. & Tel. Co.,
   628 F.2d 267 (4th Cir. 1980) .................................................................................... 2

State of Wisconsin Inv. Bd. v. Ruttenberg,
   Civil Action Nos. CV-99-BU-3097-S and CV-99-BU-3129-S
   (N.D. Ala. July 3, 2001) .......................................................................................... 19

In re Towers Fin. Corp. Noteholders Litig.,
   177 F.R.D. 167 (S.D.N.Y. 1997) .............................................................................. 9

In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.,
   122 F.R.D. 251 (C.D. Cal. 1988) ............................................................................ 20

Walco Investments, Inc. v. Thenen,
   168 F.R.D. 315 (S.D. Fla. 1996) ............................................................................. 21

Windham v. American Brands, Inc.,
   565 F.2d 59 (4th Cir. 1977) .................................................................................... 10

## OTHER AUTHORITIES

Fed. R. Civ. P. 23(a) ................................................................................................. *passim*

Fed. R. Civ. P. 23(b) ................................................................................................ *passim*

7A Charles A. Wright, et al., Federal Practice & Procedure §1778 (2d ed. 1986) ......... 18

H.R. No. 104-369 at 35-36, reprinted in 1996 U.S.C.C.A.N. 730 (1996) ..................... 17

15 U.S.C. §78u-4(a)(3)(B)(i) ......................................................................................... 17

## PRELIMINARY STATEMENT

Lead Plaintiffs, American High-Income Trust ("AHIT") and State Street Research Income

Trust ("SSR Trust") (together, "Lead Plaintiffs") submit this memorandum of law in support of

their motion for class certification pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3).

The class should be defined as all persons and entities who purchased or acquired 9¼% senior

notes due in 2009 (the "2009 Bonds") issued by Safety-Kleen Corp. ("Safety-Kleen"), or 9¼%

senior notes due in 2008 (the "2008 Bonds") issued by Safety-Kleen's predecessor, Laidlaw

Environmental Services, Inc. ("LES"), (collectively, the "Company") in their initial offerings or on

the secondary market from April 17, 1998 through March 9, 2000 (the "Class Period").[1]

Class certification is appropriate in this securities class action, because it involves a

fraudulent scheme that was uniformly perpetrated on a large group of investors, and therefore

there are numerous factual and legal questions that are common to all members of the proposed

class. These common questions predominate over any individualized questions that may exist

and, particularly in light of the numerosity of class members and the impracticability of

individualized actions, a class action is the superior means of fairly and efficiently adjudicating

these issues. Moreover, the Lead Plaintiffs' claims and defenses are typical of those of the other

class members, and in appointing the Lead Plaintiffs as the class representatives this Court has

already properly determined that they will fairly and adequately protect the interests of the class.

---

[1] Excluded from the definition of the Class are: (1) the Company and defendants, (2) members of the families of the individual defendants, (3) the subsidiaries or affiliates of the Company or of any defendant, (4) any person or entity who is a partner, officer, director, employee or controlling person of the Company or any defendant, (5) any entity in which any defendant has a controlling interest, and (6) the legal representatives, heirs, successors or assigns of any such excluded person.

## STATEMENT OF FACTS[2]

This action arises from the purchases of 2008 Bonds and 2009 Bonds (collectively, the "Bonds") by Lead Plaintiffs and the other members of the Class. The defendants include certain directors and high level officers of Safety-Kleen (the "Individual Defendants"),[3] the Company's independent auditors, PriceWaterhouseCoopers ("PWC"), and the three lead underwriters for the issuance of the 2008 and/or 2009 Bonds[4] (collectively, "Defendants").[5] Lead Plaintiffs allege that Defendants violated §§11(a) and 15 of the Securities Act of 1933 (the "Securities Act") and

---

[2] By Order entered March 27, 2002 (the "March 27 Order") this Court granted in part and denied in part Defendants' motions to dismiss. By Order entered June 14, 2002, this Court granted in part Lead Plaintiffs' motion for reconsideration of the March 27 Order, reinstating plaintiffs' claim pursuant to Section 18 of the Exchange Act and granting the Lead Plaintiffs leave to replead claims under Section 11 of the Securities Act on behalf of after-market purchasers of the Bonds. Lead Plaintiffs will soon be filing an amended complaint in accordance with the Court's order. This brief factual summary is drawn from the original Consolidated Class Action Complaint (hereinafter, the "Complaint"). References herein to "¶ ___" are to specific allegations in the Complaint. This summary is intended to facilitate the Court's understanding of the factual basis for Lead Plaintiffs' claims. While Plaintiffs have the burden of establishing the right to certification, Stastny v. Southern Bell Tel. & Tel. Co., 628 F.2d 267 (4th Cir. 1980), in ruling on a motion for class certification, the Court must accept the allegations of the complaint as true. Longman v. Food Lion, Inc., 1994 WL 686624, *2 (M.D.N.C. Oct. 17, 1994) (attached hereto as Exhibit A); In re Kirschner Med. Corp. Securities Litig., 139 F.R.D. 74, 81 (D. Md. 1991); Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 143 (4th Cir. 2001) (stating, in *dictum*, that the Fourth Circuit does not view the merits of the underlying claims as relevant to the appropriateness of certification).

[3] The Individual Defendants are Kenneth W. Winger, Paul R. Humphreys, Michael J. Bragagnolo, James R. Bullock, Leslie W. Haworth, Henry B. Tippie (in his individual capacity and as personal representative of the estate of John W. Rollins, Sr., deceased), John W. Rollins, Jr., David E. Thomas, Jr., James L. Wareham, Grover C. Wrenn and Robert W. Luba.

[4] TD Securities (USA) Inc. ("TD Securities") and NationsBanc Montgomery ("NationsBanc") were underwriters for both the 2008 and the 2009 Bonds. Raymond James & Associates, Inc. ("Raymond James") was an underwriter for only the 2009 Bonds. Collectively, they are referred to as the "Underwriter Defendants."

[5] Safety-Kleen's majority shareholder, Laidlaw, Inc., a defendant in this action, filed for bankruptcy protection subsequent to the filing of this action, and therefore proceedings have been automatically stayed against it pursuant to §362 of the Bankruptcy Code.

§§10(b), 20(a) and 18 of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder.  Defendants engaged in a massive and continuing course of fraudulent conduct which commenced prior to the offering of the 2008 Bonds and continued throughout the Class Period.

## I.     The Defendants' Fraudulent Scheme

Before it filed for bankruptcy protection in June 2000, Safety-Kleen was one of the leading hazardous and industrial waste operations in the United States.  It was formed as a result of two corporate acquisitions.  First, in May 1997, Rollins Environmental Services, Inc. ("Rollins") acquired Laidlaw, Inc.'s hazardous and industrial waste operations (the "Rollins Acquisition"), and changed its name to Laidlaw Environmental Services, Inc. ("LES").  ¶ 46.  A year later, LES (through its subsidiary, LES, Inc.) acquired all of the outstanding capital stock of the former Safety-Kleen Corporation ("Old Safety-Kleen") in a tender offer and subsequent merger completed in May 1998 (the "Safety-Kleen Acquisition").  ¶¶ 18, 47.

Unbeknownst to investors, beginning no later than 1997, the defendants caused LES to artificially inflate its reported revenue and income by a wide variety of improper practices.  ¶ 51. These practices were carried over to Safety-Kleen following the Safety-Kleen Acquisition.  See id.  As a result, throughout the Class Period, LES and later Safety-Kleen reported their financial results in a manner which did not conform with generally accepted accounting principles ("GAAP") and which grossly overstated the Company's earnings, revenue and income.  Id.; ¶ 90. This scheme and ongoing course of conduct during the Class Period fostered the illusion that Safety-Kleen was profitable and growing.  Ultimately, when Safety-Kleen could no longer hide the truth, it was forced to file for bankruptcy protection and to restate its financial statements for three fiscal years.  ¶¶ 2-4.

The manipulative accounting practices which caused Safety-Kleen's financial results to be materially misstated included the following, among others: (1) Safety-Kleen inappropriately recognized gains in accounting for derivatives transactions (¶ 60); (2) in dereliction of GAAP, the Company applied the "pooling" approach to determining closure costs, calculating the amortization of landfill space based on an average cost of all the landfills that were owned (¶ 70), and LES and Safety-Kleen reduced the amounts of their environmental reserves to levels below actual probable environmental liabilities, adding the amounts of these reductions to their reported income (¶ 71); (3) the Company engaged in several forms of double billing; (4) the Company extended the useful lives for virtually all of its long-lived capital assets to upwards of thirty (30) years, which grossly exceeded the economic lives of those assets and which represented a major departure from industry norms, which reduced depreciation and amortization expenses and in turn artificially increased reported earnings (¶ 78); (5) the Company improperly capitalized costs that should have been recorded as expenses (¶ 80); (6) the Company recorded operating expenses as reductions in accrued liabilities rather than as expenses (¶ 81); (7) dozens of individual journal entries for amounts between $500,000 and $20 million were made for fictitious transactions, and numerous accounting adjustments were recorded on the Company's books for which there was no supporting documentation (¶ 82); and (8) during and after the conversion of Safety-Kleen's systems to LES's system, Safety-Kleen had a significant problem with accounts receivable because the new system could not tell which customers had paid their invoices, resulting in overstating reported accounts receivable and revenues (¶¶ 88-89).

Each accounting gimmick alone resulted in material misstatements of Safety-Kleen's financial position. Together, the cumulative effect of Defendants' improper accounting was to enable Safety-Kleen to report continually improving profits during the Class Period, when proper

accounting would have disclosed that Safety-Kleen <u>lost</u> over one-half billion dollars during that same period, and was not a viable concern. ¶ 6.

Throughout the Class Period, Defendants continued to pump false information to the market. Among other ways, they did so through: press releases and quarterly reports on Forms 10-Q containing false and misleading quarterly financial results (¶¶126, 127, 129, 132, 134, 136, 138, 171, 174, 179, 188, 191); annual reports on Form 10-K which reported materially false and misleading financial results for fiscal year-end 1998 and 1999 (¶¶ 130, 184); and "BUY" recommendations by Raymond James and TD Securities analysts (¶125, 128, 135, 139, 173, 175, 182, 192). The Company's annual financial statements were audited by PWC, and PWC issued unqualified opinions thereon, falsely stating that the financial statements were prepared in accordance with GAAP. ¶¶ 34, 52. These audit opinions were contained in the Company's Form 10-K filings along with the financial statements. ¶¶ 130, 187. In addition, as discussed below, PWC's audit opinions and the Company's financial statements were contained in the offering memoranda and registration statements pursuant to which the Company issued the Bonds.

## II.    The Issuance of the Bonds

To finance the Safety-Kleen Acquisition and certain related transactions in April 1998, LES and Services borrowed approximately $1.8 billion under Services' senior secured bank facility (the "Senior Credit Facility") with Toronto Dominion Bank (an affiliate of defendant TD Securities) and a syndicate of banks, including an affiliate of defendant NationsBanc. ¶ 49. Following the Safety-Kleen Acquisition, LES and Services issued $325 million of the 2008 Bonds in order to repay a portion of the Senior Credit Facility. ¶¶ 95, 103, 382, 423.

The 2008 Bonds were issued through a two-step transaction. First, unregistered bonds were offered and sold pursuant to an offering memorandum (the "1998 Offering Memorandum").

5

¶ 96.  Subsequently, LES and Services made an exchange offer whereby the unregistered bonds were exchanged for identical bonds which had been registered pursuant to a registration statement (the "1998 Registration Statement").  Id.  Following the exchange offer, the registered bonds were publicly traded on the open market.  See ¶ 285.

The 1998 Offering Memorandum and the 1998 Registration Statement presented historical and selected consolidated financial data for LES and its subsidiaries and provided *pro forma* combined financial data, including EBITDA figures which were presented as providing "useful information regarding the Company's ability to service debt."  ¶¶ 101, 104-109, 119, 123, 124.  The financial data that was provided in these documents, including the EBITDA figures, was materially false and misleading due to the manipulative accounting practices discussed above.

The Rollins Acquisition, which was consummated in May 1997, was financed in part by LES's issuance of a $350.0 million 5% subordinated convertible pay-in-kind debenture (the "PIK Debenture") to Laidlaw.  ¶ 46.  In April 1999, as part of Laidlaw's plan to monetize its investment before Safety-Kleen's fraud was uncovered, Laidlaw caused Safety-Kleen to agree to repurchase the PIK Debenture from Laidlaw for $200 million in cash and 11,320,755 shares of Safety-Kleen common stock.  ¶ 141.  Safety-Kleen funded the cash portion of the repurchase through an offering of the 2009 Bonds.  Id.

The 2009 Bonds were sold through the same type of two-step transaction as the 2008 Bonds:  First, unregistered bonds were sold pursuant to an offering memorandum (the "1998 Offering Memorandum"), and then those bonds were exchanged for identical bonds which had been registered through a registration statement (the "1998 Registration Statement").  The 1998 Offering Memorandum and the 1998 Registration Statement both described, among other things, the Company's purported competitive strengths, the substantial cost savings purportedly achieved

6

by the Company by virtue of the Safety-Kleen Acquisition, and the resulting Adjusted EBITDA estimates of $485.2 million which could be used for debt service for the bonds.  They also presented historical and selected consolidated financial data for the Company and its subsidiaries, including financial statements audited by PWC, and presented *pro forma* revenue and EBITDA figures for the Company.  ¶¶ 151-157, 167, 170.  Because of the Company's pervasive improper accounting practices, the financial information presented in the 1999 Offering Memorandum and the 1999 Registration Statement was materially false and misleading.

**III.    Plaintiffs and the Class Members Purchase the Bonds in Reliance on the Defendants' False and Misleading Statements**

In reliance on the information contained in the Company's Registration Statements and/or other SEC filings (including the Form 10-K filings which included the Company's financial statements and PWC's audit opinions), Lead Plaintiffs and the members of the Class purchased the Bonds.  ¶ 359.  However, as a result of the improper accounting practices discussed above, the Company's financial statements, and all of the information derived from those financial statements that had been disseminated to investors in the Company's press releases, Registration Statements, and other SEC filings, were materially false and misleading.  ¶¶ 90-92.  Had the true facts been disclosed to them, Lead Plaintiffs and the Class members would not have purchased the 2008 Bonds or the 2009 Bonds, or would have purchased them only at substantially discounted prices.  ¶¶ 90-92, 359-361.

**IV.    The Truth Begins to Emerge**

In early 2000, Safety-Kleen's internal auditors determined that the Company's revenues for fiscal years 1997 through 1999 were overstated and they uncovered a number of bogus accounting entries.  ¶¶ 200-201.  On March 6, 2000, the Company announced that it had

uncovered material "accounting irregularities" in its financial reports, leading it to place its three top executives – defendants Winger, Bragagnolo and Humphreys – on leave while a Special Committee appointed by Safety-Kleen's Board of Directors investigated the extent to which the Company would need to restate its financial reports dating back at least to the end of fiscal year 1998. ¶¶ 2, 206. In that announcement, the Company admitted that its previously reported financial results from as early as the end of 1997 had been materially misstated. ¶ 3. On March 9, 2000, the Company informed the investing public that defendant PWC had withdrawn its previously issued reports on the Company's financial statements for the fiscal years ended August 31, 1999, 1998 and 1997. ¶¶ 3, 210. In response, the value of the Bonds which Lead Plaintiffs purchased plunged dramatically. ¶ 3.

As a result of a forensic audit, which uncovered massive misstatements in Safety-Kleen's financials, the Company disclosed its intentions to restate its prior financial statements for fiscal 1997, 1998 and 1999. ¶ 5. It also disclosed its determination "that there have been accounting irregularities in several areas, including inappropriate recognition of gain on derivatives transactions, improper revenue recognition, inappropriate capitalization of costs, and insufficient liability accruals." ¶ 215. On July 9, 2001, the Company filed an amended Form 10-K with the SEC which disclosed its restated financial results. The restatements resulted in a $2.2 million reported net operating loss for the Company in fiscal 1998, instead of the $120 million in operating income it had previously reported. For fiscal 1999, the restatements reduced the Company's previously-reported $28.2 million in operating income to only $6.8 million.

# ARGUMENT

## I.    Legal Standards Applicable to Motions for Class Certification

Rule 23 of the Federal Rules of Civil Procedure, which governs class actions, is broadly

construed to facilitate certification of class actions.  "'[T]he interests of justice require that in a

doubtful case . . . any error, if there is to be one, should be committed in favor of allowing the

class action.'" South Carolina Nat'l Bank v. Stone, 139 F.R.D. 325, 328 (D.S.C. 1991) (quoting

Esplin v. Hirschi, 402 F.2d 94, 101 (10th Cir. 1968)); accord In re A.H. Robins Co., 880 F.2d

709, 740 (4th Cir. 1989); Black v. Rhone-Poulenc, Inc., 173 F.R.D. 156, 161 n.5 (S.D. W. Va.

1996) (noting the "liberal interpretation accorded Rule 23 in this circuit").

The courts in this Circuit have routinely certified cases involving a securities fraud scheme

uniformly perpetrated on a group of investors, emphasizing that allegations of violations of the

federal securities laws are "particularly appropriate for class action" treatment. See Longman,

1994 WL 686624 at *2; Simpson v. Specialty Retail Concepts, 149 F.R.D. 94, 98 (M.D.N.C.

1993); In re Southeast Hotel Properties Ltd. Partnership Investor Litig., 151 F.R.D. 597, 601

(W.D.N.C. 1993); South Carolina Nat'l Bank, 139 F.R.D. at 328; In re Kirschner Med. Corp.

Sec. Litig., 139 F.R.D. 74, 77 (D. Md. 1991).

Numerous courts have certified securities fraud cases where the class is composed of

bondholders or noteholders rather than common shareholders, as here. See, e.g., Ross v. Bank

South, N.A., 837 F.2d 980, 989-90, 1008 (11th Cir. 1988), vacated and reheard without

addressing class cert., 885 F.2d 723 (11th Cir. 1989) (affirming certification of bondholder class);

In re Towers Fin. Corp. Noteholders Litig., 177 F.R.D. 167 (S.D.N.Y. 1997) (certifying

noteholder class); South Carolina Nat'l Bank, 139 F.R.D. at 328-29, 335 (certifying bondholder

class); Hansen v. Landaker, 2000 WL 1803936 (Ohio Ct. App. Dec. 7, 2000) (certifying

bondholder class under Ohio Civ. Rule 23) (attached hereto as Exhibit B).

In order to have a class certified pursuant to Rule 23, a plaintiff must satisfy the four

requirements of Rule 23(a) and at least one of the conditions under Rule 23(b).[6]  Windham v.

American Brands, Inc., 565 F.2d 59, 64 n.6 (4th Cir. 1977) (en banc).  As demonstrated below,

Lead Plaintiffs satisfy all of the requirements of Rule 23(a) as well as Rule 23(b)'s requirements

that common questions of law and fact predominate as to all members of the Class, and that a

class action is superior to alternative methods for the fair and efficient adjudication of the action.

## II.   This Action Satisfies The Standards For Class Certification Under Rule 23(a) of the Federal Rules of Civil Procedure

Rule 23(a) requires that the following four requirements be met in order to maintain a suit

as a class action:

(a)     the class is so numerous that joinder of all members is impracticable;

(b)     there are questions of law or fact common to the class;

(c)     the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(d)     the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a).  All of these requirements are met in this case.

### A.   The Members Of The Class Are So Numerous That Joinder Of All Members Is Impracticable

The numerosity requirement of Rule 23 is clearly satisfied here.  No specific number of

claimants is necessary to satisfy the numerosity requirement (see Cypress v. Newport News Gen.

---

[6] Lead Plaintiffs move for class certification pursuant to 23(b)(3).

10

& Nonsectarian Hosp. Ass'n, 375 F.2d 648, 653 (4th Cir.1967)), and there is no mechanical test to determine whether numerosity exists. See Kelley v. Norfolk & Western Ry. Co., 584 F.2d 34, 35 (4th Cir. 1978). Lead Plaintiffs need not establish the exact number of members of the class or their identities, but must merely demonstrate that the class is sufficiently numerous that joinder of all members is impracticable. See Peoples v. Wendover Funding, Inc., 179 F.R.D. 492, 497 (D. Md. 1998); Simpson, 149 F.R.D. at 98. Moreover, "the numerosity requirement of Rule 23(a)(1) is generally assumed to have been met in class action suits, such as the one here, involving nationally traded securities." In re Amerifirst Sec. Litig., 139 F.R.D. 423, 427 (S.D. Fla. 1991).

Although Lead Plaintiffs do not presently know the precise number of the proposed Class members here,[7] Lead Plaintiffs believe there are hundreds of persons or entities who purchased the 2008 Bonds and the 2009 Bonds in the initial offerings and in the secondary market. Courts have certified classes as small as 40 members as sufficiently large to satisfy the impracticability requirement. Peoples v. Wendover Funding, 179 F.R.D. at 497. Accord Kirschner Med., 139 F.R.D. at 78 (citing Dameron v. Sinai Hosp., 595 F. Supp. 1404, 1408 (D. Md. 1984) (finding a class of 25 to 30 members raises presumption that joinder is impracticable)).

In addition, geographical dispersion among potential claimants weighs heavily in favor of class treatment. See, e.g., Southeast Hotel Properties, 151 F.R.D. at 601 ("Of course, impracticability of joinder is not determined by a numerical test alone; in addition to the potential size of the class, the Court should also consider the geographic dispersion of the class") (citing Kirschner Med., 139 F.R.D. at 78). There is little question that these purchasers are geographically dispersed, as are the two Lead Plaintiffs, AHIT and SSR, who are located in

---

[7] The names of Class members are available from the Company's transfer agent for the Bonds.

11

California and Massachusetts, respectively. Under these circumstances, where the proposed class

is comprised of numerous, geographically dispersed purchasers who would be unlikely to join in

one forum to prosecute what is essentially an identical claim, there is little doubt that class

treatment is appropriate and the most efficient means of prosecuting this action.

**B.      This Action Involves Questions Of Law And Fact Common To
Lead Plaintiffs And The Class**

The commonality requirement of Rule 23(a)(2) does not require that all, or even most,

issues be common, nor that common issues predominate, but only that common issues exist.

Central Wesleyan College v. W.R. Grace & Co., 143 F.R.D. 628, 636 (D.S.C.1992), aff'd, 6 F.3d

177 (4th Cir.1993); Holsey v. Armour & Co., 743 F.2d 199, 216-17 (4th Cir. 1984); see

Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 344 (4th Cir.1998). "It is

enough for a lawsuit to raise questions that are substantially related to the resolution of the case

and that link the class members together, even though the individuals themselves are not

identically situated." Ganesh, L.L.C. v. Computer Learning Centers, Inc., 183 F.R.D. 487, 450

(E.D. Va. 1998). Thus, factual differences among the class members' claims will not preclude

certification if the class members share the same legal theory. Brown v. Eckerd Drugs, Inc., 663

F.2d 1268, 1275 (4th Cir. 1981), vacated on other grounds, 457 U.S. 1128 (1982).

This action involves, almost exclusively, issues of law and fact that are common to each

member of the Class, thus easily satisfying this requirement. The Class members' claims all arise

out of the same set of facts and are based upon the same legal theories. Each Class member faces

the following identical issues:

(a)     Whether Defendants violated the federal securities laws;

12

(b)    Whether the Registration Statements and other public statements and filings published and disseminated to the investing public and purchasers of the Bonds during the Class Period omitted and/or misrepresented material facts about the business affairs, financial condition, profitability and present and future prospects of the Company;

(c)    Whether Defendants' false statements created the market for the Bonds;

(d)    Whether Defendants acted wilfully, recklessly or negligently in omitting to state and/or misrepresenting material facts about the financial condition, profitability and future prospects of Safety-Kleen;

(e)    Whether the Bonds traded at artificially inflated prices in the secondary market during the Class Period due to the nondisclosures and/or misrepresentations detailed in the Complaint; and

(e)    Whether the members of the Class sustained damages, and if so, what is the proper measure thereof.

Courts look favorably upon class action treatment where standardized conduct is directed uniformly to all of the class members. Chisolm v. TranSouth Fin. Corp., 194 F.R.D. 538, 559 (E.D. Va. 2000). "'Courts have consistently found a common nucleus of operative facts when the defendants are alleged to have directed standardized conduct toward the putative class members, or where the class claims arise out of standard documents.'" Id. at 555 (quoting Peterson v. H & R Block Tax Servs., Inc., 174 F.R.D. 78, 82  (N.D. Ill. 1997)).  See also Blackie v. Barrack, 524 F.2d 891, 902-905 (9th Cir. 1975) (holding that common questions of law and fact abound where alleged fraud involves uniform written documents like news releases).  Such is the case here. Defendants are alleged to have made material misrepresentations and omitted material information

about the Company in the Registration Statements, SEC filings, press releases, and other uniform

documents publicly disseminated throughout the Class Period, and are alleged to have failed to

disclose material facts. These allegations satisfy the commonality requirement of Rule 23(a)(2).

See Southeast Hotel Properties, 151 F.R.D. at 602 (finding commonality factor met where private

placement memorandum and other offering materials contained false and misleading statements or

omitted material facts concerning the investment).

The elements of the various securities fraud claims that Lead Plaintiffs assert make clear

that the Defendants' course of conduct is critically at issue in this lawsuit, and that the proof of

that conduct will be common to Lead Plaintiffs and all Class members. For example, in the Rule

10b-5 context, misrepresentation in annual reports, interim reports, and press releases has been

found to satisfy the common question requirement. Simpson, 149 F.R.D. at 98; Longman, 1994

WL 686624 at *2; Kirschner Med., 139 F.R.D. at 78-79. Accord South Carolina Nat'l Bank, 139

F.R.D. at 329 (finding that theories underlying a securities fraud action such as a fraudulent

course of conduct, fraud on the undeveloped market and controlling person liability necessarily

involve common questions of both law and fact); Ganesh, 183 F.R.D. at 490 (finding that

misrepresentation, scienter and materiality are "paradigmatic common question[s]" in securities

fraud actions). Similarly, common fact issues in the Section 11 counts focus on whether

Defendants were negligent in failing to exercise reasonable care by not detecting, disclosing

and/or correcting the material omissions and materially misleading statements contained in the

Registration Statements. Likewise, a key issue common to all class members with respect to the

Section 18 claim is whether certain of the Defendants made false or misleading statements in the

Company's audited financial statements for the fiscal years 1997, 1998 and 1999 that were

included in the Company's Forms 10-K that were filed with the SEC. Simpson, 149 F.R.D. at 99

14

(court found common issues of fact and law when certifying Section 18 claim); In re MDC

Holdings Sec. Litig., 754 F. Supp. 785, 806-07 (S.D. Cal. 1990) (certifying Section 18 claim as

class action where plaintiffs "alleged a common course of action based on the same

misrepresentations").

Given these common factual and legal issues, the common question requirement of Rule

23(a)(2) is met.

### C.    Lead Plaintiffs' Claims Are Typical Of The Class

Under Rule 23(a)(3), a proposed class representative must show that "the claims or

defenses of the representative parties are typical of the claims or defenses of the class." Like the

commonality requirement, typicality does not require identical claims or defenses. See Southeast

Hotel Properties, 151 F.R.D. at 605; Kirschner Med., 139 F.R.D. at 78-79. The typicality

requirement is met if plaintiffs' claims arise from the same course of conduct that gives rise to the

claims of the other Class members and are based on the same legal theory. Simpson, 149 F.R.D.

at 99. The Supreme Court has noted that the "commonality and typicality requirements of Rule

23(a) tend to merge." General Tel. Co. v. Falcon, 457 U.S. 147, 157 n.13 (1982).

This Court has held that typicality is rarely lacking in securities class actions. South

Carolina Nat'l Bank, 139 F.R.D. at 329 (finding named plaintiffs typical of the class members as

a whole, in that they relied on the integrity of the market in purchasing bonds from the defendants

and relied on the offering statement disseminated in connection with the sale of bonds). Here, the

claims asserted by Lead Plaintiffs and the Class arise from identical events and practices and are

based on identical legal theories. The Complaint alleges that Defendants violated federal

securities laws by disseminating a series of false and misleading financial statements and

representations concerning Safety-Kleen's financial results and condition, and that, but for

15

Defendants' fraudulent conduct, there would have been no market for the Bonds. Lead Plaintiffs further allege that they and other Class members purchased or otherwise acquired the Bonds on the secondary market at prices inflated by such false financial statements and misrepresentations, and were damaged thereby. In proving the elements of the various securities fraud claims, members of the proposed Class and Lead Plaintiffs share an interest in having the Court resolve such issues as whether Defendants made any misstatements or omissions, and whether those statements are material. See Ganesh, 183 F.R.D. at 489-490.

Moreover, the issues in securities fraud claims are typical to the class members and proposed representatives alike, whether Lead Plaintiffs purchased the Bonds on the initial offering or in the secondary market. See, e.g., In re Badger Mountain Irr. Dist. Sec. Litig., 143 F.R.D. 693, 699 (W.D. Wash.1992) (holding that so long as same course of conduct by defendants allegedly caused all of the plaintiffs' injuries, the requirement of typicality between public offering purchasers and aftermarket purchasers is satisfied); Appleyard v. Wallace, 754 F.2d 955, 958 (11th Cir. 1985) (noting that strong similarity of legal theories will satisfy typicality requirement despite substantial factual differences).

### D. The Lead Plaintiffs Will Adequately Protect The Interests Of The Class

Rule 23(a)(4) requires Lead Plaintiffs to demonstrate that they will fairly and adequately protect the interests of every putative claimant by showing that they have no interests that are antagonistic to other class members and that they are competent to undertake the case. Ganesh, 183 F.R.D. at 490; Simpson, 149 F.R.D. at 101; Longman, 1994 WL 686624 at *3. See also South Carolina Nat'l Bank, 139 F.R.D. at 329-31 (holding a plaintiff's adequacy to represent class is determined by plaintiff's counsel's ability to vigorously prosecute the matter).

Here, the Lead Plaintiffs' interests are directly aligned with the interests of absent Class members, thus satisfying the first prong of the test. Lead Plaintiffs and each Class member have been damaged by the same alleged conduct, and each has precisely the same interest in achieving the maximum possible recovery. Lead Plaintiffs have indicated that they will protect the interests of the Class. The legislative history of the Private Securities Litigation Reform Act of 1995 shows that the Act's very purpose was to encourage institutional investors to take an active role in securities class actions and serve as lead plaintiff.[8] Indeed, by appointing the proposed Class representatives to serve as Lead Plaintiffs, this Court already has determined, pursuant to §21D of the Exchange Act, that these plaintiffs are capable of adequately representing the interests of Class members. 15 U.S.C. §78u-4(a)(3)(B)(i). Therefore, no antagonism exists. In addition, Lead Plaintiffs have retained counsel that have extensive experience in complex securities litigation and class action proceedings and a reputation for tenaciously prosecuting such actions.[9] Thus, the two-fold standard of Rule 23(a)(4) is satisfied.

## III.    The Standards For Class Certification Under Federal Rule of Civil Procedure 23(b)(3) Have Been Met

Lead Plaintiffs seek certification under Rule 23(b)(3). Therefore, in addition to satisfying the foregoing requirements, Lead Plaintiffs must also show:

> that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

---

[8]  See H.R. No. 104-369 at 35-36, reprinted in 1996 U.S.C.C.A.N. 730 (1996) ("The Conference Committee seeks to increase the likelihood that institutional investors will serve as lead plaintiffs by requiring courts to presume that the member of the purported class with the largest financial stake in the relief sought is the 'most adequate plaintiff'.").

[9]  This Court has already appointed Lead Plaintiffs' counsel as Lead Counsel.

As demonstrated below, these requirements are satisfied.

### A.    Common Questions Of Law Or Fact Predominate

Generally, common questions of law or fact are held to predominate if they represent a significant aspect of the case and can be resolved for all class members in a single adjudication. See 7A Charles A. Wright, Arthur A. Miller & Mary Kay Kane, Federal Practice & Procedure §1778, at 528 (2d ed. 1986). The common questions need not be dispositive; this subsection requires only that the common questions of law or fact outweigh the individual questions. Chisolm v. TranSouth Fin. Corp., 184 F.R.D. 556, 565 (E.D. Va. 1999). The other relevant consideration is whether a class action is superior to other ways of reaching a fair and efficient resolution of the controversy. Ganesh, 183 F.R.D. at 491. "The goal is to ensure that class certification occurs only when economy and efficiency are reasonably likely to result, and in a way that fairly weighs the competing interests of the parties." Id.

As previously discussed, the common questions and their predominance over individual claims are manifest in the fact that Defendants' allegedly unlawful conduct consisted of the dissemination of materially false and misleading financial statements and representations to Lead Plaintiffs and the rest of the Class. To the extent that Lead Plaintiffs can prove Defendants' omissions and/or statements were materially false and misleading, they will have proven that Defendants made the same materially false and misleading statements to all the other Class members as well. See Southeast Hotel Properties, 151 F.R.D. at 603. Additionally, with respect to purchases of the 2008 Bonds and the 2009 Bonds in the after-market, the course of wrongful activity of which Lead Plaintiffs complain had the same effect on them as it did on all members of the Class who purchased the 2008 Bonds and 2009 Bonds in the after-market; namely, to cause them to make such purchases at artificially inflated market prices. The respective factual and legal

elements of liability in this action are common to all members of the Class, and common issues

clearly predominate.[10]

Given that liability issues predominate in securities cases such as this, the Supreme Court

has noted that "[p]redominance is a test readily met in . . . cases alleging consumer or securities

fraud." Amchem Prods. v. Windsor, 521 U.S. 591, 625 (1997). This is true even if the particular

claim requires proof of individual reliance, as does the plaintiffs' Section 18 claim. A number of

courts have granted class certification in cases involving Section 18 claims, holding that the

numerous common issues relative to those claims predominate over the single individual issue of

reliance. See, e.g., Simpson, 149 F.R.D. at 102 ("the question of whether Defendants ... made

material misrepresentations, and if so, whether they were made intentionally or recklessly or

negligently are common to the entire class and predominate over individual issues of reliance" on

Section 18 claim); State of Wisconsin Inv. Bd. v. Ruttenberg, Civil Action Nos. CV-99-BU-3097-

S and CV-99-BU-3129-S, Memorandum Opinion, at 16-18 (N.D. Ala. July 3, 2001) (attached

hereto as Exhibit C); In re MDC Holdings Sec. Litig., 754 F. Supp. at 806-07 (certifying Section

18 claim as class action where plaintiffs "alleged a common course of action based on the same

misrepresentations," and "[t]he alternative would be to unleash thousands of individual suits into

the judicial system, and risk that many plaintiffs would be unable to seek redress because of

economics"); Helfand v. Cenco , 80 F.R.D. 1, 8-9 (N.D. Ill. 1977) (certifying class action that

included Section 18 claims). Other courts have likewise held, outside of the Section 18 context,

---

[10]"[T]he necessity for calculation of damages on an individual basis should not preclude class
determination when common issues which determine liability predominate." Bogosian v. Gulf Oil
Corp., 561 F.2d 434, 456 (3d Cir. 1977). "[C]ourts uniformly hold that class actions may be
appropriate even though there are differences in the amount of damages suffered by the individual
class members." South Carolina Nat'l Bank, 139 F.R.D. at 331. Indeed, "once liability and the
relevant dates are established, assignment of damages becomes a ministerial task." In re Alexander
Grant & Co. Litig., 110 F.R.D. 528, 534 (S.D. Fla. 1986).

that individual issues of reliance do not preclude class certification.  See, e.g., Kirkpatrick v. J.C. Bradford & Co ., 827 F.2d 718, 724-25 (11th Cir. 1987) (individual issues of reliance do not predominate where plaintiffs allege a common course of conduct of misrepresentations through affirmative acts and omissions); Southeast Hotel Properties, 151 F.R.D. at 605 (common questions of fact relating to an alleged common course of conduct by all defendants predominate over issues of individual reliance); Connett v. Justus Enterprises, 1991 WL 13076, *10  (D. Kan. Jan. 24, 1991) (finding common questions of law and fact predominate over any individual questions where complaint alleged a course of conduct by defendants to misrepresent or omit material information in the relevant documents relating to a bond issue) (attached hereto as Exhibit D).   As the Third Circuit held in granting class certification in a Rule 10b-5 case prior to the Supreme Court's determination that reliance in such cases could be presumed under the fraud-on-the-market theory:

> The presence of individual questions as to the reliance of each investor does not mean that the common questions of law and fact do not predominate over questions affecting individual members as required by Rule 23(b)(3) ...  In rejecting such a contention, the Second Circuit stated, "Carried to its logical end [this argument] would negate any attempted class action under Rule 10b-5, since ... reliance is an issue lurking in every 10b-5 action."  Green v. Wolf Corp., 406 F.2d [291,] 301 [(2d Cir. 1968)].  Rather than eliminate securities class actions, it would be more efficient to order separate trials, if necessary, limited to the issue of reliance.

Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985); see also In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig., 122 F.R.D. 251, 255 (C.D. Cal. 1988) ("The policies served by the securities laws would be in part eviscerated if the reliance requirement precluded class certification."); Lubin v. Sybedon Corp., 688 F. Supp. 1425, 1460 (S.D. Cal. 1988) (where plaintiff "has alleged that each investor relied upon precisely the same misrepresentations and

omissions ... it would defy common sense to find that class certification is defeated by the possibility of individual questions appertaining to one of the elements of one of the cases' causes of action").[11]

Accordingly, common questions of law or fact predominate over any questions affecting only individual members.

### B.    The Class Action Is Superior To Other Available Methods of Adjudication

Rule 23(b)(3) also requires that the Court determine whether a class action is superior to other possible methods of fairly and efficiently resolving the controversy.  In determining whether the "superiority" requirements of Rule 23(b)(3) are met, the Court must consider the following factors:

(a)    the interest of members of the Class in individually controlling the prosecution of separate actions;

(b)    the extent and nature of any litigation concerning this controversy already commenced by potential Class members;

(c)    the desirability of concentrating the litigation of the claims in this particular forum; and

(d)    the difficulties likely to be encountered in the management of a class action.

See Fed. R. Civ. P. 23(b)(3)(A)-(D).  Each of these factors militates strongly in favor of class certification here.

---

[11] Numerous other courts have reached the same result and certified classes in Section 10b-5 cases where proof of individual reliance was required either because the case was decided prior to the Supreme Court's recognition of the fraud-on-the-market theory or because the presumption of reliance was overcome.  See e.g. Green v. Wolf Corp., 406 F.2d 291, 301 (2d Cir. 1968), cert. denied, 395 U.S. 977 (1969); Walco Investments, Inc. v. Thenen, 168 F.R.D. 315, 334 (S.D. Fla. 1996); Schneider v. Traweek, 1990 WL 132716 (C.D. Cal. July 31, 1990) (attached hereto as Exhibit E); In re United Energy Corp. Solar Power Modules Sec. Litig., 122 F.R.D. at 255; Helfand, 80 F.R.D. at 8-9; Seiden v. Nicholson, 69 F.R.D. 681, 686 (N.D. Ill. 1976); Feldman v. Lifton, 64 F.R.D. 539, 548 (S.D.N.Y. 1974).

With respect to the first factor – the interest of members of the Class in individually controlling the prosecution of separate actions – a class action is the only economically feasible method of adjudication where those who have been injured are in a poor position to seek legal redress, because of either a lack of sufficient information, or the disproportionate expense of pursuing individual claims.  The costs and expense of such individual actions, when weighed against the individual recoveries potentially available, would be prohibitive.  Few members of the proposed Class would, as a practical matter, be in a position to proceed individually against Defendants.  Moreover, "'[s]eparate actions by each of the class members would be repetitive, wasteful, and an extraordinary burden on the courts.'"  Kirkpatrick, 827 F.2d at 725 (citation omitted).

The second factor – the extent and nature of any litigation concerning this controversy already commenced by potential Class members – also militates in favor of certification here.  This Court appointed Plaintiffs as Lead Plaintiffs to run this litigation (over objection by Muzinich & Co., Inc., the plaintiff in Muzinich & Co. Inc. v. Winger et al., C.A. 3:00-1145-17, whose objection was later withdrawn).  To Lead Plaintiffs' best knowledge, no other litigation on behalf of the purchasers of the 2008 Bonds and/or the 2009 Bonds concerning the specific wrongs alleged in the Complaint on behalf of the Class is pending.

The third factor – the desirability of concentrating the litigation of the claims in this particular forum – has already been decided by the MultiDistrict Litigation Panel.  See Order dated December 1, 2000 (attached hereto as Exhibit F).  The MDL found that this action provides the optimal forum for resolution of the claims of the Class, based on the facts that Safety-Kleen's principal place of business is within this District, and the documents are witnesses are

22

concentrated in this District.  Id.  In addition, most of the Defendants reside herein, and the majority of Defendants' alleged wrongful acts occurred here.

Finally, no difficulties are likely to be encountered in the management of a class action.  Indeed, prosecution of this action on a class basis is much more efficient than individual adjudication of thousands of claims.  In addition, Lead Plaintiffs are endeavoring, where possible, to coordinate discovery in this action with discovery being taken in related matters pending in this Court.  Further, as noted above, because Class members may find individual litigation cost-prohibitive, the class mechanism provides a means of fair and efficient resolution of these claims.  Lead Plaintiffs' counsel, who have substantial experience in complex securities litigation and class actions, do not anticipate any significant or unusual difficulties in the management of this action as a class action.  Therefore, the class action device is the superior method for adjudicating the claims of the Class members.

## CONCLUSION

For all of the foregoing reasons, it is respectfully requested that the Court issue an Order certifying the action to proceed as a class action pursuant to Fed. R. Civ. P. 23(b)(3), certifying Lead Plaintiffs as Class representatives and certifying Lead Counsel as Class Counsel.

Dated: June 27, 2002

                                                                                               _____

GRANT & EISENHOFER, P.A.
Stuart M. Grant
Megan D. McIntyre
Diane Zilka
1220 Market Street, Suite 500
Wilmington, DE 19801
(302) 622-7000
Lead Counsel for the Plaintiff Class

and

_Pope Johnson, III, by permission_

MCCUTCHEN, BLANTON, RHODES &
JOHNSON, LLP
Pope D. Johnson, III
Federal I.D. No. 2206
P.O. Drawer 11209
Columbia, SC  29211-1209
(803) 799-9791
Local Counsel for the Plaintiff Class

24

ATTACHMENT

1994 WL 686624                                                                    Page 1
Fed. Sec. L. Rep. P 98,447
**(Cite as: 1994 WL 686624 (M.D.N.C.))**

United States District Court, M.D. North Carolina.

**LONGMAN, et al.,**
v.
**FOOD LION, INC., et al.**

Nos. 4:92CV00696, 4:92CV00705.

Oct. 17, 1994.

ERWIN, District Judge.

*Facts*

**\*1** On November 5, 1992, The American Broadcasting Company, in its "Prime Time Live" network television program, reported the findings of a six-month long investigation it had conducted into Food Lion's operation and practices. This investigation included research which utilized hidden cameras and involved interviews with numerous employees at several Food Lion stores.

The November 5, 1992 broadcast revealed for the first time that Food Lion had concealed from its customers the company's practice of:
(a) selling rotten meat and fish products by, among other things, bleaching them in Clorox covering them with barbecue sauce, grinding them with sausage mixture, and repackaging them with false expiration dates;
(b) altering expiration dates on products such as eggs, yogurt, cheese and meats, by using fingernail polish remover;
(c) trimming portions of cheese which had been eaten by rats and putting it out for sale; and
(d) removing spoiled food from dumpsters and putting it out for sale.
First Amended Complaint of David I. Longman at ¶¶ 26(a)-(d);  Complaint of Jeffrey Feinman, et al. at ¶¶ 28-36.

The Complaint sets forth numerous alleged misstatements by the Defendants contained in various Securities and Exchange Commission (SEC) filings. The Complaint alleges violations of Sections 10(b) and 20(a) of the Securities and Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a) (1934), as well as a violation of Rule 10(b)-5 of the SEC.   Additionally, there are alleged state law claims of fraud and deceit and negligent misrepresentation.

*Issues Presented*
I. Have Plaintiffs satisfied Local Rule 212?

II. Are the alleged violations of federal securities law proper for class certification?

III. Are Plaintiffs proper representatives of both Class A and Class B Stock?

IV. Is the proposed class period appropriate?

V. Should Plaintiffs' pendent claims be certified for class treatment?

*I. Local Rule 212*

Local Rule 212(d), M.D.N.C., provides that "[t]he burden shall be upon any party seeking to maintain a case as a class action to present an evidentiary basis to the court showing that the action is properly maintainable as such."

Class determination is made at the advent of an action; therefore, the allegations contained in the complaint, including the class action allegations, are accepted for the purposes of the class motion. *See Eisen v. Carliele & Jacquelin,* 417 U.S. 156, 177-78 (1974);  *Stastny v. Southern Bell Tel. & Tel. Co.,* 628 F.2d 267, 275 (4th Cir.1980);  *Doctor v. Seaboard C.L.R. Co.,* 540 F.2d 699, 708-09 (4th Cir.1976).

The Complaint makes factual allegations to substantiate the necessary elements for certification under Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure. Local Rule 202(d), M.D.N.C., provides that "[w]hen allegations of facts not appearing of record are relied upon to support a motion, affidavits, parts of depositions, and other pertinent documents *then available* shall accompany the motion." (Emphasis added.)

**\*2** The Court finds that the plaintiffs complied with Local Rule 212. Sufficient factual allegations have been made to establish the necessary elements for class certification.

*II. Class Certification*

When considering a motion for the certification of a class, the allegations of the complaint must be taken as true. *Simpson v. Specialty Retail Concepts, Inc.,* 149 F.R.D. 94, 97 (M.D.N.C.1993) (quoting *Blackie v. Barrack,* 524 F.2d 891, 901 n. 17 (9th Cir.1975), *cert. denied,* 429 U.S. 816 (1976)).  Taking the allegations in the Complaint as true, the Court finds that the alleged violations of federal securities laws are well suited for class action. Rule 23 is to be construed liberally to effectuate this end. *Simpson,* 149 F.R.D. at 98.  *See*

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

also *Kahan v. Rosenstiel,* 424 F.2d 161, 169 (3d Cir.1970), *cert. denied,* 398 U.S. 950 (1970).

To proceed with a class action, the Court must find the four prerequisites enumerated in Rule 23(a). Additionally, at least one of the requirements of Rule 23(b) must be satisfied. Rule 23(a) requires that at least one member of a class may sue or be sued as representative parties of all only if: (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interest of the class. Subsection 23(b) requires that common questions of fact or law predominate and that a class action be superior to other methods of adjudication.

### A. Numerosity

In securities fraud actions brought against publicly owned and nationally listed corporations, the numerosity requirement has been met by a showing that a large number of shares were outstanding and traded during the relevant period. *Simpson,* 149 F.R.D. at 99. *See also Garfinkel v. Memory Metals, Inc.,* 695 F.Supp. 1397, 1401 (D.Conn.1988). The numerous shareholders of Food Lion stock coupled with the substantial purchases during the class period are sufficient to establish the numerosity as required by Rule 23(a)(1).

### B. Commonality

The commonality requirement of Rule 23(a)(2) is often applied in the context of securities fraud litigation. *Moskowitz v. Lopp,* 128 F.R.D. 624, 628 (E.D.Pa.1989) . "In the 10b-5 context, misrepresentation in annual reports, interim reports, and press releases have been found to satisfy the common question requirement." *Simpson,* 149 F.R.D. at 98. *See Blackie,* 524 F.2d at 902. The federal claims alleged in the Complaint contain elements of fraud that would be common to the Class.

### C. Typicality

The typicality requirement is met if plaintiffs' claims arise from the same course of conduct that gives rise to the claims of other Class members and is based on the same legal theory. *Simpson,* 149 F.R.D. at 98. *See also In re Kirschner Medical Corp. Sec. Litig.,* 139 F.R.D. 74, 79 (D.Md.1991).

### D. Fair and Adequate Representation by Class Representatives

**\*3** The requirements for adequate representation under Rule 23(a)(4) are that the named plaintiffs have no conflict of interest with the class and that a qualified and experienced attorney is obtained for the purpose of litigation. *Id.* at 101. *See also South Carolina National Bank v. Stone,* 139 F.R.D. 325, 329-31 (D.S.C.1991) (holding a plaintiff's adequacy to represent class is determined by plaintiff's counsel's ability to vigorously prosecute the matter).

### 1. Mr. Longman

The Court finds that there is ample evidence in the record to conclude that Longman, in conjunction with his counsel, can fairly and adequately support the interest of the Class. There is nothing that requires a plaintiff to possess encyclopedic knowledge of the legal theories supporting a class' claims in order to be a class representative. Accordingly, Mr. Longman shall be a Class representative.

### 2. Mr. Gardner

The Court finds that there is substantial evidence in the record to conclude that Mr. Gardner will provide vigorous representation of the Class. The Defendants have offered no evidence of how Mr. Gardner's participation in other legal proceedings does anything but indicate that he is able to serve as a representative in this matter. It is incontrovertible that participation in prior securities litigation, without other significant disabling factors, is not relevant to a proposed class representative's adequacy. Accordingly, Mr. Gardner shall be a Class representative.

### 3. Mr. Hankin

The Defendants contend that since Mr. and Mrs. Hankin purchased 200 shares of Food Lion stock as tenants by the entireties, Mr. Hankin is not a typical and adequate class representative. Defendants contend that since Mrs. Hankin does not want to be a *named party* in the suit, Mr. Hankin lacks standing. To establish standing, the Hankins only need to establish that they are members of the Class. *Sosna v. Iowa,* 419 U.S. 393, 401 (1975), citing *Rosario v. Rockefeller,* 410 U.S. 752 (1973); *Hall v. Beals,* 396 U.S. 45 (1969). It is not contested that both Mr. and Mrs. Hankin will be members of the Class; therefore, the only question that remains with respect to class certification is whether Mr. Hankin will "fairly and adequately protect the interests of the class." *Sosna,* 419 U.S. at 403. The evidence in the record reveals that Mr. Hankin, with the assistance of his counsel, will fairly and adequately represent the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1994 WL 686624                                                         Page 3
(Cite as: 1994 WL 686624, *3 (M.D.N.C.))

interests of the Class; therefore, he shall be a Class representative.

### E. Common Issues of Fact and Law

Rule 23(b) requires that common questions of law and fact predominate over questions affecting individual members. Additionally, "the Court must determine whether the class action device is superior to other methods of adjudication." *Simpson,* 149 F.R.D. at 102.

With respect to the alleged federal securities violations, the individual issues will involve reliance and damages. Those issues become significant only if the Class can demonstrate the common elements of material misrepresentation and/or omissions and scienter. *Id.* The Court finds that the common issues predominate over the individual issues. Additionally, the Court finds that the class action device is superior to other methods of adjudication.

### III. Class A and Class B Stock

*4 The court, in *Sanders v. Robinson Humphrey/ American Express,* 634 F.Supp. 1048, 1057 (N.D.Ga.1986), *cert. denied,* 485 U.S. 959 (1988), stated that "[w]hen plaintiffs have alleged such a common course of conduct, courts consistently have found no bar to class certification even though members of a class may have purchased different types of securities or interests, or purchased similar securities at different times."

In *Endo v. Albertine,* 147 F.R.D. 164, 167-68 (N.D.Ill.1993), defendants argued that plaintiffs who had bought only Class A common stock could not also represent purchasers of debentures and notes. The court firmly rejected this contention, stating:
These claims are equally applicable to stock and debenture holders. The facts and legal theories asserted by the class to prove any violations will be identical regardless of the type of security at issue. *Blackie v. Barrack,* 524 F.2d 891, 911 n. 27 (9th Cir.1975). The only difference between the claims for the different types of securities is that any violation may have affected the value of each differently. (Citations omitted.) This difference does not make the claims of the purchasers of each type of security atypical of the others. The defendants point to no claim under which the positions of the holders of the different types of securities would be adverse. There is no question here that the claims of both the named plaintiffs and the debenture holders arose "from the same event or practice or course of conduct that [gave] rise to the claims of other class members and [their]

claims are based on the same legal theory". *See Rosario,* 963 F.2d at 1018. Therefore, we find that plaintiffs have shown that the class claims are typical under Rule 23(a)(3).
*Id.* at 167-68 (alterations in original). The Court finds that the Plaintiffs are the appropriate representatives for both Class A and Class B stock.

### IV. The Proposed Class Period

The plaintiffs propose a class period beginning March 31, 1990. This is the date on which the Defendants allegedly began withholding information. The Defendants contend that May 7, 1990 is the appropriate starting date since the first alleged misrepresentation was made on this date. The Court finds that May 7, 1990 is the proper starting date for the class period. The Food Lion Annual Report was filed with the Securities and Exchange Commission on May 7, 1990. This is the first alleged misrepresentation; therefore, it could not have been relied upon by investors prior to this date. Accordingly, the class period shall begin May 7, 1990 and extend through November 5, 1992.

### V. Pendent Common Law Claims

Courts have split on the issues presented by certification of pendent securities claims. *Priest v. Zayre Corp.,* 118 F.R.D. 552, 557 (D.Mass.1988). *See Gruber v. Price Waterhouse,* 117 F.R.D. 75, 81 (E.D.Pa.1987) (referencing the divergent judicial perspectives regarding the question of whether individual issues predominate as to common law claims).

*5 In *Kirkpatrick v. J.C. Bradford & Co.,* 827 F.2d 718, 725 (11th Cir.1987), the court found "that the differing standards of liability required by the laws of the various states would render class action treatment unmanageable," and determined that the state law claims failed to satisfy the requirements of Rule 23(b)(3).

Although there are undoubtedly differences among the various applicable state laws, it remains uncertain at this time whether there exists such a substantial variation among the states with regard to the common law claims as to outweigh the commonality of legal and factual issues otherwise present in this litigation. *Kirschner,* 139 F.R.D. at 84. *See In re Energy Systems Equipment Leasing Securities Litigation,* 642 F.Supp. 718, 753 (E.D.N.Y.1986). Accordingly, Plaintiffs' pendent claims will be provisionally certified as a Class along with the federal securities claims. Should problems relating to conflicting state laws or other issues of management arise as to the pendent claims, the Court will reconsider the certification of those claims at that time. *Simpson,*

1994 WL 686624
**(Cite as: 1994 WL 686624, \*5 (M.D.N.C.))**

149 F.R.D. at 103; *See Kirschner,* 139 F.R.D. at 85 n. 5.

*Conclusion*

The Court GRANTS the Plaintiffs' Motion to Certify Class.

The Class shall include all persons who purchased the common stock of Food Lion, Inc. from May 7, 1990 through November 5, 1992 and were damaged thereby. Excluded from the Class are Defendants herein, members of the immediate families of the individual Defendants, any entity in which any Defendant has a controlling interest, and Defendants' legal representatives, heirs, successors, predecessors-in-interest, or assigns of any Defendant.

Plaintiffs David I. Longman, Jeffrey Feinman, Paul N. Gardner Defined Plan Trust, and Edwin Hankin shall be representatives of said Class.

Pursuant to Rule 23, the Court retains the power to adjust or reconsider its decision. *Simpson,* 149 F.R.D. at 104.

ORDER

Consistent with the Memorandum Opinion filed contemporaneously herewith, the federal securities claims [FN1] along with the pendent state claims [FN2] shall proceed as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following class: all persons who purchased the common stock of Food Lion, Inc., from May 7, 1990 through November 5, 1992, and were damaged thereby. Excluded from the Class are defendants herein, members of the immediate families of the individual defendants, any entity in which any defendant has a controlling interest, and defendants' legal representatives, heirs, successors, predecessors-in-interest, or assigns of any defendant.

Plaintiffs David I. Longman, Jeffrey Feinman, Paul N. Gardner Defined Plan Trust, and Edwin Hankin shall be representatives of said Class.

Pursuant to Rule 23, the Court retains the power to adjust or reconsider its decision. *Simpson,* 149 F.R.D. at 104.

IT IS SO ORDERED.

FN1. 15 U.S.C. §§ 78(j) and 78t(a), and Rule 10(b)5 of the Securities and Exchange Act of 1934.

FN2. The pendent state law claims are for fraud and negligent misrepresentation.

1994 WL 686624, 1994 WL 686624 (M.D.N.C.), Fed. Sec. L. Rep. P 98,447

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

ATTACHMENT

B

Only the Westlaw citation is currently available.

CHECK OHIO SUPREME COURT RULES FOR REPORTING OF OPINIONS AND WEIGHT OF LEGAL AUTHORITY.

Court of Appeals of Ohio, Tenth District, Franklin County.

**James HANSEN et al., Plaintiffs-Appellees,**

v.

**James LANDAKER, Receiver for K.G. Marx, Inc. et al., and Mark L. Frendt et al., Defendants-Appellants.**

**Nos. 99AP-1117, 99AP-1118.**

Dec. 7, 2000.

Appeals from the Franklin County Court of Common Pleas.

Swedlow, Butler, Inman, Levine & Lewis, Jeffrey M. Lewis and Todd H. Neuman, for plaintiffs-appellees, James Hansen, Frank Duval, Jeannine Duval, Albert Glick and Carter Randolph.

Strip, Fargo, Hoppers & Leithart Co., A.C. Strip and Kenneth R. Goldberg, for defendants-appellants, Mark L. Frendt, Gail M. Frendt, Gary A. Riddle and Barbara A. Georges.

Rendigs, Fry, Keily & Dennis, LLP, and Thomas S. Shore, Jr., for defendants-appellants, Landaker, Kramer & Associates, James Landaker and Scott Harper.

Buckingham, Doolittle & Burroughs, Joel H. Mirman and Andrew W. Owen, for third-party defendant-appellant, Quantum Capital Corporation, dba Diversified Capital Markets, Thomas Daly, Thomas Dooley and Nancy Vargo.

Kemp, Schaeffer, Rowe & Lardiere Co., and Michael N. Schaeffer, for defendant-appellant Michael Patterson.

Carlile, Patchen & Murphy, LLP, and John Haller, for defendants-appellants, Dinsmore & Shohl, David G. LeGrand and Robert F. Gage.

Vorys, Sater, Seymour & Pease, and Gail C. Ford, for defendant-appellant, Belinda S. Barnes.

McCORMAC, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.

OPINION

McCORMAC.

**\*1** This matter involves ten consolidated appeals from a judgment of the Franklin County Court of Common Pleas certifying two consolidated cases brought by plaintiffs-appellees, James Hansen, Albert Glick, Frank Duval, Jeannine Duval, and Carter Randolph, as a class action pursuant to Civ.R. 23.

The genesis of this action is in a 1995 public offering of common stock and convertible promissory notes by K.G. Marx, Inc. ("Marx securities"). According to plaintiffs' complaints: K.G. Marx; its directors, Mark Frendt, Gail Frendt, Gary Riddle, and Barbara Georges (collectively "Directors"); its lawyers, Dinsmore & Shohl, L.L.P., David G. LeGrand, Robert F. Gage (collectively "Dinsmore"), and Belinda S. Barnes; and its accountants, Landaker, Kramer & Associates, Inc., James Landaker and Scott Harper (collectively "Landaker"), prepared an offering circular for distribution to potential purchasers of the Marx securities. The offering circular allegedly misrepresented or failed to disclose several material facts relating to the financial condition of K.G. Marx. In alleged reliance upon the offering circular, plaintiffs each purchased Marx securities during the latter half of 1995. As a result of the material facts which were misrepresented or not disclosed in the offering circular, K.G. Marx went bankrupt and the Marx securities purchased by plaintiffs have been rendered worthless.

On April 18, 1997, Quantum Capital Corp., James Hansen, Albert Glick, and Frank Duval commenced this matter with the filing of a complaint in the Franklin County Court of Common Pleas (hereinafter "case number one"). The complaint in case number one named Mark Frendt, Gail Frendt, Gary Riddle and Barbara Georges as defendants and asserted claims for violation of R.C. 1707.41, 1707.43, fraud and breach of fiduciary duty in the preparation and distribution of the offering circular. On June 23, 1997, plaintiffs filed their first amended complaint in case number one. The amended complaint added Jeannine Duval and Carter Randolph as plaintiffs, changed the first claim to allege violations of R.C. 1707.41, 1707.43 and 1707.44, and changed the second claim to allege a violation of R.C. 1707.59.

On June 24, 1997, Quantum Capital, James Hansen, Albert Glick, and Frank Duval filed a second action against K.G. Marx's receiver (hereinafter "case number two"). The original complaint in case number two asserted claims for violation of R.C. 1707.41, 1707.43

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

and 1707.44, breach of contract, estoppel and fraud.

On August 11, 1997, the trial court ordered plaintiffs' two cases consolidated.

On January 22, 1998, Quantum Capital voluntarily dismissed all of its claims against all defendants in both cases.

On January 23, 1998, plaintiffs filed a motion requesting leave to amend their complaints to include several shareholder derivative claims and to pursue the consolidated action as a class action pursuant to Civ.R. 23. On March 9, 1998, the trial court granted plaintiffs' motion to amend their complaints.

*2 On April 1, 1998, plaintiffs filed their second amended complaint in case number one and their first amended complaint in case number two. In case number one, the amendments sought to maintain the consolidated action as a class action, and added a shareholder derivative action and a claim for negligent misrepresentation/non-disclosure against the Directors. The amendments in case number two also sought to maintain the action as a class action; added Jeannine Duval and Carter Randolph as plaintiffs; added a shareholder derivative claim for malpractice/indemnity/ contribution against Dinsmore, and Barnes; added claims for estoppel, fraud and negligent misrepresentation/non-disclosure against K.G. Marx; and added claims for malpractice and estoppel against Landaker.

On March 16, 1998, the trial court granted defendants an extension of time to respond to plaintiffs' requests to maintain its shareholder derivative claims and to pursue its claims as a class action until defendants had completed the depositions of plaintiffs' proposed class representatives.

On May 4, 1998, the Directors and the receiver for K.G. Marx filed separate third-party complaints seeking contribution and indemnification from Quantum Capital and Quantum Capital principals, Thomas Dooley, Nancy Vargo, Thomas Daly and Michael Patterson.

By a decision and entry filed on September 3, 1999, the trial court granted plaintiffs' request to maintain their claims as a class action, but denied their request to pursue its shareholder derivative claims. Landaker appeals from the trial court's decision and entry of September 3, 1999, assigning the following errors:

*First Assignment of Error*
The Trial Court erred in holding that the "typicality" element of Ohio Civ. Rule 23(a)(3) was met. Alternatively, the Trial Court erred in holding that

common questions of law or fact predominated over individual questions in Plaintiffs-Appellees" claims under Ohio Civ. Rule 23(B)(3).
*Second Assignment of Error*
The Trial Court erred in deciding the issue of class certification without conducting an evidentiary hearing.

Landaker's first assignment of error asserts that the trial court erred in certifying plaintiffs' claims as a class action pursuant to Civ.R. 23. A trial court's decision to certify or not to certify an action as a class action may only be reversed on a showing that the trial court abused its discretion. *Baughman v. State Farm Mut. Auto. Ins. Co.* (2000), 88 Ohio St.3d 480, 483. However, a trial court does not have unlimited discretion in deciding whether or not to certify a class action, but must exercise its discretion within the boundaries established by Civ.R. 23. *Hamilton v. Ohio Sav. Bank* (1998), 82 Ohio St.3d 67, 70. A determination by a trial court regarding class certification that is clearly outside the boundaries established by Civ.R. 23, or that suggests that the trial court did not conduct a rigorous analysis into whether or not the prerequisites of Civ.R. 23 are satisfied, will constitute an abuse of discretion. *Id.*

*3 Under Civ.R. 23, seven requirements must be met before an action may be maintained as a class action: (1) an identifiable class must exist and the definition of the class must be unambiguous; (2) the named representatives must be members of the class; (3) the class must be so numerous that joinder of all members is impracticable; (4) there must be questions of law or fact common to the class; (5) the claims or defenses of the representative parties must be typical of the claims or defenses of the class; (6) the representative parties must fairly and adequately protect the interests of the class; and (7) one of the three Civ.R. 23(B) requirements must be satisfied. Civ.R. 23(A) and (B); *Warner v. Waste Management, Inc.* (1988), 36 Ohio St.3d 91, 94-98.

In determining whether the seven class certification requirements have been met, a trial court is not to consider the merits of the claims. *Ojalvo v. Bd. of Trustees of Ohio State Univ.* (1984), 12 Ohio St.3d 230, 233. However, a trial court may consider any evidence before it at that stage of the proceedings which bears on the issue of class certification. *Senter v. General Motors Corp.* (C.A.6, 1976), 532 F.2d 511, 523. Thus, the trial court could properly consider plaintiffs' depositions in making its certification determination under Civ.R. 23.

The first Civ.R. 23 requirement, that there be an identifiable and unambiguous class, will not be deemed satisfied unless the description of the class is sufficiently definite such that it is administratively feasible for the

court to determine whether or not a particular individual is a member of the class. *Hamilton,* at 71-72 (quoting 7A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure [2 Ed.1986] 120-121m, Section 1760). Stated another way, the class must be defined with enough precision to "permit identification within a reasonable effort." *Warner,* at 96.

In the instant case, it is clear from the record that the class certified by the trial court consists of approximately one hundred eighty-four investors who purchased securities in K.G. Marx through the 1995 public offering. Membership in this class is clearly limited and individual members are identifiable with very little effort. In order to determine whether an individual is a class member, the individual need be asked at most two questions: (1) Did you purchase K.G. Marx stock or promissory notes? (2) If so, did you purchase them through the 1995 public offering? The first requirement for class certification is met.

The second requirement for class certification is that the parties named to represent the class actually be members of the class. In order to satisfy this requirement, a plaintiff need only have proper standing to sue on behalf of the class. *Hamilton,* at 74. To have standing to sue on behalf of the class, a plaintiff must possess the same interests and have suffered the same injury as all members of the class. *Id.*

*4 Here, the only dispute regarding the requirement that the class representatives be members of the class centers on plaintiff, Carter Randolph. All other plaintiffs and class members are individual investors who purchased Marx securities for themselves through the 1995 public offering, and who suffered financial loss when the value of the Marx securities declined. In contrast, Randolph's deposition testimony reveals that Randolph is an investment advisor who only purchased Marx securities on behalf of his clients. Therefore, unlike the members of the class, Randolph did not suffer a financial loss as a direct result of the Marx securities' decline in value. Accordingly, Randolph is not a proper class representative. This error, however, is not fatal to plaintiffs' class certification, as it may be remedied by deleting Randolph as a class representative on remand. See *Warner,* at 97. (Remanding the case for determination of class membership.)

The third requirement for class certification is numerosity. Civ.R. 23(A)(1) states that a class action may only be maintained if "the class is so numerous that joinder of all members is impracticable." Here, the purported class has approximately one hundred eighty-five people, well beyond the number that can practicably

be joined in a single action. *Warner,* at 97. Thus, the numerosity requirement is satisfied.

We now turn to the fourth requirement for class certification, "commonality," which requires that "there are questions of law or fact common to the class." Civ.R. 23(A)(2). The Ohio Supreme Court has indicated that the commonality requirement is to be given a permissive application. *Warner,* at paragraph three of the syllabus. It is not necessary that all the questions of law or fact raised in the dispute be common to all the parties. *Marks v. C.P. Chemical Co.* (1987), 31 Ohio St.3d 200, 202. If there is a common nucleus of operative facts, or a common liability issue, the rule is satisfied. *Warner,* at paragraph three of the syllabus.

The trial court found the commonality requirement was satisfied, as all class members had similar legal claims stemming from the nucleus of operative facts surrounding the offering circular. The trial court did not abuse its discretion in so concluding.

The next requirement for class certification is typicality. Civ.R. 23(A)(3) mandates that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." "[T]he requirement of typicality serves the purpose of protecting absent class members and promoting the economy of class action by ensuring that the interests of the named plaintiffs are substantially aligned with those of the class." *Baughman,* at 484 (citing Moore's Federal Practice [3 Ed.1977] 23-92 to 23-93, Section 23.24 [1] ). Typicality is satisfied where there is no express conflict between the representatives and the class. *Warner,* at paragraph four of the syllabus.

*5 Landaker argues that the claims of the class representatives are not typical of the misrepresentation/ non-disclosure claims of class members. Plaintiffs' class claims generally allege that the class members relied upon the misleading or incomplete offering circular in deciding to purchase Marx securities. In contrast, plaintiffs' depositions reveal that plaintiffs did not rely upon the offering circular in deciding to purchase Marx securities. Essentially, Landaker argues that, because plaintiffs are subject to a defense which is not typical of the class, their claims are not typical of the class. In *Baughman,* the Ohio Supreme Court rejected this same argument, stating as follows:

" * * * [D]efenses asserted against a class representative should not make his or her claims atypical. Defenses may affect the individual's ultimate right to recover, but they do not affect the presentation of the case on the liability issues for the plaintiff class.

"This view is supported by the principle that the class representative need not show a probability of individual

success on the merits, and by the use of the disjunctive in Rule 23[A], which refers to 'claims or defenses.' " * * *

*Baughman,* at 486 (quoting 1 Newberg on Class Actions [3 Ed.1992], 3-90 to 3-93, Section 3.16).

Although plaintiffs' *claims* are typical of those of the class, Landaker would deny plaintiffs' class certification because plaintiffs may not be able to prove reliance. This argument goes to individual substantive disputes. If plaintiffs were required to prove reliance at this stage of the proceedings, it follows that no class action could stand until a plaintiff proved every material element of his individual claims. *Baughman,* at 486. Such a procedure was not envisioned by Civ.R. 23. *Id.*

Further, Landaker's position that plaintiffs did not rely upon the offering circular because they relied upon the advice of their brokers or investment advisers in deciding to purchase Marx securities is flawed. Although plaintiffs admit that they did not rely directly upon the offering circular, if the brokers or investment advisers upon whom plaintiffs relied obtained their information from the offering circular, plaintiffs can nonetheless prove "indirect reliance" upon the offering circular. *South Carolina Natl. Bank v. Stone* (D.S.C.1991), 139 F.R.D. 325, 331 (investor satisfies reliance element by proof that he relied on his broker who, in turn, relied upon the official statement); *Abrams v. Southeastern Municipal Bonds, Inc.* (D.Colo.1990), No. 89 N 150, unreported (investor indirectly relied on official statement through her broker). In fact, it is likely that most class members will have relied indirectly, rather than directly, upon the offering circular in this case, as it is unlikely that many people would have purchased Marx securities without a recommendation of some kind from a financial adviser or stock broker. Accordingly, indirect reliance upon the offering circular neither subjects plaintiffs to reliance defenses nor makes plaintiffs' claims atypical of those of the class. *Abelson v. Strong* (D.Mass.1987), No. 85-0592-S, unreported.

*6 Plaintiffs have satisfied the typicality requirement.

The sixth requirement for class certification is that the class representatives "fairly and adequately represent the class." Civ.R. 23(A)(4). This requirement is of crucial importance in terms of ensuring that members of the class who will not have their individual days in court are afforded due process of law. *Marks,* at 203.

The adequate representation requirement is generally divided into two parts: (1) the adequacy of the representative parties themselves; and (2) the adequacy of the representative parties' counsel. *Warner,* at 98. A

representative will be deemed adequate so long as his interests are not antagonistic to the interests of other class members. *Marks,* at 203. The representatives' counsel will be deemed adequate where the lawyers are "qualified, experienced and generally able to conduct the proposed litigation." Wright, Miller & Kane, at 375, Section 1769.1.

While it is true that plaintiffs' depositions reveal plaintiffs to be unfamiliar with both the underlying facts and the nature of the litigation they are pursuing, this shortcoming does not make them inadequate class representatives. It is well-established that it is not necessary that proposed class representatives be knowledgeable, intelligent or have a firm understanding of the legal or factual basis on which their case rests in order for them to be deemed adequate to represent the class. *Surowitz v. Hilton Hotels Corporation* (1966), 383 U.S. 363, 371, 86 S.Ct. 845, 850. This rule would appear to stem from the realization that class representatives who are laypersons inherently rely on their counsel to identify the relevant facts and understand and argue the salient law. This realization is all the more true where, as here, the case involves a complex area such as securities law.

Because plaintiffs' interests are not antagonistic to the interests of other class members, we cannot say that the trial court abused its discretion in concluding that plaintiffs are capable of fairly and adequately representing the class.

With respect to the adequacy of plaintiffs' counsel, we have found nothing in the record which would indicate that the trial court abused its discretion in concluding that plaintiffs' counsel could fairly and adequately represent the class.

Both plaintiffs and their counsel are equipped to fairly and adequately represent the interests of the class.

The seventh and final requirement for class certifications requires a finding that one of the three requirements of Civ.R. 23(B) is satisfied. In granting class certification, the trial court determined that plaintiffs had satisfied Civ.R. 23(B)(3), which provides:
An action may be maintained as a class action if the prerequisites of subdivision (A) are satisfied, and in addition:
* * *
(3) *the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the*

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d
(Cite as: 2000 WL 1803936, *6 (Ohio App. 10 Dist.))

Page 9

controversy. The matters pertinent to the findings include: (a) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (b) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (c) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (d) the difficulties likely to be encountered in the management of a class action. [Emphasis added.]

**\*7** It has already been determined that the claims of the class members share common questions of law and fact arising from the offering circular. However, for purposes of concluding that common questions of law or fact predominate over individual issues, it is not enough for such common questions to merely exist, rather the common questions must represent a significant aspect of the case and they must be capable of resolution for all class members in a single adjudication. *Schmidt v. Avco Corp.* (1984), 15 Ohio St.3d 310, 313. " '[A] claim will meet the predominance requirement when there exists generalized evidence which proves or disproves an element on a simultaneous, class-wide basis, since such proof obviates the need to examine each class member's individual position .' " *Cope v. Metropolitan Life Ins. Co.* (1998), 82 Ohio St.3d 426, 429-430 (quoting *Lockwood Motors, Inc. v. Gen. Motors Corp.* (D.Minn.1995), 162 F.R.D. 569, 580).

Landaker argues that the trial court abused its discretion in finding that common issues of law or fact predominate over individual issues because plaintiffs' claims will require each class member to individually prove that he or she actually relied upon the offering circular in making the decision to purchase Marx securities. Plaintiffs counter that the Ohio Supreme Court's decision in *Hamilton* and *Cope* support the trial court's finding that the class members' reliance on the offering circular can be inferred across the class and that common issues, therefore, predominate.

*Hamilton* involved an attempt to certify a class consisting of mortgagors on whose mortgages the defendant, Ohio Savings Bank, had calculated interest using a method which charged the mortgagors' interest at rates that were in excess of the rates set forth in the standard mortgage contracts entered into by the parties. *Hamilton,* at 68. The trial court denied class certification without opinion. *Id.* at 69. On appeal, the court of appeals determined that the trial court had properly denied certification to the class under Civ.R. 23(B)(3). *Id.*

In *Cope,* the plaintiffs sought certification of a class

consisting of holders of life insurance policies issued by defendant, MetLife, who were sold replacement insurance as new insurance and did not receive the statutorily mandated disclosure warnings. *Cope,* at 437. The crux of the plaintiffs' complaint was that MetLife "engaged in a scheme to collect larger commissions and front-end load charges by intentionally omitting the state-mandated written disclosure warnings when issuing replacement life insurance." *Id.* at 433. The trial court concluded that Civ.R. 23(B)(3)'s predominance requirement was not satisfied because " 'an individual determination as to what the plaintiffs were told by their respective agents will be crucial in determining liability.' " *Id.* at 428. The court of appeals agreed with the trial court, holding that individualized proof would be necessary to determine each claim. *Id.*

**\*8** In determining that the predominance requirement of Civ.R. 23(B)(3) was satisfied in *Hamilton* and *Cope,* the Ohio Supreme Court held that, because the misrepresentations at issue were contained in standard form documents, the misrepresentations were essentially identical with respect to each individual class member. *Cope,* at 437; *Hamilton,* at 84. In such cases, the court concluded it was unnecessary to require each individual class member to prove reliance on the standardized forms. *Cope,* at 435-437; *Hamilton,* at 83-84. Instead, reliance on the standardized forms could be inferred across the entire class. *Hamilton,* at 84; *Cope,* at 435-436.

Here, the offering circular, which contained the alleged misrepresentations and omissions, is a standard form document. To be sure, some individualized scrutiny will be required to ensure that the securities dealers or brokers who advised class members to purchase Marx securities actually received the offering circular. However, this is a relatively minor matter given that the balance of factual and legal issues raised by plaintiffs' complaints is common to all class members.

Landaker argues, however, that the inference of reliance deemed appropriate in *Hamilton* and *Cope* is inapplicable to the malpractice and estoppel claims which plaintiffs have brought against it. According to Landaker, plaintiffs' malpractice and estoppel claims, unlike the fraud and ordinary negligence claims at issue in *Hamilton* and *Cope,* require individualized showings that the class members' reliance on the offering circular was specifically foreseeable.

Accountants are not liable for professional malpractice to anyone in the public-at-large who happens to rely upon their work. *Haddon View Investment Co. v. Coopers & Lybrand* (1982), 70 Ohio St.2d 154, 156.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Not Reported in N.E.2d
(Cite as: 2000 WL 1803936, *8 (Ohio App. 10 Dist.))

Rather, accountants need only answer for professional negligence to their clients and to non- clients whom the accountants understood would rely upon their work. *Haddon View,* at 157.

Here, plaintiffs allege that Landaker prepared financial statements for K.G. Marx in preparation for the public offering, that the financial statements were distributed as part of the offering circular. In such circumstances, it could be specifically foreseen that the financial statements prepared by Landaker would be relied upon by persons interested in investing in K.G. Marx.

Landaker is correct that plaintiffs will have to establish specific foreseeability. However, establishing this element will not require individualized proof as to each class member. Given the well-defined and clearly limited class certified by the trial court, plaintiffs may establish specifically foreseeability as to the class as a whole.

The trial court could reasonably find that common issues predominated over individual ones.

Finally, given the size of the class and the predominance of common issues, class action treatment may well be the most efficient way to adjudicate the claims of the class members.

*9 In conclusion, we wish to emphasize that the question before us is whether the trial court abused its discretion in determining that the present matter should be certified as a class action, not whether we would have certified the action as a class action had we been the trial court. Reasonable jurists could reasonably find that the seven class action requirements were met.

Landaker's first assignment of error is overruled.

In its second assignment of error, Landaker argues that the trial court abused its discretion in certifying this matter as a class action without conducting an evidentiary hearing.

Civ.R. 23 does not require that a hearing be held on a motion to certify an action as a class action. Accordingly, in order to prevail on the argument that the trial court failed to hold an evidentiary hearing, an appellant must show that an evidentiary hearing would have substantially affected his rights. *Kalmbach Feeds, Inc. v. Lust* (1987), 36 Ohio App.3d 186, 188. As explained above, plaintiffs have presented ample evidence to show a basis for proceeding as a class action. Further, the trial court was fully appraised of Landaker's arguments against class certification when it made its decision. Accordingly, Landaker's rights were not substantially affected by the trial court's failure to hold an evidentiary hearing.

Landaker's second assignment of error is overruled.

Having overruled Landaker's first and second assignments of error, the judgment of the trial court is affirmed subject to Carter Randolph's removal as a class representative.

*Judgment affirmed.*

BRYANT and KENNEDY, JJ., concur.

2000 WL 1803936 (Ohio App. 10 Dist.)

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

ATTACHMENT
C

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA 3 PM 3: 55
SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| STATE OF WISCONSIN INVESTMENT BOARD, KENNETH D. BUSH, EDWARD E. EUBANK, and JOHN MICHAEL, suing on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) ) |  |
|  | ) | CIVIL ACTION NOS. |
| Plaintiffs, | ) ) | CV-99-BU-3097-S and |
| vs. | ) ) | CV-99-BU-3129-S |
| HAROLD RUTTENBERG, et al., | ) ) ) | **ENTERED** |
| Defendants. | ) | JUL 0 3 2001 |

## MEMORANDUM OF OPINION

This cause comes to be heard on a motion for class certification filed by the Lead Plaintiff Committee ("Committee") on February 1, 2001. This Committee, consisting of the State of Wisconsin Investment Board, Kenneth D. Bush, Edward E. Eubank, Jr., and John Michael, contends that class treatment under Federal Rule of Civil Procedure 23(b)(3) is appropriate for the putative class members' claims for various violations

Page 1 of 20

365

of securities laws by Harold Ruttenberg, Eric L. Tyra, Peter Berman, Cooper Evans, Patrick Lloyd, Don-Allen Ruttenberg, Michael P. Lazarus, Helen Rockey, Scott C. Wynne, Randall Haines, and Adam Gilburne, as high-level officers and insiders of Just for Feet, Inc. ("Feet Defendants"); and by Deloitte & Touche LLP, Steven H. Barry, and Karen Baker, as independent auditors and audit managers ("audit Defendants"). Only one argument against certification of the class as a whole has been presented to the Court by any of the Defendants. This argument is that internal conflicts among the claims of the putative class members make a class action an inadequate means of resolving the claims of the putative class members. The Defendants concentrate instead on issues of class definition, disputing which claims would come within the compass of the class action; what the appropriate class period is; and whether a single class or multiple subclasses should be certified against the Defendants.

Class certification is appropriate if and only if *all* of the requirements of Federal Rule of Civil Procedure 23(a) are satisfied and "at least one of the alternative requirements of Rule 23(b) are satisfied. . . ," so long as that alternative requirement is appropriate to the relief sought in the action. *Turner v. Beneficial Corp.*, 242 F.3d 1023, 1025 (11th Cir. 2001).

Page 2 of 20

To begin with, plaintiffs desiring class certification "must satisfy the prerequisites of numerosity, commonality, typicality, and adequacy of representation specified in Rule 23(a)." *Murray v. Auslander*, 244 F.3d 807, 810 (11th Cir. 2001). The class must be so numerous that any attempt to bring such claims of its members in a single action pursuant to standard joinder rules would be impracticable. *See Kilgo v. Bowman Transport, Inc.*, 789 F.2d 859, 878 (11th Cir. 1986); *Pederson v. Louisiana State University*, 213 F.3d 858, 868 (5th Cir. 2000); and *Andrews v. Bechtel Power Corp.*, 780 F.2d 124, 132 (1st Cir. 1985). Next, issues of law or fact common to all members of the putative class must exist. This requirement is a minimal one, requiring a mere identity of some factual or legal matter among members of the putative class. *See Hudson v. Delta Air Lines, Inc.*, 90 F.3d 451, 456 (11th Cir. 1996); *James v. City of Dallas, Texas*, — F.3d —, 2001 WL 682089 at *12 (5th Cir. June 18, 2001); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1019-20 (9th Cir. 1998); and *Baby Neal for and by Kanter v. Casey*, 43 F.3d 48, 56 (3d Cir. 1994). Third, the claims and defenses of the class representatives must be typical of those of the class members. This requrement tends to merge with those of commonality and adequacy: both representative plaintiffs

Page 3 of 20

and putative class members must be able to bring their claims to court on board the same truck. *See Hudson*, 90 F.3d at 456; *In re Milk Products Antitrust Litigation*, 195 F.3d 430, 436-37 (8th Cir. 1999); *Marisol A. v. Giuliani*, 126 F.3d 372, 376 (2d Cir. 1997) ("Typicality Search Term End . . . requires that the claims of the class representatives be typical of those of the class, and 'is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability.'"); and *Georgine v. Amchem Products, Inc.*, 83 F.3d 610, 631 (3d Cir. 1996) ("The typicality requirement is intended to preclude certification of those cases where the legal theories of the named plaintiffs potentially conflict with those of the absentees.").

Fourth, it must be the case that the class representatives will fairly and adequately protect the interests of the class. "Resolution of two questions determines legal adequacy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon v. Chrysler Corp.*, 150 F.3d at 1020. *See also Baffa v. Donaldson, Lufkin & Jenrette Securities Corp.*,

222 F.3d 52, 60 (2ᵈ Cir. 2000). First, there can exist no conflicts between the class representatives and the putative class members that would impair those representatives' ability to effectively litigate their class claims. *See Andrews v. American Telephone and Telegraph Co.*, 95 F.3d 1014, 1022-23 (11th Cir, 1996); and *Georgine v. Amchem Products, Inc.*, 83 F.3d at 630-31. Second, representative plaintiffs and their counsel must be of sufficient quality, determination, and demeanor that they can celerously and skillfully litigate all relevant matters. *See Local Joint Executive Board of Culinary/Bartender Trust Fund v. Las Vegas Sands, Inc.*, 244 F.3d 1152, 1162 (9th Cir. 2001); *Rand v. Monsanto Corp.*, 926 F.2d 596, 599 (7th Cir. 1991) ("Rule 23 contemplates, and the district court should insist on, a conscientious representative plaintiff. . . ," as "[a]ll class suits create some conflict between the representative and the class; the representative and counsel may be tempted to sell out the class for benefits to themselves."); and *Dujanovic v. MortgageAmerica, Inc.*, 185 F.R.D. 660, 667-68 (N.D. Ala. 1999).[1]

---

[1] At points in this litigation, this Court has been given reason to doubt that lead counsel for the Committee has the appropriate demeanor with which to litigate this action on behalf of the class as opposed to themselves or their principal clients. These concerns need not prevent certification, however, as this Court has authority under the Private Securities Litigation Reform Act to remedy the inadequacies of counsel by substitution of lead counsel that the Court deems to be adequate for the remainder of the prosecution of this case.

Beyond showing that all requisites of Rule 23(a) are satisfied, representative plaintiffs must show that an appropriate requisite condition of Rule 23(b) is met.   In the instant action, the Committee, seeking damages relief on their putative class-wide securities claims, contends that the putative class satisfies not only the requirements of Rule 23(a), but those of Rule 23(b)(3), which requires that individual issues or the claims of the individual class members not predominate over those of the class as a whole.  *See Culpepper v. Irwin Mortgage Corp.*, — F.3d —, 2001 WL 672825 at * 3 (11th Cir. June 15, 2001).  Rule 23(b)(3) requires "a *functional* similarity amongst the class members, that is, while each individual class member may have some different particulars to his or her claim, for purposes of resolving the core matters of the suit, any class member [is] functionally as good as another."   *Culpepper v. Inland Mortgage Co.*, 189 F.R.D. 668, 672 n.1 (N.D. Ala. 1999), *aff'd sub. nom.*, *Culpepper v. Irwin Mortgage Corp.*, — F.3d —, 2001 WL 672825 at * 3 (11th Cir. June 15, 2001).  As this Court stated in *Culpepper v. Inland Mortgage Co.,*

> "[t]he Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem Products, Inc. v.*

*Windsor,* 521 U.S. at 594, 117 S.Ct. at 2249. Therefore, the examination of predominance "focuses on 'the legal or factual questions that qualify each class member's case as a genuine controversy,' and is 'far more demanding' than Rule 23(a)'s commonality requirement." *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999 (11th Cir.1997) (citing *Amchem Products, Inc. v. Windsor,* 521 U.S. at 594, 117 S.Ct. at 2249-50). The locus of the predominance inquiry is whether those common issues of law and fact presented by the case are overwhelmed by the particular factual and legal inquires that the case might present. *See Andrews v. American Telephone & Telegraph Company,* 95 F.3d 1014 (11th Cir.1996). If resolution of the central inquiry of the class claim "breaks down into an unmanageable variety of individual legal and factual issues," class certification is inappropriate. *Id.*

*Id.* at 673 n.3.   "The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. Pro. 23(b)(3).

## BACKGROUND

Many of the facts related to this motion are stated in this Courts opinion of April 7, 2000. *Burke v. Ruttenberg*, 102 F. Supp. 2d 1280, 1286-89 (N.D. Ala. 2000). The Court only states the most pertinent facts here. The claims of the putative class members in this case stem from alleged attempts by the various Feet Defendants to manipulate the price of Just for Feet common stock for personal or corporate gain.[2] In May of 1997, at the opening of the proposed class period, Feet ran thirty company-owned and forty-eight franchised specialty stores in eighteen states and Puerto Rico. These stores, in contrast to others owned by different companies in the market, had been unaffected by recent flagging sales of athletic footwear, and had, in fact, shown growth during the period of lackluster sales, at least on paper. This stellar performance, as reported by Feet, allegedly persuaded numerous individuals and entities, including the members of the Committee and putative class members, to invest in Feet common stock. However, the Committee alleges, the

---

[2] Throughout the alleged class period, Just for Feet, although incorporated in Delaware, was principally an Alabama corporation, headquartered in Pelham, Alabama, and running its operations from there. Until trading was halted on November 2, 1999, shares of Feet common stock were publicly traded on the NASDAQ National Market System.

stellar performance of Feet was an illusion, maintained through the deliberate efforts of the company's officers and directors. This illusion was first maintained by inadvisable efforts to expand Feet's share of the athletic shoe market at a period when sales were low. These expansion efforts tended to require the masking of losses through the alleged use of fraudulent accounting practices, in order that expansion occur with a minimum of dissent from shareholders.

Also, the Feet Defendants, the Committee alleges, attempted to directly mislead investors in the market by filing fraudulent documents with the Securities and Exchange Commission supported by less-than-austere accounting methods. Averedly, in each Form 10-Q or 10-K filed with the SEC and in each public release touting Feet's performance contemporaneously issued, the Defendants made or participated in the making of several fraudulent misrepresentations by overstating the total sales of Feet, its gross and net income, and income per share. This continued without abatement from May of 1997, until January 21, 1999, when Feet slowly began to disseminate statements indicating the financial weakness of the company and presaging later, stronger disclosures of

financial instability in September, October, and November of 1999.[3] According to the complaints, to keep up the illusion of profitability and continued cash flow into and through 1999, the directors and officers of Feet engaged in a number of improper accounting practices.

Feet's third alleged fraudulent act was an attempt to maintain the appearance that the company would remain intact, even after buffeted by harsh financial winds in 1999 and even though up to six weeks prior to the announcement by Just for Feet that it would file a petition of bankruptcy under Chapter 11, the officers and directors of Feet knew of such an intention. According to the Committee, Feet did not disclose this intention to the public, for the purpose of arranging a secret repayment plan with certain of Feet's creditors that would be unfavorable to its shareholders. The Committee attributes this wrongdoing to a host of officers and directors of Just for Feet, averring that each either participated in the wrongdoing or permitted it to happen, with his or her knowledge and blessing, despite the presence of duty to intervene in and correct the wrongdoing.

With regard to Deloitte & Touche ("Deloitte"), the Committee avers

---

[3] According to the Committee, these later disclosures were not entirely forthcoming, either.

that it was derelict in its duty to expose the improper accounting practices of Just for Feet. In particular, it asserts that Deloitte, while issuing audit reports on the company's financial statements for the fiscal year ending January 1998 through the end of the class period, failed to insure that the underlying audit tests conformed to generally accepted auditing standards ("GAAS"). Among other things, the complaint alleges that Deloitte violated GAAS in that its senior personnel did not adequately supervise junior personnel; that it did not develop an audit plan that would screen for management irregularities; that Deloitte's auditors had an inadequate understanding of Feet's operations; that the auditors insufficiently examined collected evidence to make informed opinions about the financial statements audited by it; and that it failed to report problems to the audit committee of Feet's board of directors. Claims based on the same facts are also aimed against Steven H. Barry ("Barry"), who was, during the class period, the Birmingham office managing partner of Deloitte and the audit partner on Deloitte's audit of Just for Feet, and against Karen Baker ("Baker"), who was, during the class period, the senior manager in the audit of Just for Feet.

## CONTENTIONS & ANALYSIS

The Committee, in its motion, seeks to have certified the following defined class:

> A class of all persons and entities who purchased common stock of Just for Feet, Inc., between May 5, 1997, and November 1, 1999, excluding (1) the Defendants in this action; (2) members of the families of the Defendants in this action; (3) the subsidiaries or affiliates of any Defendants; (4) any person or entity who is a shareholder, partner, officer, director, employee, or controlling person of any Defendant; (5) any entity in which any Defendant has a controlling interest; (6) sitting magistrates, judges, justices, and their representative spouses and children; (7) counsel for Plaintiffs and their respective spouses and children; and (8) the legal representatives, heirs, successors or assigns of any such excluded person.

The Defendants have made only one challenge to certification of a class, focusing their efforts on narrowing the class definition. In arguing against class certification, the Defendants claim that the Committee is unable to satisfy the adequacy requirement of Rule 23(a) because conflicts within the class structure prevent the representative Committee from serving the interests of all class members. The Defendants next assert that if, however, class certification is appropriate, the class definition should be narrowed by the exclusion of certain claims from its

Page 12 of 20

compass; by the shrinking of the class period; and by the certification of multiple subclasses against the different Defendants.

## A.    ADEQUACY CHALLENGE TO CLASS CERTIFICATION.

Various defendants have presented a challenge to class certification on the grounds that the class representatives are incapable of fairly and adequately representing the interests of the class due to intra-class conflicts.  This conflict, the Defendants aver, are over the nature of the securities claims between those individuals who purchased Just for Feet, Inc., securities before any disclosure of alleged misrepresentations — principally on May 21, 1999 — and those individuals who purchased those securities after the disclosure.  The Defendants spell out the conflict as follows: Individuals who sold after disclosure of alleged misrepresentations will have an incentive to maximize the amount to which that disclosure corrected the price of Feet securities from their prior inflated values.  This is so because their recovery for purchasing at an inflated price will be offset by the amount in excess of the "true" market value at which they sold their shares. By contrast argue the Defendants, post-disclosure purchasers will argue that the value of their shares

remained inflated even after the disclosure because it was only a partial confession of Feet's mismanagement.  These post-disclosure purchasers have an interest in arguing such because if the purchase price was not inflated after disclosure, post-disclosure purchasers are entitled to no remedy.

The Defendants thus portend to raise an allocation dilemma, as discussed in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997). Although involving a settlement class, the proposed class in *Windsor* contained an irreconcilable conflict of interests among its members, who were suing asbestos manufacturers for present and future compensation: the interests of one group of claimants for immediate disbursement of medical benefits would conflict with the interests of another group in the establishment of a long-term fund for care.  *Id.* at 625-26.  As has been described by the Third Circuit Court of Appeals, in *Hanlon v. Chrysler Corp.*, "the clashing interests of present and future claimants presented insurmountable conflicts for class counsel who could not possibly provide adequate representation to both groups as required by Rule 23(a)(4)." *Hanlon*, 150 F.3d at 1020.

Page 14 of 20

Here, however, the Defendant's allocation dilemma argument fails, for three reasons. First, the argument presented by the Defendants is, in fact, a red herring. No conflict between various pre- and post-disclosure purchasers exists, as the pre-disclosure purchasers are economically neutral on whether the disclosure deflated the price to market levels. As an example, assume that the stock was inflated by $10 per share prior to disclosure and that disclosure fully deflated the price to market levels. The pre-disclosure purchaser would then be entitled to the entire amount of the over-valuing: $10 per share. By contrast, assume that the stock price is inflated $20 per share, but the disclosure is only partial, deflating the stock value $10 per share. The purchaser then sells. He still has the benefit of $10 inflation when he sells, and thus, that $10 per share being offset from the inflation value, he is only entitled to a $10 per share recovery. Thus, it does not matter how much the deflation of the stock price at the time of sale: the recovery to the post-disclosure purchaser will be the same with or without offset.

Second, even were the Defendants correct in their argument, it still would not imply an irreconcilable conflict between pre-disclosure purchasers and post-disclosure purchasers sufficient to merit denial of

Page 15 of 20

certification.  This is so, because the conflicts argued by the Defendants between groups of pre-disclosure and post-disclosure purchasers would also apply to the common series of pre-disclosure purchasers, each of whom sells his or her stock at a different price after disclosure.  Each of these pre-disclosure purchasers, on the Defendants' argument will have an interest in arguing that on the day of his or her sale, the stock price had declined to market values, precluding any sellers who received a greater loss after that date from claiming more damages.  This Court has not found a case in which such a difficulty defeated the prospect of class certification.  Finally, the Committee contains members that represent the whole range of interests capable of maximizing recovery for the class in a manner not possible were the class divided.   The challenge to the adequacy of representation in the class therefore fails.

## B.  CHALLENGES TO CLASS DEFINITION.

The remaining challenges of the Defendants relate to the appropriate definition of the class.  First, the Defendants argue that the representative Plaintiffs' claims pursuant to section 18 of the Securities Act should not be made class-wide, as a demonstration of liability on

those claims would require individualized proof of reliance by each

Plaintiff on the misrepresentations of Feet.    This would violate the

predominance requirement of Rule 23(b)(3), the Defendants argue, by

making individual issues of reliance the overwhelming issue of the various

claims.  This Court will follow *Simpson v. Specialty Retail Concepts*, 149

F.R.D. 94, 102 (M.D.N.C. 1993) and *In re MDC Holdings Securities*

*Litigation*, 754 F.Supp. 785, 792 (S.D. Cal. 1990).  Because the *Simpson*

court's argument is persuasive, the Court quotes it in full:

> In the remaining federal and state law claims, Simpson
> must prove individual reliance on behalf of himself and the
> class. DH & S argues that class certification should be denied
> as to these claims because such proof would be unwieldy and
> unnecessary. While individualized reliance will have to be
> proven, this Court agrees with those courts which have found
> that the common issues predominate and that considerations
> of judicial efficiency and economy will be furthered by
> permitting certification of the pendent state law claims. *See*
> *e.g. Kirschner*, 139 F.R.D. at 83 (and cases cited therein);
> *Keyser v. Commonwealth Nat. Fin. Corp.*, 121 F.R.D. 642
> (M.D.Pa. 1988). As noted in *Kirschner*, "[i]n the event that
> individual issues of reliance pose difficulties as to case
> management at a later stage, there are mechanisms available
> to effectively litigate the reliance questions, without destroying
> the efficiency of class proceedings on other issues." 139
> F.R.D. at 83 (citing *In re ORFA Sec. Litig.*, 654 F.Supp. 1449,
> 1462 (D.N.J. 1987) (citing cases that approve of the use of
> hearings, questionnaires, or other procedures to manage the
> reliance element)). As a result, the Court finds individual

Page 17 of 20

> questions of reliance do not predominate over issues common
> to the claims.

*Simpson*, 149 F.R.D. at 102. This Court, after the principal common practice issues are resolved, can hold mini-trials on the issue of individual reliance with respect to each shareholder. *In re MDC Holdings Securities Litigation*, 754 F.Supp. at 792. As such, this Court will not cleave this claim from the class definition on grounds that individual issues will therefore preponderate.

The Defendants next argue for the Court to shrink the class period for the same reasons it requests the Court to deny class certification. This Court is of the opinion that the periods for which liability can be ascribed to the various Defendants is one best left to the jury at trial and not made by the Court on a motion for class certification.

Finally, the Defendants argue that multiple subclasses must be certified to deal with each of the Defendants in this action and the various limited periods of their liability. For the most part, this argument lacks merit. The Feet Defendants were allegedly engaged in a common scheme and it would be redundant to have to retry much of those issues with regard to separate classes. At the same time, the putative class

members' bases for liability against the Feet Defendants and the audit Defendants are substantially varied.  Combining trials against these two sets of defendants would be potentially confusing for a jury.  However, the certification of two subclasses is not likely to remedy the issue; the two subclasses would be identical and could still try the issue in a common (and still more confusing) proceeding.

The appropriate course, rather, is to sever the action by the class against the Feet Defendants from their action against the audit Defendants pursuant to Federal Rule of Civil Procedure 21.  The severance of issues for subsequent proceedings and trial is committed to the district court's broad discretion. *See Brunet v. United Gas Pipeline Co.*, 15 F.3d 500, 505 (5th Cir. 1994).  Several factors are to be considered in determining the appropriateness of severance:  the convenience of the parties, the risk of prejudice to any party, and the promotion of judicial expedience and economy. *See Rojas v. National Accident Insurance Underwroters*, 2001 WL 682231 (W.D. Tex. 2001), and *Old Colony Ventures I v. SMWNPF Holdings, Inc.*, 918 F.Supp. 343, 350 (D.Kan. 1996).  All of these factors militate in favor of severing the

action against the Feet Defendants from that against the audit Defendants.

## CONCLUSION

For the foregoing reasons, the motion for class certification will be GRANTED. Further, the case will heretofore be SEVERED into one action against Harold Ruttenberg, Eric L. Tyra, Peter Berman, Cooper Evans, Patrick Lloyd, Don-Allen Ruttenberg, Michael P. Lazarus, Helen Rockey, Scott C. Wynne, Randall Haines, and Adam Gilburne and a second action against Deloitte & Touche LLP, Steven H. Barry, and Karen Baker.

IT IS SO ORDERED this 3rd day of July, 2001.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE

Page 20 of 20

ATTACHMENT
D

1991 WL 13076
Fed. Sec. L. Rep. P 96,021
**(Cite as: 1991 WL 13076 (D.Kan.))**

**Page 11**

United States District Court, D. Kansas.

**James H. CONNETT, Plaintiff,**
v.
**JUSTUS ENTERPRISES OF KANSAS, INC., a/k/a
Justus Cylinder-Technology, Inc., et
al., Defendants.**

Civ. A. No. 87-1739-T.

Jan. 24, 1991.

*MEMORANDUM AND ORDER*

THEIS, District Judge.

*1 Presently before the court are the following motions: (1) plaintiff's motion for class action determination (Doc. 75); (2) the motion of defendants Ranson & Co., Inc. ("Ranson"), J. O. Davidson & Associates, Inc. ("Davidson"), and Mid-Continent Municipal Investments, Inc. ("Mid-Continent") to review the Magistrate's order (Doc. 147); (3) Ranson, Davidson, and Mid-Continent's motion to reconsider (Doc. 155); (4) the joint motion to dismiss the third amended complaint, filed by defendants Ranson, Carlos D. Taylor (who has since been dismissed from this action, *see* Doc. 197; the motion is therefore moot as it relates to him), Davidson, Mid-Continent, B.C. Christopher securities Co. ("Christopher"), and R.G. Dickinson & Co. ("Dickinson") (Doc. 187); (5) the motion for partial summary judgment filed by defendants Ranson, Davidson, and Mid-Continent (Doc. 228); and (6) the motion for partial summary judgment filed by defendant Michael G. Shotts (Doc. 230). The court held a hearing on December 10, 1990 and is prepared to rule.

This securities fraud action arises out of the issuance and sale of certain City of Chanute, Kansas, Industrial Revenue Bonds in the amount of $6,000,000. The bonds were issued at the request of and for the benefit of Justus Enterprises of Kansas, Inc. The payment of the principal and interest on the bonds was guaranteed by Justus Enterprises of Kansas, Inc. and Walter G. Justus. Plaintiff alleges that he purchased $10,000 worth of the bonds and that the defendants defrauded plaintiff and all other bond purchasers by making certain misrepresentations and omissions in connection with their issuance and sale. The third amended complaint contains two claims: Count I alleges violation of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.,* and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5. Count II alleges common law fraud.

I. Motion to Review Magistrate's Order

Defendants Ranson, Davidson, and Mid-Continent move the court to review an order issued by Magistrate Wooley. In that order, the Magistrate stayed discovery in this action except as to class certification issues until the court ruled on plaintiff's motion for class certification. Doc. 146. The Magistrate's scheduling order, Doc. 177, has mooted this motion.

II. Motion to Reconsider

Defendants Ranson, Davidson, and Mid-Continent move the court to reconsider the court's opinion and order which denied these defendants' motion to dismiss the second amended complaint. Since the filing of this motion, plaintiff has filed his third amended complaint. These defendants have raised the same arguments in their motion to dismiss the third amended complaint. This motion is also moot.

III. Motion to Dismiss Third Amended Complaint

Defendants Ranson, Davidson, Mid-Continent, Christopher, and Dickinson move to dismiss plaintiff's third amended complaint, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, on the following grounds: (1) that plaintiff failed to state a claim for relief under the fraud on the market theory; (2) that plaintiff failed to adequately plead "scienter"; and (3) plaintiff failed to state a claim insofar as it bases liability on defendants' alleged misrepresentations that the assets of Walter G. Justus included the Walter Justus Trust, or the alleged failure to disclose that the Walter Justus Trust was a spendthrift trust.

*2 The standards governing consideration of a motion to dismiss for failure to state a claim upon which relief can be granted are clearly established. Motions to dismiss are disfavored: a complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957). In considering a motion to dismiss, the factual allegations of a complaint must be taken as true and all reasonable inferences must be indulged in favor of the plaintiff. *Mitchell v. King,* 537 F.2d 385, 386 (10th Cir.1976). Pleadings are to be liberally construed. *Gas-a-Car, Inc. v. American Petrofina, Inc.,* 484 F.2d 1102, 1107 (1973). The question is not whether a plaintiff will ultimately prevail, but whether he is entitled to offer evidence in support of his claims. *Scheuer v. Rhodes,* 416 U.S. 232, 236

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

(1974).

A. Fraud on the Market

Defendants argue that to justify the application of the fraud on the market theory to newly issued securities sold on an undeveloped market, plaintiff must establish that the enterprise for which the bonds were issued was patently worthless and that defendants' alleged fraud was so pervasive that, but for the alleged fraud, the bonds would not and could not have been issued or marketed. Defendants argue that plaintiff has failed to allege that the bonds were illegally issued, that the bonds were not entitled to be marketed, or the existence of a fraudulent scheme so pervasive that, but for the fraud, the bonds could not have been sold at any price.

As defendants correctly note in their brief, a Rule 10b-5 plaintiff must plead and prove actual reliance to state a claim for relief. However, if the fraud on the market theory properly applies to a case, a rebuttable presumption of reliance arises in favor of the plaintiff. *See Basic, Inc. v. Levinson,* 485 U.S. 224, ----, 108 S.Ct. 978, 993 (1988). Two distinct fraud on the market theories have been recognized. *See Ross v. Bank South, N.A.,* 837 F.2d 980 (11th Cir.1988), *rev'd in part on rehearing,* 885 F.2d 723 (11th Cir.1989) (en banc), *cert. denied,* 110 S.Ct. 1924 (1990). The first theory involves a plaintiff who purchased securities traded on an open and developed market, but who has not read or otherwise relied on the prospectus or other relevant document. The plaintiff in this type of case may be entitled to relief because he relied "generally on the supposition that the market price is validly set and that no unsuspected manipulation has artificially inflated the price ..." *Id.* at 992 (quoting *Blackie v. Barrack,* 524 F.2d 891, 907 (9th Cir.1975), *cert. denied,* 429 U.S. 816 (1976)).

The second type of fraud on the market case involves fraud in the issuance of securities traded on an undeveloped or primary market. The plaintiff in this type of case may recover if he can show that but for the defendants' fraud the security would not have been marketed and that he relied on the integrity of the market to produce marketable securities. *Id.* at 993. The defendants correctly note that the present case involves the second theory, known as "fraud in the issuance" or "fraud created the market." In this type of case, the plaintiff's burden of proof is to show that:

**\*3** (1) the defendants knowingly conspired to bring securities onto the market which were not entitled to be marketed, intending to defraud purchasers, (2) [the plaintiff] reasonably relied on the Bonds' availability on

the market as an indication of their apparent genuineness, and (3) as a result of the scheme to defraud, he suffered a loss.

*Shores v. Sklar,* 647 F.2d 462, 469-70 (5th Cir.1981) (en banc) (footnote omitted), *cert. denied,* 455 U.S. 1102 (1983).

A prima facie showing of reliance is established in a fraud in the issuance case upon proof of a scheme to bring securities onto the market which were not entitled to be marketed. "But for the fraud in such a case, plaintiff *could not* have purchased the bond because the bonds would not have been offered for sale." *Ross,* 837 F.2d at 994 (emphasis in original). The fraud must be "so pervasive that without it, the issuer would not have issued, the dealer could not have dealt in, and the buyer could not have bought these bonds, because they would not have been offered on the market at any price." *Shores,* 647 F.2d at 464 n. 2. If the plaintiff proves only that "the bonds would have been offered at a lower price or a higher rate, rather than that they would never have been issued or marketed, he cannot recover." *Id.* at 470.

The causal connection between the defendants' fraud and the plaintiff's injury is established by proving that the securities could not have been marketed at any price absent fraud. *Freeman v. Laventhol & Horwath,* 915 F.2d 193, 200 (6th Cir.1990). This can be shown either by proof that the promoters knew the enterprise itself was patently worthless, *see Abell v. Potomac Insurance Co.,* 858 F.2d 1104, 1122 (5th Cir.1988), or that the bonds were not validly issued under state law. *See T.J. Raney & Sons, Inc. v. Fort Cobb, Oklahoma Irrigation Fuel Authority,* 717 F.2d 1330, 1333 (10th Cir.1983), *cert. denied,* 465 U.S. 1026 (1984). Whether the bonds would have been marketable absent the fraud presents a complex factual inquiry. *Ross,* 837 F.2d at 1001-02.

After carefully examining plaintiff's complaint and the applicable case law, the court cannot conclude that plaintiff can prove no set of facts entitling him to relief. Plaintiff's third amended complaint tracks the language of Rule 10b-5 and contains sufficient additional detail of the alleged fraud. Defendants have notice of plaintiff's cause of action sufficient to answer and mount a defense. The matters raised by defendants deal with the burden of proof plaintiff will face at trial. In the present case, plaintiff may be able to prove that the enterprise for which the bonds were issued, Justus Enterprises of Kansas, Inc., was patently worthless. Plaintiff additionally alleges that the personal guarantor of the bonds was insolvent. The court believes this is an additional factor in the worthlessness of the enterprise.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

It is becoming apparent to the court that these defendants shall never be satisfied with the pleadings filed by plaintiff's counsel. The court could order plaintiff to amend his complaint to add the additional allegations defendants desire. However, the court is firmly convinced that such a course of action would merely trigger the filing of yet another round of motions to dismiss, further delaying this litigation. Defendants are on adequate notice of the plaintiff's theory of the case and are well aware of the proof plaintiff must produce to prevail. Whether plaintiff can survive a properly supported motion for summary judgment and prevail at trial remains to be seen. Pursuant to Fed.R.Civ.P. 12(a), defendants shall file their answers within 10 days from the date of this order.

B. Pleading Scienter

**\*4** Defendants argue that plaintiff has not pleaded any basis for defendants' alleged scienter, i.e., an intent to defraud and actual knowledge of the falsity or reckless disregard for the truth. The allegations of knowledge are contained in ¶ 12D of plaintiff's third amended complaint. Plaintiff alleges that these defendants had actual knowledge that the Justus Trust was a spendthrift trust (¶ 12D(3)) and that the property to be acquired with the proceeds of the bond issue did not have a fair market value of $11,000,000 or more (¶ 12D(5)). Plaintiff also alleges that these defendants either knew or would have discovered had they not been grossly negligent in their investigation of Walter G. Justus that: (1) Walter G. Justus did not have a net worth of $25,000,000 (¶ 12D(1)); (2) Walter G. Justus did not have an annual income of $5,000,000 (¶ 12D(2)); and (3) Walter G. Justus did not receive an annual income of $900,000 from the Justus Trust (¶ 12D(4)). Defendants argue that plaintiff has pleaded no basis for their alleged knowledge of the truth, that an allegation of gross negligence is insufficient, and that plaintiff has failed to plead the factual circumstances concerning defendants' investigation of Walter G. Justus.

Rule 9(b) of the Federal Rules of Civil Procedure provides in pertinent part, "malice, intent, knowledge, and other condition of mind of a person may be averred generally." The Tenth Circuit has held in the securities fraud context that Rule 9(b) requires neither the pleading of detailed evidentiary matter nor any particularity in connection with an averment of intent or knowledge. *Seattle-First National Bank v. Carlstedt,* 800 F.2d 1008, 1010 (10th Cir.1986). Plaintiff need not plead a factual basis for defendants' knowledge. This court held, in denying defendants' motion to dismiss the second amended complaint, that plaintiff had properly pleaded a basis for the defendants' knowledge. *See* Doc. 153.

Plaintiff has adequately pleaded defendants' intent and knowledge in ¶¶ 12D(3) and (5).

Defendants also argue that plaintiff must plead that the alleged misrepresentations were made knowingly, willfully, or recklessly. Paragraphs 12D(1), (2), and (4) of plaintiff's third amended complaint allege that defendants either had knowledge or were grossly negligent. Since plaintiff has pleaded actual knowledge in the alternative, the allegations contained in those paragraphs are sufficient. Further, plaintiff's proposed fourth amended complaint would add allegations of recklessness to ¶¶ 12D(1), (2) and (4). Plaintiff's motion to amend is currently being briefed and will be decided by the Magistrate.

C. Trust Allegations

Defendants argue that the documents cited by plaintiff neither state nor imply that the Walter Justus Trust was a personal asset of Walter Justus or that the trust guaranteed the bonds. Defendants focus on two documents, the Official Statement and the new issue announcement. Defendants argue that neither the Official Statement nor the new issue announcement represented that the trust was an asset of Walter G. Justus. Defendants further argue that their alleged failure to reveal the spendthrift nature of the trust is immaterial, since the trust was not represented as being part of the guarantee of the bonds.

**\*5** It is important to note what defendants do not raise in their motion to dismiss. Defendants do not address the following allegations made in Count I of plaintiff's third amended complaint: (1) that misrepresentations regarding Walter G. Justus' net worth, his annual income from the trust, and the value of the property to be acquired were made in a written application for a letter of intent; (2) that Walter G. Justus told the City Council of the City of Chanute at a public hearing that the trust from which he received income was not a spendthrift trust; (3) that misrepresentations regarding Justus' net worth were made in a compilation financial statement; (4) that misrepresentations regarding Justus' net worth, his annual cash income, and the value of the property to be acquired were made in the preliminary offering circular (or new issue announcement); (5) that misrepresentations regarding Justus' annual cash income and the fair market value of the acquired assets were made in the Official Statement; (6) that the Official Statement represented that the underwriters of the bond issue were Ranson, Dickinson, Christopher, Davidson, and Mid-Continent; and (7) that in all documents, the defendants omitted that the trust was a spendthrift trust, that a due diligence investigation of the bond issue had

not been made, and that the independent appraisal contained certain precautionary statements.

As Professors Wright and Miller have stated, a motion under Rule 12(b)(6) tests the sufficiency of the statement of the claim for relief; it is not a procedure for resolving a contest about the facts or the merits of the case. 5A C. Wright & A. Miller, Federal Practice and Procedure § 1356 (2d ed. 1990). The court must determine whether the allegations in the complaint constitute a statement of a claim under Rule 8(a) of the Federal Rules of Civil Procedure. *Id.* § 1357. Under Rule 8(a), a pleading which sets forth a claim for relief must contain: (1) a statement of the court's jurisdiction; (2) "a short and plain statement of the claim showing that the pleader is entitled to relief," and (3) a demand for judgment. Fed.R.Civ.P. 8(a). An examination of plaintiff's third amended complaint indicates that plaintiff has made two claims for relief: a claim for violation of section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 (Count I) and a claim for fraud (Count II).

A motion to dismiss for failure to state a claim must make a defense to a claim for relief in the pleading. Defendants' motion does not make a defense to plaintiff's claim for relief. Defendants are attempting to isolate portions of one claim for relief (securities fraud) and determine the truth or falsity of the allegations contained therein. Defendants are not arguing that plaintiff's allegations, if true, fail to state a claim for securities fraud upon which relief may be granted. Rather, defendants argue that certain of the allegations of plaintiff's complaint are not true. Even were the court to address defendants' contentions and conclude that defendants were correct, the court could not dismiss the complaint for failure to state a claim. The court must assume that all the remaining allegations of the complaint are true. Given that assumption, the court cannot conclude that plaintiff can prove no set of facts which would entitle him to relief. The court shall deny the motion to dismiss.

IV. Motions for Partial Summary Judgment

*6 Defendants Ranson, Davidson, and Mid-Continent have filed a motion for partial summary judgment, alleging that they are entitled to judgment as a matter of law on the following claims: (1) that defendants misrepresented to the City Council of the City of Chanute in the Application for Letter of Intent and to the plaintiff that Walter G. Justus had a net worth of approximately $25,000,000; (2) that defendants misrepresented to the City Council of the City of Chanute in the Application for Letter of Intent and to the plaintiff that Walter G. Justus had an annual income of $900,000 from a trust; (3) that defendants misrepresented to the plaintiff that Walter G. Justus had an annual income of $5,000,000; and (4) that the bonds were issued and sold with the intent to defraud the plaintiff. Defendants argue that the financial representations regarding Walter G. Justus were true and that no intent to defraud can be shown because Justus personally invested $7,700,000 in Justus Enterprises of Kansas. Defendant Michael G. Shotts has also moved for summary judgment, merely incorporating the other defendants' arguments.

The court is familiar with the standards governing the consideration of a motion for summary judgment. The Federal Rules of Civil Procedure provide that summary judgment is appropriate when the documentary evidence filed with the motion "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323-24 (1986). The court's inquiry is to determine "whether there is the need for a trial-- whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986).

The burden at the summary judgment stage is similar to the burden of proof at trial. The court must enter summary judgment, "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322. The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact on its claim. Rule 56, however, imposes no requirement on the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* at 323 (emphasis in original). Once the moving party has properly supported its motion for summary judgment, the nonmoving party may not rest upon mere allegations or denials, but must set forth specific facts showing a genuine issue for trial, relying upon the types of evidentiary materials contemplated by Rule 56. Fed.R.Civ.P. 56(e). Each party must demonstrate to the court the existence of contested facts on each claim it will have to prove at trial. *Celotex,* 477 U.S. at 324. The court reviews the evidence on summary judgment under the substantive law and based on the evidentiary burden the party will face at trial on

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

the particular claim. *Anderson,* 477 U.S. at 254.

*7 The court will not summarize the uncontroverted facts as set forth by the defendants. Suffice it to say that defendants have set forth 55 paragraphs, with references to the deposition of Walter G. Justus, outlining Justus' personal investment in Justus Enterprises of Kansas, trust income, annual income, net worth, and qualifications to value his own assets.

A. Financial Status of Walter G. Justus

The court will deny the motion for partial summary judgment as it pertains to the allegations of Justus' financial status. The court does not believe that the Federal Rules of Civil Procedure authorize the type of partial summary judgment sought by the defendants. Rule 56(b) does allow a defendant to bring a motion for partial summary judgment. Rule 56(c) contemplates a partial summary judgment on the issue of liability, even though the amount of damages remains controverted. It is also well established that a defendant may obtain summary judgment on one claim while other claims may remain for trial. Plaintiff's third amended complaint contains two claims--one for securities fraud and one for common law fraud. The securities fraud claim is pleaded as a plan, conspiracy, and scheme involving multiple misrepresentations and omissions. Defendants' motion does not seek judgment on either of the two claims in their entirety. Defendants instead seek summary judgment on specific factual issues concerning the financial status of Walter G. Justus.

A party is not entitled to partial summary judgment if the judgment would not be dispositive of the claim. Partial summary judgment may not be invoked to dispose of only part of a claim. *See Westinghouse Electric Corp. v. Fidelity and Deposit Co.,* 63 Bankr. 18, 22 (E.D.Pa.1986). Summary judgment may be had as to one claim among many, but Rule 56 does not allow a judgment as to one portion of a claim. *Kendall McGaw Laboratories, Inc. v. Community Memorial Hospital,* 125 F.R.D. 420, 421 (D.N.J.1989); *Strandell v. Jackson County, Illinois,* 648 F.Supp. 126, 136 (S.D.Ill.1986); *see* 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure § 2737, at p. 457 (2d ed. 1983). The summary judgment rule does not permit the piecemealing of a single claim. *Arado v. General Fire Extinguisher Corp.,* 626 F.Supp. 506, 509 (N.D.Ill.1985); *Newman-Green, Inc. v. Alfonzo-Larrain,* 612 F.Supp. 1434, 1439 (N.D.Ill.1985). Framing a motion as one for partial summary judgment does not cure the defect of moving for judgment on a portion of a claim. *Capitol Records, Inc. v. Progress Record Distributing, Inc.,* 106 F.R.D. 25, 28

(N.D.Ill.1985). Summary judgment is inappropriate.

B. Intent to Defraud

Defendants argue that merely because Justus Enterprises of Kansas failed does not allow an inference that a fraudulent conspiracy was played out against the investors. Defendants argue that Justus' personal investment of money in the business clearly establishes that Justus possessed no fraudulent intent. Defendants have failed to address the state of mind of any of the other players. That Justus may have personally invested a large sum of money in Justus Enterprises of Kansas does not answer whether the other defendants had the intent to defraud. The court shall deny the motion for summary judgment as it pertains to the intent to defraud issue.

V. Motion for Class Action Determination

*8 Plaintiff seeks to have a class certified under Rule 23(b)(3) of the Federal Rules of Civil Procedure. That rule provides:

An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

* * *

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3). The prerequisites for all class actions are contained in Rule 23(a):

One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties

1991 WL 13076
(Cite as: 1991 WL 13076, *8 (D.Kan.))

will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

The district court has a wide amount of discretion when determining whether a suit should be maintained as a class action. *Sollenbarger v. Mountain States Telephone & Telegraph Co.,* 121 F.R.D. 417, 422 (D.N.M.1988). The court must examine the factual and legal issues and scrutinize plaintiff's claims to determine if they are amenable to adjudication on a class-wide basis. The court does not, however, examine the merits of the controversy. *Id.*

A. Securities Law Claim

Plaintiff's claim as contained in Count I of the third amended complaint is based on section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder. In his motion for class action determination, plaintiff requests that the court: (1) certify this action as a class action under Rule 23(b)(3) and define the class to consist of all persons who purchased City of Chanute, Kansas, Industrial Revenue Bonds (Justus Enterprises of Kansas, Inc.-- Tenant), excluding the defendants; (2) certify plaintiff as class representative; (3) order plaintiff to bear the burden, including the cost, of notifying members of the class; and (4) direct plaintiff to submit a proposal outlining the procedure for determining the identity and address of each member of the class and the procedure for providing notice, together with the contents of that notice, pursuant to Rule 23(c)(2).

Defendants Ranson, Carlos Taylor (who has since been dismissed), Davidson, Mid-Continent, Christopher, and Dickinson (hereinafter also referred to as the "underwriter defendants") note that plaintiff's motion is untimely under Local Rule 209, which requires a motion for class action determination to be filed within 90 days of filing the complaint. The plaintiff's motion was not filed until some seven months after the initial complaint was filed. These defendants argue that this is a sufficient reason to deny the motion. The delay in filing the class action motion was not prejudicial. A delay of some four months is an insufficient reason to deny class certification.

1. Rule 23(a) Requirements

*9 a. Numerosity

The number of members in the putative class must be so large as to make joinder of all impracticable.

Fed.R.Civ.P. 23(a)(1). In the third amended complaint, plaintiff alleges that the class consists of approximately 450 persons and consists of all persons who purchased the bonds at issue here. Numerosity has not been seriously contested. The court finds that plaintiff has met the numerosity requirement.

b. Commonality

The putative class must share common questions of law or fact. Fed.R.Civ.P. 23(a)(2). In the complaint, plaintiff alleges that all questions of law or fact raised by the complaint are common to the members of the class with the exception of the amount of monetary loss sustained by each individual class member.

Plaintiff has identified some eleven common issues of fact or law: whether there was a conspiracy resulting in misrepresentations; whether representations were made to the City of Chanute; whether they were false; whether they were material; whether the City relied; whether the other representations referred to in the complaint were made; whether they were false; whether they were material; whether the omissions referred to in the complaint occurred; whether the misrepresentations and omissions caused the underwriting and issuance of the bonds; and whether the defendants had the requisite scienter. The court finds that common questions of law and fact do exist in this case.

c. Typicality

The claims of the representative party must be typical of the claims of the putative class. Fed.R.Civ.P. 23(a)(3). The class representative must possess the same interest and suffer the same injury as the class members. *Sollenbarger v. Mountain States Telephone & Telegraph Co.,* 121 F.R.D. 417, 424 (D.N.M.1988). The claims of the representative need not be identical, however. *Id.* The court looks to see if there are significant antagonistic interests between the representative and the class. *Id.* The court is unaware of any such antagonistic interests in the present case.

The underwriter defendants argue that plaintiff's claims are not typical of the claims of the putative class. In his deposition, Connett was unable to state whether his claims were typical, since he was unaware of the facts under which the individual class members purchased their bonds. The court believes that it is unreasonable to expect the named plaintiff to have personal knowledge of the facts underlying the claims of the approximately 450 potential class members.

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Plaintiff argues that misrepresentations are alleged at two stages: first, to the City of Chanute causing the issuance of the bonds; and second, to the investors at the time of the original issue for the purpose of creating an artificial demand and artificial price. Plaintiff disavows any reliance on oral representations to the investors, arguing that the claims are based on written documents. The class claims are based on alleged misrepresentations and omissions contained in a finite (and small) number of documents. Plaintiff possesses the same interest (as a bondholder) and has suffered the same injury (the loss of his investment) as the class members. Plaintiff's claims appear typical.

*10 d. Adequacy of Representation

The class representative must fairly and adequately represent the interests of the class. Fed.R.Civ.P. 23(a)(4). This requires both that the attorney for the named plaintiff is qualified and capable of conducting the litigation and that the named plaintiff's interests are not antagonistic to the interests of the putative class. *Aguinaga v. John Morrell & Co.,* 602 F.Supp. 1270, 1278 (D.Kan.1985).

Defendants argue that Connett lacks the necessary independent judgment and personal factual information to prosecute this case. Defendants state that Connett relied on counsel in responding to questions at his deposition. As noted above, it is unreasonable to expect the plaintiff to know more than the facts as they pertain to him. The court does not expect the plaintiff to have personal knowledge of the claims of other bondholders or of the legal requirements for a securities fraud claim. Connett's interests do not appear to be antagonistic to the interests of the class. The court finds that Connett is an adequate class representative.

The court finds that plaintiff's attorneys are adequate to prosecute this action. Both are experienced lawyers of the bar of this court and are qualified and capable of prosecuting this action. The court has noted the delays referenced by defendants in their responses. Such matters will be taken into consideration by the court or the Magistrate in the future scheduling and management of this case. However, the court does not view these matters as affecting the competency of counsel.

2. Rule 23(b)(3) Requirements

a. Predominance

The predominance question under Rule 23(b)(3) focuses on the existence of a common nucleus of operative facts. *Sollenbarger v. Mountain States Telephone & Telegraph*

*Co.,* 121 F.R.D. 417, 433 (D.N.M.1988) (quoting *Esplin v. Hirschi,* 402 F.2d 94, 99 (10th Cir.1968)). If error is to be made, it should be in favor of the maintenance of the class action. *Id.* at 435.

The underwriter defendants argue that plaintiff has not shown that the questions of law or fact common to the class predominate over the questions affecting only individual members. Defendants also argue that common questions do not predominate because plaintiff must prove individual reliance on the alleged misrepresentations. Defendants seek to address the merits of plaintiff's complaint and argue that the court must first conclude that plaintiff has properly alleged a cause of action for fraud on the market before certifying a class.

The defendants fail to note that the district court cannot rule on the merits of the controversy when ruling on a motion for class certification. The court must scrutinize the facts at the core of the dispute and determine the common legal and factual basis of the controversy without addressing the merits. *Id.* at 422.

Plaintiff's complaint alleges a course of conduct by defendants to misrepresent or omit material information in the relevant documents relating to the bond issue. With the exception of the amount of loss suffered by each individual investor, all questions of law and fact appear to be identical on a class-wide basis. The court finds that the common questions of law and fact predominate over any individual questions.

*11 b. Superiority

The parties do not address the size of the individual class members' claims and whether the class members could effectively litigate on an individual basis. *See Sollenbarger,* 121 F.R.D. at 436.

The specific elements contained in Rule 23(b)(3) are: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the difficulties likely to be encountered in the management of a class action.

Plaintiff's complaint alleges that no other litigation has been commenced by members of the class and that no members have evidenced interest in individually prosecuting separate actions. To the court's knowledge, no other bondholders have brought suit. Plaintiff's

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

complaint alleges that the members of the class are predominantly citizens and residents of the State of Kansas, that the events relating to the promotion and sale of the bonds occurred primarily in the State of Kansas, and it is therefore desirable to concentrate the litigation of the claims in this forum.   Management of this class action should be no more difficult than the management of any other class action. From the matters presently before the court, it appears that a class action would be superior to other available methods for the adjudication of this controversy.

B. Common Law Claim

Defendant Coopers & Lybrand argues that plaintiff's common law fraud claim is not proper for class action treatment, since common law fraud focuses on individual issues.  Further, not all the class members are citizens or residents of Kansas, complicating the case with different state law versions of common law fraud. Coopers & Lybrand concludes that even if the federal securities claim is certified as a class action, the common law claim should not be certified.    The underwriter defendants claim that common questions do not predominate in the common law fraud claim because plaintiff must prove individual reliance.    Further, an unknown number of class members reside in other states.

The parties have not addressed what other state's laws may be involved in this suit and whether those laws conflict with Kansas law.   If there is a conflict, the court would then have to consider whether the exercise of personal jurisdiction over the foreign parties is appropriate. *Sollenbarger,* 121 F.R.D. at 427.   At this point in time, the court believes certification of a plaintiff class on the common law fraud claim is appropriate.   This determination is subject to revision at a later time if necessary.

Accordingly, the court shall certify a class consisting of all persons who purchased City of Chanute, Kansas, Industrial Revenue bonds (Justus Enterprises of Kansas, Inc.--Tenant), excluding the defendants.   Plaintiff James H. Connett is designated the class representative. Plaintiff shall prepare the notice to the class required by Rule 23(c)(2) and bear the costs of same. Plaintiff shall, within thirty (30) days from the date of this order, submit to the court a proposal for determining the

identity of each class member, the procedure for providing notice, and a proposed notice to the class.

*12 IT IS BY THE COURT THEREFORE ORDERED that defendants Ranson, Davidson, and Mid-Continent's motion to review the Magistrate's order (Doc. 147) is moot.

IT IS FURTHER ORDERED that defendants Ranson, Davidson, and Mid-Continent's motion to reconsider (Doc. 155) is moot.

IT IS FURTHER ORDERED that defendants Ranson, Davidson, Mid-Continent, Christopher, and Dickinson's joint motion to dismiss the third amended complaint (Doc. 187) is hereby denied.   These defendants shall file their answers to plaintiff's third amended complaint within ten (10) days of the date of this opinion and order.

IT IS FURTHER ORDERED that defendant Ranson, Davidson, and Mid-Continent's motion for partial summary judgment (Doc. 228) is hereby denied.

IT IS FURTHER ORDERED that defendant Michael G. Shotts' motion for partial summary judgment (Doc. 230) is hereby denied.

IT IS FURTHER ORDERED that plaintiff's motion for class action determination (Doc. 75) is hereby granted and this case is hereby certified as a class action with plaintiff Connett and his present counsel of record to represent the class of all persons who purchased City of Chanute, Kansas, Industrial Revenue Bonds (Justus Enterprises of Kansas, Inc.--Tenant), excluding the defendants.

IT IS FURTHER ORDERED that plaintiff, within thirty (30) days from the date of this order, submit to the court a proposal for determining the identity of each class member, the procedure for providing notice, and a proposed notice to the class.

1991 WL 13076, 1991 WL 13076 (D.Kan.), Fed. Sec. L. Rep. P 96,021

END OF DOCUMENT



ATTACHMENT
E

1990 WL 132716                                                                                **Page 19**
Fed. Sec. L. Rep. P 95,419
**(Cite as: 1990 WL 132716 (C.D.Cal.))**

United States District Court, C.D. California.

**SCHNEIDER, et al.**
v.
**TRAWEEK, et al.**

**No. CV 88-0905 RG (KX).**

July 31, 1990.

Opinion

GADBOIS, District Judge.

**\*1** The Plaintiffs' Motion for Class Certification came on regularly for hearing before this Court on June 25, 1990. Marc M. Seltzer and Gretchen M. Nelson represented the proposed Plaintiff class. Seven Defendants separately opposed the Motion for Class Certification.

Alan J. Weil and Corey E. Klein appeared on behalf of Defendant Manatt, Phelps, Rothenberg, & Phillips. Meryl L. Young represented Defendant Kenneth Leventhal & Company. Kenneth S. Meyers appeared on behalf of Defendants Stephen B. Fainsbert and Bell, Fainsbert & Finer. Defendants C. Michael Maher, MPG Investment Fund No. 1, Ltd. and Traweek 85-25, Ltd. were all represented by Russ M. Fukano. Sean E. Judge appeared on behalf of Defendant Pass & Fainsbert.

This is a putative class action brought by seven named Plaintiffs alleging violations of the federal securities laws and civil RICO on behalf of approximately 5,300 investors who collectively lost over $45 million in eight limited partnerships organized and headed by Defendant Richard W. Traweek ("Richard Traweek").

The limited partnerships were formed for the purpose of acquiring, operating and holding for investment income-producing residential, commercial or industrial real property. The names of the eight limited real estate partnerships ("Traweek Limited Partnerships") were as follows:

1) Traweek Investment Fund No. 18, Ltd. ("TIF No. 18");

2) Traweek Investment Fund No. 19, Ltd. ("TIF No. 19");

3) Traweek Investment Fund No. 20, Ltd. ("TIF No. 20");

4) Traweek Investment Fund No. 21, Ltd. ("TIF No. 21");

5) Traweek Investment Fund No. 22, Ltd. ("TIF No. 22");

6) MPG Investment Fund No. 1, Ltd. ("MPG No. 1") [FN1];

7) Traweek Private Placement No. 1, Ltd. ("TPP-1");

8) Traweek 85-25, Ltd. ("TK 85-25").

Six of the Traweek Limited Partnerships were already in bankruptcy by the time this lawsuit was brought. The only two that were solvent when the action was filed were named as Defendants: Defendant MPG No. 1 and Defendant TK 85-25. On March 23, 1990, Defendant TK 85-25 filed for Chapter 11 bankruptcy and the automatic stay was imposed. Defendant MPG No. 1 is the only Traweek Limited Partnership that is currently solvent.

THE PARTIES RELEVANT TO THIS MOTION
A. *The Proposed Plaintiff Class*

The seven named Plaintiffs seek to certify one "global" class of approximately 5,300 investors, as well as eight subclasses representing the specific investors in each of the eight Traweek Limited Partnerships. The chart below matches each named Plaintiff with the specific Traweek Limited Partnership he/she invested in, along with the number of potential plaintiffs in each proposed subclass:

PROPOSED SUBCLASSES

|    | Named Plaintiff   | Limited Partnership | No. in Subclass |
|----|-------------------|---------------------|-----------------|
| 1) | Edward Schneider  | TIF No. 18          | 1,400           |
| 2) | Dirk In't Hout    | TIF No. 19          | 500             |
| 3) | Thomas Hazen      | TIF No. 20          | 350             |
| 4) | Brendan Mulhall   | TIF No. 21          | 2,400           |
| 5) | Clarine Clampitt  | TIF No. 22          | 150             |

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

1990 WL 132716                                                                    Page 20
**(Cite as: 1990 WL 132716, \*1 (C.D.Cal.))**

| 6) | Jerry Sutton | MPG No. 1 | 500 |
|----|--------------|-----------|-----|
| 7) | Howard Klein | TPP-1 | 25 |
| 8) | -NONE- [FN2] | TK 85-25 | 45 |

**\*2** In addition to lead Defendant Richard Traweek, the proposed Plaintiff class seeks relief under the federal securities laws and civil RICO against the following individuals and entities relevant to this motion:

**B.** *The Defendants*

(a) *The Traweek Corporate Defendants*

Defendant Richard Traweek was one of the original general partners for each of the eight Traweek Limited Partnerships. In addition, Richard Traweek was either the CEO and/or the principal/sole shareholder of six corporations that are all named as Defendants. The following corporations will be collectively referred to as the "Traweek Corporate Defendants":

1) Traweek Real Estate Corp., Inc.;

2) Traweek Securities, Inc.;

3) Traweek Western Property Management Co.;

4) Traweek Commercial Insurance Co.;

5) Starlite Systems, Inc.,

6) Wilshire Securities, Inc.

Defendant Traweek Real Estate was also an original general partner in each of the eight Traweek Limited Partnerships. The remainder of the Traweek Corporate Defendants ostensibly provided various services (i.e., insurance coverage, management of the properties, brokering securities, etc.) to the Traweek Limited Partnerships.

The Traweek Corporate Defendants are alleged to be "dummy" corporations or alter egos of Defendant Richard Traweek. The Plaintiffs further allege that most of these corporations had no net assets and any earnings would be funneled directly to Defendant Richard Traweek.

(b) *Defendant C. Michael Maher*

Defendant C. Michael Maher ("Maher") is an individual who is alleged to have held several executive positions in three of the Traweek Corporate Defendants. Maher was also an executive in an entity called Traweek Investment

Co., Inc., that was a co-defendant along with Defendant Richard Traweek in the two state court securities fraud actions which eventually led to Traweek's financial demise.

Defendant Richard Traweek and Traweek Real Estate resigned as the general partners of TIF No. 23 on April 10, 1987 due to Traweek's impending bankruptcy. The TIF No. 23 limited partnership +wWas then reorganized and renamed MPG Investment Fund No. 1. Defendant Maher took over as the sole general partner of Defendant MPG No. 1 limited partnership.

(c) *Defendant Manatt, Phelps, Rothenberg & Phillips*

Defendant Manett, Phelps, Rothenberg & Phillips ("Manatt Phelps") is a law firm that is alleged to have been the principal author of the offering materials for TIF Nos. 18, 19, 20 and 22. Plaintiffs further allege that Defendant Manatt Phelps provided expert tax opinions which were quoted in these prospectuses.

(d) *Defendant Pass & Fainsbert*

Defendant Pass & Fainsbert is a law corporation that through its principal, Defendant Stephen B. Fainsbert, defended Richard Traweek in the *Morrow* action in state court. Defendant Pass & Fainsbert was allegedly responsible for the litigation disclosure statements included in the prospectuses for TIF Nos. 18 and 19 regarding the status and probable outcome of the *Morrow* action.

(e) *Defendant Bell, Fainsbert & Finer*

**\*3** Defendant Bell, Fainsbert & Finer ("the Bell firm") is alleged to have been the principal author of the TK 85-25 prospectus. Plaintiffs further allege that the Defendant Bell firm has served as general counsel for the Traweek Corporate Defendants since 1975, and "prepared numerous documents relating to various transactions involving the Traweek Limited Partnerships and rendered advice on business transactions and management decisions concerning the partnerships during the Class Period." Second Amended Complaint, ¶ 36.

(f) *Defendant Stephen B. Fainsbert*

Defendant Stephen B. Fainsbert ("Fainsbert") is an

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

individual who was a secondary general partner of the Traweek 85-25 limited partnership along with Defendants Richard Traweek and Traweek Real Estate. Defendant Fainsbert is alleged to be a principal in both Pass & Fainsbert and in the Bell firm. Plaintiffs allege that Defendant Fainsbert has served as general counsel for the Traweek Corporate Defendants since 1975 and was Richard Traweek's trial lawyer in the *Morrow* action.

### (g) *Defendant Kenneth Leventhal & Company*

Defendant Kenneth Leventhal & Company ("the Leventhal firm") is an accounting firm that audited the financial statements of Defendant Traweek Real Estate for its 1982-1986 fiscal years. Defendant Leventhal also reviewed the financial statements of the Traweek Limited Partnerships for their 1984-1986 fiscal years.

The Leventhal firm's reports on the financial condition of Defendant Traweek Real Estate, a general partner of each of the eight Traweek Limited Partnerships, were allegedly relied upon and quoted in some of the prospectuses at issue.

### *FACTUAL BACKGROUND*

The Plaintiffs' claims essentially arise out of allegedly material omissions and misstatements made in the various sets of offering materials and private placement memoranda ("the prospectuses") used to market the debt and equity securities issued by the eight Traweek Limited Partnerships. These alleged material omissions and misstatements relate to the potential impact of two state court verdicts totalling over $3.5 million rendered against Defendant Richard Traweek and Traweek Investment Company.

### A. *The $3.5 Million Superior Court Jury Verdicts Against Richard Traweek and His Fruitless Appeals: March 1984-May 1987*

Both Superior Court cases were state securities fraud actions arising out of Richard Traweek's real estate dealings. The first of three related actions, *Annette Ballou et al. v. Richard Traweek and Traweek Investment Corp.,* (consolidated as "the *Ballou* action"), was filed in the Superior Court of the State of California for the County of Los Angeles on December 20, 1979.

In November of 1980, the second action entitled, *Morrow & Company, Inc. v. John Muir Investors, et al.,* ("the *Morrow* action") was filed in the Superior Court for the County of Contra Costa.

On March 1, 1984, a jury found Richard Traweek guilty of fraud and awarded the *Morrow* plaintiffs $1,137,891 in compensatory and punitive damages. After appealing the verdict all the way up to the California Supreme Court, the $1.138 million judgment became final and was entered against Defendant Richard Traweek on May 14, 1986. Traweek satisfied this judgment by paying in installments from June to October of 1986.

**\*4** On September 21, 1984, the jury in the *Ballou* action found Richard Traweek and Traweek Investment Co. guilty of fraud and awarded the plaintiffs $2.138 million in compensatory and punitive damages. Again, Traweek appealed the judgment all the way up to the California Supreme Court and lost at every level. On May 21, 1987, the $2.138 million judgment, plus accrued interest, became final and was entered against Richard Traweek.

### B. *The Eight Traweek Limited Partnerships and their Respective Prospectuses: March 1984-January 1988*

Beginning on March 26, 1984, with the initial TIF No. 18 offering materials, and in each set of prospectuses that followed, Defendant Richard Traweek and his affiliates were portrayed as having achieved tremendous financial success, growing from a startup organization to become a major real estate syndicator which had collected more than $120 million for real estate investment purposes.

The eight sets of prospectuses were issued in the time period between March 26, 1984 and July 17, 1985. Investors were still purchasing securities in TK 85-25 as late as January of 1988. During this exact same 3 1/2 - year time frame between March 1984 and January 1988, Richard Traweek was hit with the two Superior Court jury verdicts totalling over $3.5 million and after exhausting his appeals, both judgments became final.

With the exception of the MPG No. 1 prospectus, [FN3] the Plaintiffs contend that the following allegedly false and misleading statements were made in the remaining seven sets of offering materials:

a) That Defendants Richard Traweek and Traweek Real Estate, the general partners for all eight of the limited partnerships, were financially stable;

b) Minimized the potential impact of the $3.5 million state court verdicts against Richard Traweek, and expressed confidence that the awards would be either reversed on appeal or substantially reduced;

c) That the profitability of the limited partnerships

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

would continue to increase in the future;

 The Plaintiffs also allege that the assets and the net earnings of Defendant Traweek and the Traweek Corporate Defendants were materially overstated in the prospectuses.

 Again, excluding the MPG No. 1 prospectus, the Plaintiffs further allege that the remaining seven sets of prospectuses failed to disclose that the pending state court judgments could result in the financial demise of Defendant Richard Traweek, which would materially affect his ability to continue as general partner of the limited partnerships.

 Post-trial pleadings filed on behalf of Defendant Richard Traweek back in October and November of 1984, after the *Ballou* jury had rendered its $2.138 million verdict, affirmatively represented that a judgment of even $500,000 would "cripple the defendants [Richard Traweek and Traweek Investment Co.] and likely drive them out of business." Simultaneously, on November 24, 1984, Defendant Traweek was issuing the prospectus for TIF No. 19, attesting to his financial success and stability.

 **5** These contradictions are highlighted by the fact that counsel for the *Ballou* plaintiffs opposed Traweek's November 1984 post-trial motion by offering a copy of the TIF No. 18 prospectus as evidence of Traweek's wealth, in an effort to impeach Traweek's claims of his precarious financial condition.

C. *Defendant Richard Traweek's Financial Demise: April 1987-January 1988*

 On April 10, 1987, Defendants Richard Traweek and Traweek Real Estate resigned as the general partners of TIT No. 23, due to the potential impact of the $2.138 million *Ballou* judgment that was nearly final. TIF No. 23 was reorganized into what is now MPG No. 1, and a new prospectus was issued representing that Defendant C. Michael Maher was taking over as the sole general partner. The MPG No. 1 prospectus represented that Maher would be making all the business decisions completely independent of former general partner Richard Traweek.

 The $2.138 million *Ballou* judgment became final on May 21, 1987 and was entered against Defendant Richard Traweek. At this point, Defendant Richard Traweek had already paid the $1.138 million judgment rendered against him in the *Morrow* action.

 Defendant Richard Traweek could not satisfy the *Ballou*

judgment and on June 25, 1987, the *Ballou* plaintiffs filed a motion for the appointment of a receiver to attach the receipts of five of the Traweek Limited Partnerships (TIF Nos. 18, 19, 20, 21, 22).

 On August 13, 1987, Defendant Richard Traweek declared personal bankruptcy and was forced to resign as general partner of his seven remaining limited partnerships. By January of 1988, foreclosure proceedings had been instituted against six of the eight original Traweek Limited Partnerships, with five of them having filed petitions for bankruptcy. Defendant MPG No. 1 is the only Traweek Limited Partnership that is currently solvent. Defendant Richard Traweek, however, voluntarily dismissed his petition in bankruptcy in January 1988.

 Upon careful consideration of the voluminous pleadings, declarations, exhibits, and oral arguments of counsel, the Court hereby GRANTS the Plaintiffs' Motion for Class Certification based on the reasoning set forth below.

*ANALYSIS*

 With their Fed.R.Civ.P. 23(c)(1) Motion for Class Certification, the seven named Plaintiffs seek to certify one "global" class of all 5,300 investors pursuant to the requirements of Rule 23(a) and (b)(3). The "global" class that Plaintiffs seek to certify would consist of:

 All persons and entities who purchased any limited partnership units and/or promissory notes issued by Traweek Investment Fund ("TIF") No. 18, Ltd., TIF No. 19, Ltd., TIF No. 20, Ltd., TIF No. 21, Ltd., TIF No. 22, Ltd., MPG Investment Fund No. 1, Ltd. ("MPG No. 1"), Traweek Private Placement Fund 1 ("TPP-1"), or Traweek 85-25, Ltd. ("TK 85-25") at any time during the period from March 1984 through January 1988, inclusive. [FN4]

 Plaintiffs' Moving Papers, at 2. The Plaintiffs also seek to certify eight subclasses representing the specific investors in each of the eight limited partnerships. [FN5]

 **6** The law in the Ninth Circuit is very well established that the requirements of Rule 23 should be liberally construed in favor of class action cases brought under the federal securities laws. *Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir.1975), *cert. denied,* 429 U.S. 816 (1976) (other citations omitted). In ruling on the Certification Motion, the court must avoid reviewing the merits of the underlying action and focus solely on the requirements of Rule 23. *Eisen v. Carlisle and Jacquelin,* 417 U.S. 156, 178 (1974).

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

I.  *CERTIFICATION OF A "GLOBAL" CLASS CONSISTING OF 5,300 INVESTORS* A. *The Four Prerequisites of Rule 23(a)*

The Plaintiffs bear the burden of demonstrating that all of the requirements of Rule 23 have been satisfied. *General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 160 (1980).  The Plaintiffs must first demonstrate that the four Rule 23(a) prerequisites to maintaining a class action are satisfied:

One or more members of a class may sue or be sued as representative parties on behalf of all if

(1) the class is so numerous that joinder of all members is impracticable,

(2) there are questions of law or fact common to the class,

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).    The Plaintiffs are able to sufficiently demonstrate compliance with these requirements with respect to the "global" class.

(1) *Numerosity:  The Impracticability of Joinder*

The Plaintiffs satisfy the "numerosity" requirement of Rule 23(a)(1) because it is estimated that the "global" class will consist of over 5,300 investors who purchased securities issued by the eight Traweek Limited Partnerships.   These 5,300 potential class members are dispersed geographically throughout the United States, although many of them reside in California.

The sheer number of potential class members combined with the fact that they are scattered throughout the country are enough to make joinder impracticable.   " 'Impracticability' does not mean 'impossibility', but only the difficulty or inconvenience of joining all members of the class."  *Harris v. Palm Springs Alpine Estates, Inc.,* 329 F.2d 909, 913-914 (9th Cir.1964) (citations omitted).

(2) *Commonality:  Questions of Law or Fact*

a. *The Seven Traweek Limited Partnerships Excluding Defendant MPG No. 1*

The Plaintiffs have satisfied the Rule 23(a)(2)

"commonality" requirement because their claims arise out of the same set of operative facts and are based on common legal theories.    The Second Amended Complaint alleges that a common course of conduct on the part of the Defendants defrauded all of the investors in the Traweek Limited Partnerships.   That common course of conduct was the preparation and distribution of allegedly misleading and fraudulent prospectuses marketing the Traweek Limited Partnerships.

*7 The minimizing (or ignoring) of the potentially devastating impact of the $3.5 million jury verdicts rendered against Defendant Richard Traweek, provides the common "thread" of misrepresentations and omissions running through seven of the eight sets of offering materials (excluding the prospectus for Defendant MPG No. 1). [FN6]

The Plaintiffs allege that through a "conspiracy, common enterprise, or common course of conduct," the Defendants made the Traweek Limited Partnerships appear financially stable, profitable, and well-managed, when in fact, they were all poised on the brink of bankruptcy.

Some of the common legal and factual questions that arise from the Defendants' conduct are:  a) whether the Defendants' conduct violated the federal securities laws and RICO;   b) whether there was a conspiracy or common scheme between the Defendants as alleged in the First Amended Complaint;   c) whether the seven sets of prospectuses omitted and/or misrepresented material facts about the securities, Richard Traweek's financial stability, and the continued viability of the limited partnerships.

The Defendants contend that common questions do not exist because the various sets of prospectuses contained varying "degrees" of disclosure regarding the state court judgments pending against Defendant Richard Traweek. [FN7]  The fact that the alleged misrepresentations and omissions differed slightly in substance and were contained in different sets of documents does not preclude a finding of "commonality" under Ninth Circuit authority.

In a federal securities fraud case involving alleged misrepresentations made in 45 different documents over a two-year span, the Ninth Circuit affirmed a finding of Rule 23(a)(2) "commonality," stating that:

The overwhelming weight of authority holds that repeated representations of the sort alleged here satisfy the [Rule 23(a)(2) ] "common question" requirement.  Confronted with a class of purchasers allegedly

defrauded over a period of time by similar misrepresentations, courts have taken the common sense approach that the class is united by a common interest in determining whether a defendant's course of conduct is in its broad outlines actionable, which is not defeated by slight differences in the class members' positions. (citations omitted).

*Blackie v. Barrack,* 524 F.2d 891, 902 (9th Cir.1975) *cert. denied* 429 U.S. 816 (1976); *see also Harris v. Palm Springs Alpine Estates,* 329 F.2d 909, 914 (9th Cir.1964) ("substantial" common questions found where complaint alleged "common course of conduct over entire period directed against all investors, generally relied upon, and violating common statutory provisions ...").

(3) *Typicality: Named Plaintiffs' Claims Typical of those of the Entire Class*

The Plaintiffs have sufficiently demonstrated that the named class representatives' claims are typical of those of the entire "global" class because the "typicality" prerequisite of Rule 23(a)(3) is satisfied when all members of the class are victims of the same course of conduct. *In re Pizza Time Theatre Sec. Litig.,* 112 F.R.D. 15, 21-22 (N.D.Cal.1986); *In re Unioil Sec. Litig.,* 107 F.R.D. 615, 620 (C.D.Cal.1985) (Rymer, J.). Once again, the Defendants' alleged common course of conduct was marketing the Traweek Limited Partnerships as financially stable, profitable, and well-managed, when in fact, they were all teetering on the brink of bankruptcy. In determining Rule 23(a)(3) "typicality," Judge Rymer found that:

**8** The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether the other class members have been injured by the same course of conduct.

*Unioil, supra,* at 620, quoting *Dura-Bilt Corp. v. Chase Manhattan Corp.,* 89 F.R.D. 87, 99 (S.D.N.Y.1981).

All of the claims in this action arise out of the investors' reliance on the allegedly misleading offering materials prepared and issued by the Defendants to sell securities in the Traweek Limited Partnerships. All of the named Plaintiffs and the rest of the "global" class members suffered similar injuries in that everyone bought soon-to-be worthless securities in the Traweek Limited Partnerships based on the misleading offering materials.

The fact that some named Plaintiffs or other members of the proposed "global" class may have had oral representations made to them regarding the Traweek Limited Partnerships does not preclude a finding of "typicality." While class members may have learned of the Traweek Limited Partnerships by virtue of conversations with friends, business associates, or attended meetings in which these securities were promoted, the Second Amended Complaint alleges that all of the named Plaintiffs relied on the representations made in the prospectuses when deciding to purchase the securities.

In certifying a Rule 26(b)(3) class in *United Energy Corp. Sec. Litig.,* 122 F.R.D. 251 (C.D.Cal.1988), Judge Kenyon rejected the very argument Defendants are making in this case:

Defendants argue that certification is improper because of representations made to plaintiffs by brokers and others. Defendants argue that these representations turn this case into one for oral misrepresentations, for which class certification should not readily be available. However, this argument misreads Plaintiffs' complaint, which focuses solely on disclosures in and omissions from the standardized letters issued. Any intervening oral representations may impact somewhat on the reliance issue, if that issue becomes crucial at trial. As the *Data Access* court recognized, various types of reliance are present in almost all securities cases. A class action of purchasers could never be maintained if these differences (reliance on friends, brokers, etc.) were permitted to defeat class certification. 103 F.R.D. at 139.

122 F.R.D. at 255; *See also In re Technical Equities Sec. Litig.,* [1988- 1989 Transfer Binder] FED.SEC.L.REP. ¶ 94,093 at 91,109 (N.D.Cal.1988) ("[f]act that some named plaintiffs may have relied on personal representations rather than solely on a written circular or prospectus is not sufficient to find their claims not typical").

Defendant Leventhal makes much of the fact that some of the named Plaintiffs attended sales presentations for the Traweek Limited Partnerships, had personal or business contacts with Defendant Richard Traweek, or were social acquaintances of Defendant S.V. "Tex" Traweek, Richard's father.

**9** Reliance upon the advice or representations of a stockbroker, investment advisor, family member or other third parties is a factor that is always present in a securities fraud class action and has been rejected as a basis for defeating class certification. *See, e.g., Roberts v. Heim,* 670 F.Supp. 1466, 1492 (N.D.Cal.1987); *Seidman v. Stauffer Chemical Corp.,* [1986-1987

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

Transfer Binder] FED.SEC.L.REP. (CCH) ¶ 92,868 (D.Conn.1986); (other citations omitted).

The fact that the named Plaintiffs purchased different types of securities, either limited partnership units or promissory notes, at different times from different limited partnerships does not destroy the "typicality" of their claims. As outlined above, all of the named Plaintiffs and the purported class members they represent were injured by the Defendants' common course of conduct of making the Traweek "empire" appear financially stable and successful in the prospectuses, when in fact it was on the verge of collapse. *See Eisenberg v. Gagnon,* 766 F.2d 770 (3rd Cir.), *cert. denied sub nom., Wassertom v. Eisenberg,* 474 U.S. 946 (1985) (named plaintiffs investing in two different limited partnerships allowed to represent investors in third, where same defendants made same alleged omissions and misrepresentations); *In re Technical Equities Fed. Sec. Litig.,* [Current Binder] FED.SEC.L.REP. (CCH) ¶ 94,093 (N.D.Cal.1988) (class and subclasses certified consisting of stock purchasers, note purchasers and debenture purchasers).

*(4) Adequacy of Representation: Named Plaintiffs Will Fairly and Adequately Protect the Interests of the Class*

"The 'adequacy of representation' requirement of Rule 23(a)(4) is comprised of two factors: 1) that the representative party's attorney be qualified, experienced and generally able to conduct the litigation; and 2) that the suit not be collusive and plaintiff's interests not be antagonistic to those of the remainder of the class." *In re United Energy Corp. Sec. Litig.,* 122 F.R.D. 251, 257 (C.D.Cal.1988) (Kenyon, J.) *citing In re Unioil Securities Litig.,* 107 F.R.D. 615, 621-22 (C.D.Cal.1985) (Rymer, J.).

a. *Qualifications of Plaintiffs and their Counsel*

The qualifications of Plaintiffs' counsel are not at issue since the Defendants conceded at oral argument that no one questions the ability of the law firm of Corinblit & Seltzer to prosecute this action on behalf of the proposed class.

Defendant Manatt Phelps, however, makes a weak attempt to contend that some of the named Plaintiffs "[h]ave had no involvement in or knowledge of the initiation or prosecution of this action," thus making it "improper for the Court to entrust these named Plaintiffs with the representation of the class as a whole." Defendant Manatt Phelps' Opposition Papers, at 27-28.

The case Defendant Manatt Phelps relies on, however,

requires that the "proposed representative demonstrate 'an alarming unfamiliarity with the suit" before the Court would consider refusing to certify a class in that person's name. *Lubin v. Sybedon Corp.,* 688 F.Supp. 1425, 1462 (S.D.Cal.1988). The excerpts from the depositions of various named Plaintiffs that Manatt Phelps points to as evidence of an "alarming unfamiliarity with the suit" fall far short of that standard.

b. *The Defendants' Allegations of a Collusive Lawsuit and Conflict Between Potential Class Members*

**\*10** Defendants Manatt Phelps, the Bell firm, and Stephen Fainsbert focus their respective opposition papers on the second prong of the "adequacy of representation" analysis. These Defendants argue that "[t]he conflicts of interest and collusion presented by this lawsuit are so pervasive that no class can be certified." Defendant Manatt Phelps' Opposition Papers, at 3.

The basic premise is that after the collapse of his financial empire, Defendant Richard Traweek initiated this lawsuit against himself and is controlling the prosecution of this action from "behind-the-scenes" in an effort to deflect liability away from himself and toward the "deep-pocket" Defendant law firms.

The Defendant law firms rely almost exclusively on the self-serving deposition testimony of Defendant Richard Traweek [FN8] to detail the following allegations of conflict of interest between members of the class and collusion in the initiation and prosecution of this action:

The Defendants focus on an informal group of investors referred to as the "*Ad Hoc* Committee," ("AHC"), who came together to explore the possibility of bringing this action. Once the decision was made to bring this action, the AHC hired Plaintiffs' original counsel and solicited contributions from potential class members for a litigation war chest.

Defendants Manatt Phelps and the Bell firm contend that the AHC was nothing more than the "puppet committee" of Defendant Richard Traweek, who allegedly handpicked the original members of the AHC. Richard Traweek allegedly encouraged the AHC to file a class action ostensibly against him, but in reality against the "deep-pocket" law and accounting firms that worked on the Traweek Limited Partnerships.

Richard Traweek then allegedly controlled the prosecution of this action by suggesting which legal theories to plead and determining which entities and individuals would be named as Defendants. Richard Traweek is also alleged to have "moles" within the

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

potential class who feed him "inside" information and documents pertaining to this litigation.

While some elements of this dark tale may be plausible, the lack of credibility and obvious bias of the source of these allegations--Defendant Richard Traweek himself-- does not provide this Court with a sound basis to determine that this action is so collusive in origin as to preclude class certification.

There are, however, some issues regarding conflict between potential members of the class that should be examined. Some of the original members of the AHC had been paid by the Traweek organization for referring investors to the limited partnerships. Plaintiffs' original counsel, the law firm of Graham & James, represented the entire original AHC, including the members who were once on the Traweek payroll ("paid finders").

Some of the Defendants then threatened to cross-claim against the members of the original AHC who were once paid finders. Plaintiffs' counsel was placed in a *potential* conflict of interest by virtue of their representation of both the paid finders (who were facing the possibility of being pulled in as Defendants via the threatened cross-claim) and the rest of the AHC, potential class members. Without admitting that there was a conflict, Graham & James withdrew as counsel of record for Plaintiffs to avoid "even the appearance" of conflict.

*11 The paid finders resigned from the AHC and are now represented by separate counsel. Plaintiffs' current counsel, Corinblit & Seltzer, assures the Court that they have never represented any individual or corporate entity that may be a potential Defendant in this action.

The current *Ad Hoc* Committee is comprised of six investors who are all "clean," in that none have ever had financial connections to the Traweek Corporate Defendants. The Court is satisfied that the remedial actions taken by Plaintiffs' new counsel sufficiently quell the possibility of conflict arising between potential class members and the "new" AHC. Accordingly, the Court concludes that the named Plaintiffs will fairly and adequately protect the interests of the class.

B. *Rule 23(b)(3) "Predominance" Analysis*

In addition to satisfying the four prerequisites of Rule 23(a), the Plaintiffs must also meet one of the Rule 23(b) requirements. In this action, Plaintiffs have opted to attempt certification under Rule 23(b)(3):

(b) *Class Actions Maintainable.* An action may be

maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

* * *

(3) the Court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). The Rule 23(b)(3) analysis parallels the "commonality" inquiry of Rule 23(a)(2), but requires the Plaintiffs to demonstrate not only common questions, but that they predominate over individualized issues.

Defendants C. Michael Maher, MPG No. 1, and Leventhal rely heavily on the alleged lack of Rule 23(b)(3) "predominance" in opposing class certification. Defendants Maher and MPG No. 1 focus their attack on the factual differences between the disclosures made in the prospectus for MPG No. 1 and the representations made in the offering materials for the remaining seven Traweek Limited Partnerships.

Defendant Leventhal contends that the question of reliance, a critical element in the Plaintiffs' securities fraud claims, is highly individualized in this action and precludes a finding of Rule 23(b)(3) "predominance." The Court, however, is unpersuaded by these arguments and finds instead, that the Plaintiffs have satisfied the requirements of Rule 23(b)(3).

(1) *The Predominance of Common Questions Relating to the Investors in Defendant MPG No. 1*

In vigorously opposing the inclusion of the MPG No. 1 investors into the "global" class, Defendants MPG No. 1 and Maher point to the differences between the MPG No. 1 prospectus and the offering materials for the seven remaining Traweek Limited Partnerships and contend that these material variations preclude a finding of Rule 23(b)(3) "predominance".

While these differences do exist, the investors in MPG No. 1 will also be certified as part of the "global" class because there are factual and legal questions relating to the MPG No. 1 investors that overlap with the rest of the proposed class and predominate over individualized issues.

*12 A brief review of the facts surrounding the MPG No. 1 limited partnership will illuminate the reasons for the differences in the prospectus, as well as highlight the

1990 WL 132716                                                                                    Page 27
(Cite as: 1990 WL 132716, *12 (C.D.Cal.))

common legal and factual questions that predominate over issues affecting only individual members of the class.

Defendant MPG No. 1 was originally organized on September 12, 1986 as TIF No. 23, with Defendants Richard Traweek and Traweek Real Estate as the general partners. On April 10, 1987, Defendants Richard Traweek and Traweek Real Estate resigned as general partners because bankruptcy loomed large on the horizon as the $2.138 million *Ballou* judgment was very close to becoming final. At this point, Defendant Richard Traweek had already paid off the $1.138 million judgment rendered against him in the *Morrow* action.

On May 14, 1987, TIF No. 23 was reorganized and investors were given refunds, along with an amended prospectus encouraging them to "roll over" their investments into the "new" MPG No. 1 limited partnership. The MPG No. 1 prospectus represents that Defendant Maher will replace Defendants Richard Traweek and Traweek Real Estate as the new general partner. The MPG No. 1 prospectus also promises that general partner Maher will make all business decisions on behalf of the limited partnership "independent" of Richard Traweek and the Traweek Corporate Defendants.

Most significantly however, the MPG No. 1 prospectus disclosed the finality of the $2.138 million *Ballou* judgment against Defendant Richard Traweek and described its potential impact as follows:

As a result of the California Supreme Court's refusal to grant an appeal of the Court of Appeals' judgment in *Ballou v. Traweek,* the judgment is final and defendant Richard W. Traweek, is obligated to pay damages in the amount of $2,138,000, plus accrued interest, which as of the date of this Supplement has not been paid. There can be no assurance to Mr. Traweek's ability to pay such judgment. While it is not possible to predict the consequences which might result from the foregoing, it is possible that Mr. Traweek and Traweek Real Estate Corporation may not be able to continue as general partner ... or, if they remain as general partners, no assurance can be given that they will be able to, as they sometimes have in the past, provide interim financial assistance to the partnerships with operating cash deficits.

Supplement Dated June 22, 1987 to the MPG No. 1, Ltd. Prospectus Dated June 3, 1987, at 2-3.

There is no question that compared to the other seven sets of offering materials, the MPG No. 1 prospectus

contained significantly more information on the facts and potential impact of the *Ballou* judgment against Defendant Richard Traweek. As such, the investors in MPG No. 1 focus their fraud claims on alleged misrepresentations and omissions regarding: a) Maher's independence from Traweek; b) Maher's ability to perform as general partner; and c) Richard Traweek's continued "behind-the-scenes" control of MPG No. 1.

*13 Defendants Maher and MPG No. 1 contend that these claims are materially different from the claims asserted by the investors in the other seven limited partnerships, where the prospectuses either glossed over or minimized the potential impact of the pending state court judgments.

Looking at the MPG No. 1 investors' claims in the context of the overall "themes" running through the Second Amended Complaint, however, reveals that there is substantial overlap in factual and legal questions between the MPG No. 1 investors and the rest of the "global" class.

The overriding "theme" in this case is that all of the various Defendants contributed somehow in preparing and distributing offering materials that made the Traweek Limited Partnerships *appear* to be financially stable, profitable, and well-managed, when in fact, they were all teetering on the brink of bankruptcy. In this sense, the MPG No. 1 prospectus made misrepresentations and omissions substantially similar to those made in the seven other sets of offering materials. These common questions predominate over any factual questions relating only to individuals who invested in MPG No. 1.

For example, despite the more detailed disclosures, the Plaintiffs still allege that the MPG No. 1 prospectus "downplayed" the financial impact the *Ballou* judgment would have on the limited partnership and Maher's ability to act as general partner. The MPG No. 1 prospectus assured investors that the limited partnership was in "good hands" now that it was out of Richard Traweek's personal control.

Plaintiffs allege that what the prospectus failed to disclose was that the new general partner, Defendant Maher, was inextricably tied into the Traweek "empire." [FN9] In other words, the Plaintiffs contend that the imminent financial collapse of Richard Traweek and the Traweek Corporate Defendants would have a severe effect on Maher's ability to continue as general partner, and that these facts were omitted from the MPG No. 1 prospectus.

Additionally, the investors in MPG No. 1 are asserting common legal theories under the same federal statutory provisions [FN10] as the rest of the proposed "global" class, making resolution of all of the Plaintiffs' claims appropriate on a "global" class-wide basis. Accordingly, common questions of law and fact predominate despite the factual differences in the disclosures made in the MPG No. 1 prospectus.

*(2) Rule 23(b) "Predominance" Can Be Determined Without Applying a "Presumption of Reliance" at the Class Certification Stage*

The Plaintiffs' Section 10(b) claims require a showing of individual reliance in order to establish "the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury." *Basic v. Levinson,* 485 U.S. 224, 242 (1988).

In the class action context, the courts have carved out two exceptions allowing Plaintiffs to demonstrate reliance by the class without requiring each individual investor to show his or her reliance upon the alleged misrepresentations or omissions. *See Blackie v. Barrack,* 524 F.2d 891, 907 (9th Cir.1975) ("fraud-on-the-market" theory of presumed reliance), *cert. denied,* 429 U.S. 816 (1976); *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128, 153-154 (1972) (reliance presumed due to difficulties in proving a fraud case based solely on omissions by one with an affirmative duty to disclose).

*14 In *Basic,* the Supreme Court left open the question of whether Rule 23(b)(3) could be satisfied absent a "presumption of reliance." Defendant Leventhal, however, reads the following dictum from *Basic* as requiring a "presumption of reliance" to be applied before a Rule 23(b)(3) finding of "predominance" can be made:

Requiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones.

*Basic,* 485 U.S. at 242.

Since the *Basic* decision, several district courts in the Ninth Circuit have certified a Rule 23(b)(3) class despite the existence of individual questions of reliance. In *In re United Energy Corp. Solar Power Modules Securities Litig.,* 122 F.R.D. 251 (C.D.Cal.1988), Judge Kenyon held that:

[w]hether or not reliance is a necessary element in a case involving misrepresentations and omissions is not a question that *needs* to be decided on this motion for class certification. If it is later determined that reliance is a necessary element, separate hearings could be held or the trial bifurcated to deal with this issue. (citation omitted) The policies served by the securities laws would be in part eviscerated if the reliance requirement precluded class certification. (citation omitted) ... Furthermore, the determination of whether each member of the class must prove reliance is itself a common question.

122 F.R.D. at 255.

Judge Enright also examined this issue in his post-*Basic* decision in *Lubin v. Sybedon Corp.,* 688 F.Supp. 1425, 1460 (S.D.Cal.1988):

[w]hether Rule 23(a)(2) commonality may be found absent a presumption of group reliance--appears to be [a question] which, if previously settled, must be reexamined in light of *Basic....* Certainly the Court did not hold that without a presumption of reliance common questions cannot predominate.... In fact, the court finds that such a conclusion ought not be inferred from *Basic,* because it would in effect amend the clear language of Rule 23(a)(2) and transform the "commonality" requirement into an "identity" requirement.

*Id.* The *Lubin* court went on to find Rule 23(b)(3) "predominance" based on its reasoning quoted above. *Id.,* at 1463.

The *United Energy* and *Lubin* decisions are in line with the approach advocated by a leading commentator on class action litigation:

The need to show individual reliance has not precluded class treatment in cases where standardized written misrepresentations have been made to class members ... In such cases, the courts have uniformly found it appropriate to certify a securities class on the common liability issues and to defer consideration of individual reliance by class members until after disposing of the common class questions. The fact that the representative plaintiff and the class members may have relied on different documents does not prevent a finding of predominance of common questions when the alleged misrepresentations are similar or present a nucleus of facts common to the class.

*15 4 *Newberg on Class Actions* 2d (1985) § 22.47 (footnotes omitted).

The Court concludes that to delve into the issues of

individualized versus group reliance at the class certification stage would constitute "an unwarranted intrusion into the merits of the claims and defenses." *In re United Energy Corp.,* 122 F.R.D. at 255. The proposed Rule 23(b)(3) "global" class will be certified because there are numerous other common questions of law and fact that predominate over questions pertaining only to individuals.

(3) *Affiliated Ute "Presumption of Reliance" Appears To Be Applicable to this Case Ensuring that Common Questions of Reliance will Predominate*

Without so ruling, the Court notes that the Plaintiff class may be able to utilize the "presumption of reliance" articulated in *Affiliated Ute Citizens of Utah v. United States,* 406 U.S. 128 (1972) in order to further support their claim of Rule 23(b)(3) "predominance."

In *Affiliated Ute,* the Supreme Court held that in cases "involving primarily a failure to disclose," proof of reliance is not required because where an omission is alleged, it would be difficult, if not impossible, to prove how the investor would have acted had the material information been disclosed. 406 U.S. at 153-54. "In a pure omission case, all that is required is a showing of materiality, which does not depend on the circumstances and beliefs of the individual investors." *In re United Energy Corp.,* 122 F.R.D. at 254.

Defendant Leventhal is wrong in contending that *Affiliated Ute* is inapplicable to the facts of this case since plaintiffs are alleging reliance on both material omissions and material misrepresentations. The Ninth Circuit has extended the *Affiliated Ute* presumption of reliance to "mixed" cases such as this one, involving both omissions and misstatements. *Cameron v. E.M. Adams & Co.,* 547 F.2d 473, 477 & n. 3 (9th Cir.1976).

CONCLUSION

The Plaintiffs have sufficiently satisfied the requirements of Rule 23(a) and (b)(3) with respect to the proposed "global" class. The Court hereby provisionally certifies a "global" class as follows:

All persons and entities who purchased any limited partnership units and/or promissory notes issued by Traweek Investment Fund ("TIF") No. 18, Ltd., TIF No. 19, Ltd., TIF No. 20, Ltd., TIF No. 21, Ltd., TIF No. 22, Ltd., MPG Investment Fund No. 1, Ltd. ("MPG No. I"), Traweek Private Placement Fund I ("TPP-I"), or Traweek 85-25, Ltd. ("TK 85-25") at any time during the period from March 1984 through January 1988, inclusive.

Excluded from the certified "global" class are all of the Defendants, members of the immediate families of the individual Defendants and any entity in which any Defendant has a controlling interest (e.g., the Traweek Corporate Defendants) and all of the subsidiaries, affiliates, legal representatives, heirs, successors or assigns of any such excluded party.

The certification of purchasers of Traweek 85-25 securities as members of the "global" class will be contingent on the Plaintiffs amending their Complaint to add Mr. Marlow Baar as a named class representative.

II. *CERTIFICATION OF EIGHT SUBCLASSES CONSISTING OF INVESTORS IN EACH OF THE TRAWEEK LIMITED PARTNERSHIPS*

*16 The Plaintiffs also seek to certify eight subclasses consisting of the investors in each of the Traweek Limited Partnerships. Subclasses are usually certified pursuant to Rule 23(c)(4), which provides that if appropriate, "a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly." Fed.R.Civ.P. 23(c)(4).

The effect of this rule is that "each subclass must independently meet the requirements of Rule 23 for the maintenance of a class action." *Betts v. Reliable Collection Agency, Ltd.,* 659 F.2d 1000, 1005 (9th Cir.1981).

Separating the members of the overall "global" class into eight subclasses corresponding to the particular Traweek Limited Partnership that the individual invested in, would facilitate the orderly management of this action. Since the representations made in the eight sets of offering materials differed slightly from partnership to partnership, creating these subclasses would help organize the presentation of evidence and better focus the reliance issues.

These potential benefits in terms of case management, however, will not be realized until this action is in a posture closer to adjudication on the merits. Accordingly, the Court will not rule at this time on the Plaintiffs' Motion for Certification as to the proposed subclasses.

If and when the Court deems such subclasses necessary, it is likely that they would be certified pursuant to the broad power granted to the Court under Rule 23(d) to adopt procedural innovations to facilitate the management of complex class actions. *American Timber*

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

& Trading v. First Nat'l Bank of Oregon, 690 F.2d 781, 786-87 (9th Cir.1982) ("Rule 23(d) confirms the district court's broad discretion to manage a complex class action") (citations omitted).

Defendants Stephan Fainsbert and Bell, Fainsbert & Finer, who currently oppose certification of the proposed TPP-1 and TK 85-25 subclasses for their failure to meet the numerosity requirements of Rule 23(a)(1) are advised that when a subclass is created as a procedural innovation under Rule 23(d) to manage complex class actions, "[i]t is unnecessary to evaluate it under Rule 23(c)(4) for commonality, numerosity, typicality, and adequacy of representation." *American Timber & Trading,* 690 F.2d at 787, n. 5.

The Court also notes that once Mr. Marlow Baar intervenes as a named class representative of the investors in the TK 85-25 limited partnership, any dispute between the Plaintiffs and Defendants Maher and TK 85-25 regarding the applicability of the "juridical link" exception of *La Mar v. H & B Novelty & Loan Co.,* 489 F.2d 461 (9th Cir.1973) will be mooted.

It is re-emphasized that the certification of the "global" class is provisional and that the Court may modify this ruling as dictated by any future developments and rulings in this action.

IT IS SO ORDERED.

FN1. This limited partnership was originally called "Traweek Investment Fund No. 23" when Defendants Richard Traweek and Traweek Real Estate were the general partners. Due to Richard Traweek's impending personal bankruptcy, he withdrew as general partner and the fund was reorganized and renamed "MPG Investment Fund No. 1, Ltd." Defendant C. Michael Maher replaced Richard Traweek and Traweek Real Estate as the general partner of the "new" limited partnership, MPG No. 1.

FN2. Lawrence Weitzel was originally named as the subclass representative for the investors in TK 85-25, but he suffered a severe heart attack after this action was filed and had to withdraw. Currently, there is no named Plaintiff representing the proposed TK 85-25 subclass.

FN3. What was originally the TIF No. 23 limited partnership was reorganized into the current MPG No. 1 following Defendant Richard Traweek's resignation as general partner. *See supra,* at 6. As such, the prospectus for MPG No. 1 does adequately disclose the financial demise of Traweek. The material omission that the Plaintiffs allege in connection with the MPG No. 1 prospectus is that it failed to disclose that Richard Traweek was still controlling the "reborn" limited

partnership through the new general partner, Defendant C. Michael Maher. Plaintiffs also allege that the MPG No. 1 prospectus affirmatively misrepresented that the limited partnership was independent of Richard Traweek and his related entities.

FN4. Excluded from the potential class are all of the Defendants, members of the immediate families of the individual Defendants and any entity in which any Defendant has a controlling interest (e.g., the Traweek Corporate Defendants) and all of the subsidiaries, affiliates, legal representatives, heirs, successors or assigns of any such excluded party.

FN5. The subclasses would be defined by the specific limited partnership that the Plaintiff invested in and the time period in which the investment was made. For example, the "TIF No. 18 sub-class" would consist of: "All persons and entities who purchased limited partnership units and/or promissory notes issued by TIF No. 18 from March 1984 through and including March 1985."

FN6. There are common questions of fact and law relating to the "global" class and the MPG No. 1 limited partnership. However, since the MPG No. 1 prospectus differs significantly in content from the other seven sets of offering materials, the Rule 23(a)(2) "commonality" analysis will be combined with the Rule 23(b)(3) "predominance" analysis with respect to this limited partnership. *See supra,* at 26-30.

FN7. Below is a brief outline of the differences in the substance of each set of offering materials, excluding MPG No. 1: TIF No. 18: Discussed only the *Morrow* action, made no mention of the pending *Ballou* action. TIF Nos. 19-22: Allegedly made misleading statements concerning the potential impact of both actions. TK 85-25 and TPP-1: Neither made any mention whatsoever of the state court actions or verdicts.

FN8. While Richard Traweek's deposition testimony provides practically the entire basis for the Defendant law firms' "collusion" arguments, Traweek simultaneously denies these allegations in his own Notice of Joinder. Defendant Richard Traweek joins in all of the other Defendants' Opposition Memoranda, except to the extent that they contend Traweek acted in collusion with the class plaintiffs. *See* Defendant Richard Traweek's, *et al.,* Notice of Joinder in Opposition to Motion to Certify the Class, at 2, filed April 17, 1989.

FN9. As previously discussed, *supra,* at 6, Defendant Maher is alleged to have held executive positions in no fewer than three of the various Traweek Corporate Defendants.

FN10. Sections 11 and 12(2) of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77l(1), Section 10(b) of the

Securities Exchange Act of 1934, 15 U.S.C. § 77j, and Rule 10b-5 promulgated thereunder, and civil RICO, 18 U.S.C. §§ 1961 *et seq.*

1990 WL 132716, 1990 WL 132716 (C.D.Cal.), Fed. Sec. L. Rep. P 95,419

END OF DOCUMENT

Copr. © West 2002 No Claim to Orig. U.S. Govt. Works

ATTACHMENT
F

JUDICIAL PANEL ON
MULTIDISTRICT LITIGATION

DEC - 1 2000

FILED
CLERK'S OFFICE

## DOCKET NO. 1378

## BEFORE THE JUDICIAL PANEL ON MULTIDISTRICT LITIGATION

## IN RE SAFETY-KLEEN CORP. SECURITIES LITIGATION

## BEFORE JOHN F. NANGLE, CHAIRMAN, LOUIS C. BECHTLE, JOHN F. KEENAN, WM. TERRELL HODGES, MOREY L. SEAR, BRUCE M. SELYA* AND JULIA SMITH GIBBONS, JUDGES OF THE PANEL

### TRANSFER ORDER

This litigation presently consists of 21 actions in the following federal districts: twenty actions in the District of South Carolina and one action in the District of Delaware. Before the Panel is a motion by plaintiff in one South Carolina action to transfer, pursuant to 28 U.S.C. §1407, the Delaware action to the District of South Carolina for coordinated or consolidated pretrial proceedings with the twenty actions pending there. PricewaterhouseCoopers LLC, lead plaintiffs in the South Carolina litigation, and seven individual Safety-Kleen Corp. (Safety-Kleen) directors support centralization in the South Carolina court. The Delaware plaintiffs oppose inclusion of their action in Section 1407 proceedings in the South Carolina district.

On the basis of the papers filed and the hearing held, the Panel finds that all actions in this litigation involve common questions of fact concerning allegations of accounting irregularities at Safety-Kleen in fiscal years 1997, 1998 and 1999 and whether misrepresentations or omissions in Safety-Kleen financial statements inflated the price of Safety-Kleen (or its predecessor companies) securities to the detriment of plaintiffs in violation of the federal securities laws. Centralization under Section 1407 in the District of South Carolina will serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation, while accordingly being necessary in order to avoid duplication of discovery, prevent inconsistent pretrial rulings, and conserve the resources of the parties, their counsel and the judiciary.

We are persuaded that the District of South Carolina is the most appropriate transferee forum for this litigation. We note that i) most actions are already pending there before Judge Joseph F. Anderson, Jr., and ii) because Safety-Kleen is headquartered in Columbia, South Carolina, documents and witnesses are likely located there.

---

* Judge Selya took no part in the decision of this matter.

- 2 -

IT IS THEREFORE ORDERED that, pursuant to 28 U.S.C. §1407, the action listed on the attached Schedule A and pending in the District of Delaware be, and the same hereby is, transferred to the District of South Carolina and, with the consent of that court, assigned to the Honorable Joseph F. Anderson, Jr., for coordinated or consolidated pretrial proceedings with the actions pending there.

FOR THE PANEL:

John F. Nangle
Chairman