**FILED**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

NOV 2 7 2002

LARRY W. PROPES, CLERK
COLUMBIA, S.C.

| | |
|---|---|
| IN RE SAFETY-KLEEN CORP. <br> BONDHOLDERS LITIGATION | ) <br> ) Consol. Case No. 3-00-1145 17 <br> ) <br> ) |

**LEAD PLAINTIFFS' REPLY MEMORANDUM**
**IN SUPPORT OF MOTION FOR CLASS CERTIFICATION**

MCCUTCHEN, BLANTON, RHODES
  & JOHNSON, LLP
Pope D. Johnson, III
Federal I.D. No. 2206
P.O. Drawer 11209
Columbia, SC  29211-1209
(803) 799-9791
Local Counsel for Lead Plaintiffs

GRANT & EISENHOFER, P.A.
Stuart M. Grant
Megan D. McIntyre
Diane Zilka
1220 Market Street, Suite 500
Wilmington, DE  19801
(302) 622-7000
Lead Counsel for Lead Plaintiffs

DATED:  November 26, 2002

276

# TABLE OF CONTENTS

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    I.    Applicable Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    II.    This Action Satisfies The Standards For Class Certification Under
         Rule 23(a) of the Federal Rules of Civil Procedure . . . . . . . . . . . . . . . . . . . . . . . 5

        A.    The Members Of The Class Are So Numerous And
             Geographically Dispersed That Joinder Is Impracticable . . . . . . . . . . . . . 5

        B.    The Lead Plaintiffs Are Adequate Class Representatives,
             Whose Claims Are Typical of Those of Other Class Members . . . . . . . . . 9

             1.    Lead Plaintiffs are not subject to any unique reliance issues . . . . 11

             2.    Lead Plaintiffs' sophistication does not render them atypical . . . 17

             3.    Lead Plaintiffs are not subject to any unique
                 causation-related defenses to their Section 11 claims . . . . . . . . 19

             4.    The fact that Lead Plaintiffs did not purchase registered
                 2009 Bonds does not make them atypical or inadequate . . . . . . . 20

             5.    SSRIT's March 8, 2000 purchase does not make it atypical . . . . 21

        C.    Common Questions Of Law Or Fact Predominate . . . . . . . . . . . . . . . . . 22

             1.    Reliance Does Not Predominate Over the Common
                 Issues Relating to Plaintiffs' Section 18 Claim . . . . . . . . . . . . . 22

             2.    Common Issues Predominate With Respect to Plaintiffs'
                 Rule 10b-5 Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

        D.    There Is No Need For Subclasses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

i

## TABLE OF AUTHORITIES

ABT v. Mazda Am. Credit,
    1999 WL 350738 (N.D. Ill. May 19, 1999) ...................................................................... 11

In re A.H. Robins Co.,
    880 F.2d 709 (4th Cir. 1989) ........................................................................................ 4

Alexander A. v. Novello,
    210 F.R.D. 27 (E.D.N.Y. 2002) .................................................................................... 7

Alexander v. Centrafarm Group,
    124 F.R.D. 178 (N.D. Ill. 1988) .................................................................................. 26

Anderson v. Bank of the South, N.A.,
    118 F.R.D. 136 (M.D. Fla. 1987) ................................................................................ 23

Basic Inc. v. Levinson,
    485 U.S. 224 (1988) .................................................................................................... 12

Belbis v. County of Cook,
    2002 WL 31600048 (N.D. Ill. Nov. 18, 2002) ............................................................ 7

Blackie v. Barrack,
    524 F.2d 891 (9th Cir.1975) ........................................................................................ 18

Bogosian v. Gulf Oil Corp.,
    561 F.2d 434 (3d Cir. 1977) ........................................................................................ 23

Brady v. Thurston Motor Lines,
    726 F.2d 136 (4th Cir. 1984) ........................................................................................ 8

Cheney v. Cyberguard,
    2002 WL 31630172 (S.D. Fla. Aug. 14, 2002) ..................................................... 11, 22

Cypress v. Newport News General & Nonsectarian Hosp. Ass'n,
    375 F.2d 648 (4th Cir. 1967) ........................................................................................ 8

Danis v. USN Communications, Inc.,
    189 F.R.D. 391 (N.D. Ill. 1999) .................................................................................. 17

In re Data Access Sys. Sec. Litig.,
    103 F.R.D. 130 (D.N.J. 1984) ............................................................................... 15, 19

Eisenberg v. Gagnon,
    766 F.2d 770 (3d Cir. 1985) ........................................................................ 8, 27

Feldman v. Lifton,
    64 F.R.D. 539 (S.D.N.Y. 1974) ...................................................................... 27

In re Ford Motor Co. Bronco II Product Liability Litig.,
    177 F.R.D. 360 (E.D. La. 1997) ....................................................................... 9

In re Franklin Nat'l Bank Sec. Litig.,
    574 F.2d 662 (2d Cir. 1978) ............................................................................ 6

Gluck v. CellStar Corp.,
    976 F. Supp. 542 (N.D. Tex. 1997) ............................................................... 17

Gould v. Marlon,
    1987 WL 34631 (D. Nev. Aug. 29, 1987) ..................................................... 19

Grice v. PNC Mortg. Corp. of Am.,
    1998 WL 350581 (D. Md. May 21, 1998) ........................................................ 8

Green v. Wolf Corp.,
    406 F.2d 291 (2d Cir. 1968) ............................................... 16, 25, 26, 27

In re Gulf Oil/Cities Serv. Tender Offer Litig.,
    112 F.R.D. 383 (S.D.N.Y.1986) ................................................................... 17

Helfand v. Cenco, Inc.,
    80 F.R.D. 1 (N.D. Ill. 1977) .......................................................................... 27

In re Honeywell Int'l Inc. Sec. Litig.,
    2002 WL 31525571 (D.N.J. Nov. 14, 2002) ................................................. 15

In re JDN Realty Corp. Sec. Litig.,
    182 F. Supp. 2d 1230 (N.D. Ga. 2002) .......................................................... 19

Keyser v. Commonwealth Nat. Fin. Corp.,
    121 F.R.D. 642 (M.D. Pa. 1988) ................................................................... 26

Kilgo v. Bowman Transp., Inc.,
    789 F.2d 859 (11th Cir. 1986) ......................................................................... 9

Kirkpatrick v. J.C. Bradford & Co.,
    827 F.2d 718 (11th Cir. 1987) .............................................. 9, 14, 16, 27

In re Kirschner Med. Corp. Sec. Litig.,
    139 F.R.D. 74 (D. Md. 1991) ..................................................................... 5, 26

Kitchens v. U.S. Shelter Corp.,
    1983 WL 1380 (D.S.C. Oct. 13, 1983) ........................................................ 8

Kohl v. Association of Trial Lawyers of America,
    183 F.R.D. 475 (D. Md. 1998) ................................................................... 9

Koos v. First Nat'l Bank,
    496 F.2d 1162 (7th Cir. 1974) .................................................................. 11

Longman v. Food Lion, Inc.,
    1994 WL 686624 (M.D.N.C. Oct. 17, 1994) ............................................. 5

In re MDC Holdings Sec. Litig.,
    754 F. Supp. 785 (S.D.Cal.1990) ......................................................... 17, 24

Magna Inv. Corp. v. John Does One Through Two Hundred,
    931 F.2d 38 (11th Cir. 1991) ................................................................... 20

McAdams v. Massachusetts Mut. Life Ins. Co.,
    2002 WL 1067449 (D. Mass. May 15, 2002) ........................................... 11

McEwen v. Digitran Sys., Inc.,
    49 F. Supp. 2d 1293 (D. Utah 1999) ......................................................... 6

McFarland v. Memorex Corp.,
    96 F.R.D. 357 (N.D. Cal.1982) ............................................................... 17

In re ORFA Sec. Litig.,
    654 F. Supp. 1449 (D.N.J. 1987) ............................................................. 26

Peil v. National Semiconductor Corp.,
    1986 WL 11699 (E.D. Pa. Oct. 16, 1986) .................................................. 6

Peil v. Speiser,
    97 F.R.D. 657 (E.D. Pa. 1983) .................................................................. 7

Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.,
    1992 WL 212226 (M.D. Pa. July 31, 1992) ............................................. 21

Priest v. Zayre Corp.,
    118 F.R.D. 552 (D. Mass. 1988) .............................................................. 18

Ridings v. Canadian Imperial Bank,
    94 F.R.D. 147 (N.D. Ill. 1982) ................................................................ 25

Rifkin v. Crow,
    80 F.R.D. 285 (N.D.Tex.1978) ................................................................ 18

Ross v. A.H. Robins Co.,
    607 F.2d 545 (2d Cir. 1979) .................................................................. 25

Ross v. Bank South, N.A.,
    885 F.2d 723 (11th Cir. 1989) ................................................................ 13

Rubenstein v. Collins,
    162 F.R.D. 534 (S.D. Tex. 1995) ............................................................ 18

Ruiz v. Stewart Associates, Inc.,
    171 F.R.D. 238 (N.D. Ill.1997) .............................................................. 21

In re Safety-Kleen Corp. Stockholders Litig.,
    No. 3:00-CV-736-17 (D.S.C. June 18, 2002) ............................................ 16

Schneider v. Traweek,
    1990 WL 132716 (C.D. Cal. July 31, 1990) ........................................ 23, 27

In re SciMed Life Sec. Litig.,
    1992 WL 413867 (D. Minn. Nov. 20, 1992) ............................................ 17

Seiden v. Nicholson,
    69 F.R.D. 681 (N.D. Ill. 1976) .............................................................. 27

Shamberg v. Ahlstrom,
    111 F.R.D. 689 (D.N.J. 1986) ................................................................ 14

Sharp v. Coopers & Lybrand,
    70 F.R.D. 544 (E.D. Pa. 1976), aff'd., 649 F.2d 175 (3d Cir. 1981) ....... 14, 23, 25, 26, 27

Shores v. Sklar,
    647 F.2d 462 (5th Cir. 1981) ................................................................ 13

Simpson v. Specialty Retail Concepts,
    149 F.R.D. 94 (M.D.N.C. 1993) ........................................................ passim

South Carolina Nat'l Bank v. Stone,
    139 F.R.D. 325 (D.S.C. 1991) .......................................................... passim

In re Southeast Hotel Properties Ltd. Partnership Investor Litig.,
  151 F.R.D. 597 (W.D.N.C. 1993) .............................................................. 5, 8, 27

State of Wisconsin Investment Board v. Ruttenberg,
  C. A. No. 99-BU-3097-S (N.D. Ala. July 3, 2001) ................................... 24, 25

Stevelman v. Alias Research, Inc.,
  2000 WL 888385 (D. Conn. June 22, 2000) ....................................................... 9

Stewart v. Abraham,
  275 F.3d 220 (3d Cir. 2001) ............................................................................... 9

In re T2 Medical, Inc. Shareholder Litig.,
  1993 WL 594003 (N.D. Ga. Nov. 16, 1993) .................................................... 15

T.J. Raney & Sons v. Fort Cobb, Okla. Irrigation Fuel Auth.,
  717 F.2d 1330 (10th Cir. 1983) ....................................................................... 13

In re U.S. Fin. Sec. Litig.,
  64 F.R.D. 443 (S.D. Cal. 1974) ....................................................................... 21

In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec. Litig.,
  122 F.R.D. 251 (C.D. Cal. 1988) ............................................................... 26, 27

In re VMS Sec. Litig.,
  136 F.R.D. 466 (N.D. Ill. 1991) ...................................................................... 29

Wachovia Bank & Trust Co. v. National Student Marketing Corp.,
  650 F.2d 342 (D.C. Cir. 1980) ........................................................................ 25

Walco Inv. v. Thenen,
  168 F.R.D. 315 (S.D. Fla. 1996) ................................................................ 23, 27

Weikel v. Tower Semiconductor Ltd.,
  183 F.R.D. 377 (D.N.J. 1998) ......................................................................... 17

Weinberger v. Jackson,
  1985 WL 5811 (N.D. Cal. Aug. 28, 1995) ......................................................... 7

## STATUTES

15 U.S.C. § 77k(a) ................................................................................................ 19

15 U.S.C. § 77k(e) ................................................................................................ 19

15 U.S.C. § 78r ..................................................................................................... 20

## OTHER AUTHORITIES

1 Newberg on Class Actions § 3.05, at 3-25 (3d ed.1992) ........................................... 9

## PRELIMINARY STATEMENT

Lead Plaintiffs American High-Income Trust ("AHIT") and State Street Research Income Trust ("SSR Trust") (together, the "Lead Plaintiffs") submit this reply memorandum of law in support of their motion for certification of a class (the "Class") consisting of all persons and entities who purchased or acquired 9¼% senior notes due in 2009 (the "2009 Bonds") issued by Safety-Kleen Corp. ("Safety-Kleen"), or 9¼% senior notes due in 2008 (the "2008 Bonds") issued by Safety-Kleen's predecessor, Laidlaw Environmental Services, Inc. ("LES") (collectively, the "Company"), in initial offerings or on the secondary market from April 17, 1998 through March 9, 2000 (the "Class Period").[1]

This is a federal securities lawsuit alleging that the Company and the defendants made materially false statements regarding the Company's financial condition during the Class Period. Although those statements were conveyed through a variety of different sources, the nature and substance of the misstatements was uniform and consistent: gross overstatements of the Company's earnings, revenues and net income, due to an ongoing scheme of "cooking the books" through manipulative accounting. All members of the proposed Class purchased Bonds during the Class Period which, were it not for the defendants' fraudulent conduct, would likely never have been issued. At the very least, if the true facts had been known, the marketplace would have understood the high-risk nature of these investments and would have priced the securities at a much lower price (if any price) to account for those risks.

---

[1] Excluded from the Class are: (1) the Company and defendants, (2) members of the families of the individual defendants, (3) the subsidiaries or affiliates of the Company or of any defendant, (4) any person or entity who is a partner, officer, director, employee or controlling person of the Company or any defendant, (5) any entity in which any defendant has a controlling interest, and (6) the legal representatives, heirs, successors or assigns of any such excluded person.

The Lead Plaintiffs and all members of the proposed Class have been injured in precisely the same way – i.e., by purchasing Bonds at excessive prices due to the defendants' overstatement of the Company's financial results throughout the Class Period. Recognizing their common interests, a group of eleven institutional investors (the "Supporting Institutions")[2] got together and decided that a class action should be filed on behalf of all of their clients and all other similarly situated persons who suffered losses on Bonds purchased during the Class Period.[3] Collectively, the Supporting Institutions purchased approximately $417 million principal amount of Bonds on behalf of at least 219 different Class members during the Class Period,[4] including over $183 million in pre-registration purchases of 2008 Bonds,[5] over $87 million in post-registration purchases of 2008 Bonds,[6] over $133

---

[2]  The Supporting Institutions are: Capital Research Management Company ("CRMC"); Capital Guardian Trust Company ("CGTC"); Franklin Advisers, Inc. ("Franklin"); Pacholder Associates, Inc. ("Pacholder"); Oak Hill Advisors, Inc. ("Oak Hill"); Oaktree Capital Management ("Oaktree"); Pacific Investment Management Company ("PIMCO"); Sankaty Advisors ("Sankaty"); State Street Research & Management Company ("SSRMC"); affiliates of Trust Company of the West (collectively, "TCW"); and Western Asset Management Company ("WAMCO").

[3]  See Declaration of Timothy J. Andrews ("Andrews Decl."), ¶ 5; Declaration of David C. Barclay ("Barclay Decl."), ¶ 5; Declaration of Michael Bevacqua ("Bevacqua Decl."), ¶ 5; Declaration of William H. Bohnsack, Jr. ("Bohnsack Decl."), ¶ 5; Declaration of Ilene Harker ("Harker Decl."), ¶ 4; Declaration of James M. Hasset ("Hasset Decl."), ¶ 4; Declaration of Peter C. Kelly ("Kelly Decl."), ¶ 5; Declaration of Richard Kuersteiner ("Kuersteiner Decl."), ¶ 3; Declaration of Francis J. McNamara, III ("McNamara Decl."), ¶ 5; Declaration of Mohan V. Phansalkar ("Phansalkar Decl."), ¶ 5; Declaration of James P. Shanahan, Jr. ("Shanahan Decl."), ¶ 5.

[4]  See Harker Decl. ¶ 3 (WAMCO made purchases for at least 71 funds and clients); Andrews Decl. ¶ 3 (Oaktree made purchases for at least 56 funds and clients); Phansalkar Decl. ¶ 3 (PIMCO made purchases for 27 funds and clients); Hasset Decl. ¶ 3 (TCW made purchases for 19 funds and clients); McNamara Decl. ¶ 3 (SSRMC made purchases for at least 14 funds and clients); Kelly Decl. ¶ 3 (CGTC made purchases for at least 11 funds and clients); Shanahan Decl. ¶ 3 (Pacholder made purchases for 6 funds and clients); Bevacqua Decl. ¶ 3 (Sankaty made purchases for at least 5 funds and clients). Barclay Decl. ¶ 3 (CRMC made purchases for at least 5 funds and clients); Bohnsack Decl. ¶ 3 (Oak Hill made purchases for 4 funds and clients); Kuersteiner Decl. ¶ 2 (Franklin made purchases for one fund).

[5]  See Andrews Decl. ¶ 2(a); Barclay Decl. ¶ 2(a); Bevacqua Decl. ¶ 2(a); Bohnsack Decl. ¶ 2(a); Hasset Decl. ¶ 2(a); Kuersteiner Decl. ¶ 2; Phansalkar Decl. ¶ 2(a); Shanahan Decl. ¶ 2(a).

[6]  See Andrews Decl. ¶ 2(b); Barclay Decl. ¶ 2(b); Bohnsack Decl. ¶ 2(b); McNamara Decl. ¶ 2(a); Phansalkar Decl. ¶ 2(b); Shanahan Decl. ¶ 2(b).

million in pre-registration purchases of 2009 Bonds,[7] and over $12.7 million in post-registration purchases of 2009 Bonds.[8]  Thus, the Supporting Institutions represent approximately half the Class.

The Supporting Institutions selected SSRIT and AHIT to serve as the Lead Plaintiffs, based on their collective conclusion that these funds would fairly and adequate represent the interests of all of the Supporting Institutions' clients, as well as those of the absent Class members.[9]  The Supporting Institutions have been monitoring the progress of the case and the performance of the Lead Plaintiffs from the beginning, and intend to continue doing so.  See id.  All of the Supporting Institutions have submitted declarations stating that they fully support certification of the proposed Class, and that they are satisfied that SSRIT and AHIT are fairly and adequately representing the interests of all of their clients, as well as all absent Class members.  See id.  Not one class member has stepped forward to oppose the motion for class certification.

Instead, it is only the defendants, feigning concern for the Lead Plaintiffs' adequacy to represent the Class, who seek to defeat class certification.  Their efforts to do so must be seen for what they are:  a transparent attempt to minimize their own liability in this case by preventing the Bond purchasers from enjoying the efficiencies of a class action, and instead relegating them to individualized lawsuits as their only hope of recovery.  Of course, the defendants hope that the individual Class members will find it economically impractical to bring such individualized lawsuits,

---

[7]  See Barclay Decl. ¶ 2(c); Bevacqua Decl. ¶ 2(c); Bohnsack Decl. ¶ 2(c); Harker Decl. ¶ 2(a); Hasset Decl. ¶ 2(b); Kelly Decl. ¶ 2; McNamara Decl. ¶ 2(b); Phansalkar Decl. ¶ 2(c).

[8]  See Bevacqua Decl. ¶ 2(d); Bohnsack Decl. ¶ 2(d); Harker Decl. ¶ 2(b).

[9]  See Andrews Decl. ¶¶ 5-6; Barclay Decl. ¶¶ 5-6; Bevacqua Decl. ¶¶ 5-6; Bohnsack Decl. ¶¶ 5-6; Harker Decl. ¶¶ 4-5; Hasset Decl. ¶¶ 4-5; Kelly Decl. ¶¶ 5-6; Kuersteiner Decl. ¶¶ 3-4; McNamara Decl. ¶¶ 5-6; Phansalkar Decl. ¶¶ 5-6; Shanahan Decl. ¶¶ 5-6.

3

and that the defendants will never have to answer for the damages they caused those investors. Plainly, the defendants are not truly interested in protecting the members of the Class.

As discussed below, this is precisely the type of case where a class should be certified. The Lead Plaintiffs and all other Class members were injured by the same course of fraudulent conduct, involving the same or substantially similar false and misleading statements. To the extent that there may be individualized issues with respect to certain claims, those individualized issues are far outweighed by the numerous issues that are common to all class members. The defendants' objections to class certification should be rejected, and the Lead Plaintiffs should be permitted to continue their prosecution of this action on behalf of all members of the proposed Class, in the same competent (and surely more than "adequate") manner which has already characterized their efforts in this case.

## ARGUMENT

### I.       Applicable Legal Standards

Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure permit class certification when (1) the class is so numerous that joinder of all members is impractical, (2) there are questions of law or fact common to the class that predominate over any questions affecting only individual members, (3) the class representative's claims or defenses are typical of those of the class, (4) the representative parties will fairly and adequately protect the interests of the class, and (5) a class action is superior to other available means of adjudication.

Courts within the Fourth Circuit have construed Rule 23 broadly to facilitate certification of class actions. See In re A.H. Robins Co., 880 F.2d 709, 740 (4th Cir. 1989); Simpson v. Specialty Retail Concepts, 149 F.R.D. 94, 98 (M.D.N.C. 1993); South Carolina Nat'l Bank v. Stone, 139 F.R.D. 325, 328 (D.S.C. 1991). As this Court has held, "[d]ue to the importance of the class action

4

device in the context of suits by aggrieved purchasers of securities, 'the interests of justice require

that in a doubtful case ... any error, if there is to be one, should be committed in favor of allowing

the class action.'" South Carolina Nat'l Bank,139 F.R.D. at 328.  Federal securities lawsuits based

on a common fraudulent scheme, like this one, are "particularly appropriate" for class action

treatment.  In re Southeast Hotel Properties Ltd. Partnership Investor Litig., 151 F.R.D. 597, 601

(W.D.N.C. 1993); see also Longman v. Food Lion, Inc., 1994 WL 686624, at *2 (M.D.N.C. Oct. 17,

1994); South Carolina Nat'l Bank, 139 F.R.D. at 328; In re Kirschner Med. Corp. Sec. Litig., 139

F.R.D. 74, 77 (D. Md. 1991).

   As discussed below, the defendants' protestations notwithstanding, the Lead Plaintiffs have

satisfied all of the criteria under Rule 23 for certification of the proposed Class in this case.

**II.     This Action Satisfies The Standards For Class Certification Under
        Rule 23(a) of the Federal Rules of Civil Procedure**

   **A.     The Members Of The Class Are So Numerous And
            Geographically Dispersed That Joinder Is Impracticable**

   The defendants' first point of attack is on the numerosity of the Class members.  They argue

that "the number of purchasers of the 2008 Bonds and 2009 Bonds is readily identifiable ... from the

records of The Bank of Nova Scotia Trust Company of New York," and that these records "suggest"

that there were "only" 40 pre-registration purchasers of 2009 Bonds and 27 pre-registration

purchasers of 2008 Bonds.  See Outside Directors' Mem. at 11-13.  As for post-registration

purchasers, the defendants point to certain Bank of Nova Scotia documents identifying owners of

the 2008 Bonds as of various dates following registration, and conclude from those documents that

there were "only 28 aftermarket purchase transactions involving only 25 entities." Id. at 13.

   The defendants' entire argument is premised on a single incorrect assumption – i.e., that the

entities listed in the Bank of Nova Scotia's records are, themselves, members of the Class.  In truth,

5

the Bank of Nova Scotia's records only identify the banks that maintain accounts with the Depository Trust Company, which is the record holder of all of the Bonds. These banks (the "Custodian Banks") are not the beneficial owners of the Bonds, but are at least one, and often several, steps removed from the beneficial owner. Each Custodian Bank holds Bonds for its clients, some of which may be Class members but others of which are money managers or other institutions that traded Bonds on behalf of their own clients and funds, which are the ultimate beneficial owners. It is these beneficial owners – not the money managers, and certainly not the Custodian Banks – that suffered losses due to the purchases of the Bonds. Therefore, it is the beneficial owners that are the members of the Class. See In re Franklin Nat'l Bank Sec. Litig., 574 F.2d 662, 669 (2d Cir. 1978) (where class consists of "purchasers" of securities, the class members are the beneficial owners, not the record holders); McEwen v. Digitran Sys., Inc., 49 F. Supp. 2d 1293, 1298 (D. Utah 1999) (investment managers' clients, not investment managers themselves, are members of class consisting of "purchasers" of securities); Peil v. National Semiconductor Corp., 1986 WL 11699, *1 (E.D. Pa. Oct. 16, 1986) ("although the stock is held in the name of the nominees, it is owned by the beneficial purchasers, and these beneficial purchasers comprise the class").

Indeed, although there is no dispute that the Lead Plaintiffs are Class members, their names do not appear in the Bank of Nova Scotia's records. Instead, SSRIT's holdings are encompassed in the entries in those records for State Street Bank and Trust Company, which was the custodian bank for all of the Bonds purchased by SSRMC on behalf of its fourteen clients and funds. See McNamara Decl. ¶ 4. AHIT's holdings are encompassed in the entries for Chase Manhattan and/or State Street Bank and Trust Company, which served as custodians for all of the Bonds purchased by CRMC on behalf of eleven clients and funds. See Barclay Decl. ¶ 4. The names of the other Supporting Institutions and their clients also do not appear on the Bank of Nova Scotia's records,

6

because they did not hold Bonds in their own names, but rather through one or more Custodian Banks. <u>See</u> Andrews Decl. ¶ 4; Bevacqua Decl. ¶ 4; Bohnsack Decl. ¶ 4; Kelly Decl. ¶ 4; Kuersteiner Decl. ¶ 2; Phansalkar Decl. ¶ 4; Shanahan Decl. ¶ 4.

Thus, the fact that there are 46 Custodian Banks identified in the Bank of Nova Scotia's records does not mean that there are only 46 Class members. Rather, each of the Custodian Banks held Bonds on behalf of at least one, and often multiple, clients. Many of those clients were institutional investors or money managers (like the Supporting Institutions) which, in turn, purchased the Bonds on behalf of numerous funds and clients (like SSRIT and AHIT). As one court has explained, these multiple layers make identification of individual class members difficult:

> The identities of certain class members are not readily ascertainable because although they are beneficial securities owners of ... stock, their securities were registered in "street names," and held by nominees. Often there are multiple layers of record ownership between a nominee and a beneficial owner. For example, a brokerage firm might hold stock for customers who in turn could be record holders for the ultimate beneficial owners.

<u>Weinberger v. Jackson</u>, 1985 WL 5811, *1 (N.D. Cal. Aug. 28, 1995).

Of course, even the defendants acknowledge that the Court need not determine the precise number of class members in order to determine numerosity. Rather, that determination can be based on reasonable estimates and sheer common sense. <u>Belbis v. County of Cook</u>, 2002 WL 31600048, *6 (N.D. Ill. Nov. 18, 2002) ("Plaintiff need not demonstrate the exact number of class members so long as a conclusion is apparent from good-faith estimates ... and the court is entitled to make 'common sense assumptions' in order to support a finding of numerosity") (citations omitted); <u>Alexander A. v. Novello</u>, 210 F.R.D. 27, 33 (E.D.N.Y. 2002) ("'[A] class action may proceed upon estimates as to the size of the proposed class,' ... and 'courts may "make common sense assumptions" to support a finding of numerosity.'") (citations omitted); <u>Peil v. Speiser</u>, 97 F.R.D.

657, 658 (E.D. Pa. 1983) ("In securities actions, the 'federal trial courts are quite willing to accept common sense assumptions in order to support a finding of numerosity.'") (citations omitted).

Here, while the Lead Plaintiffs do not know the precise number of beneficial owners of the Bonds (i.e., Class members), the Lead Plaintiffs know that number exceeds 219, which is the number of funds and clients on whose behalf the Supporting Institutions purchased Bonds during the Class Period. See supra note 4. This number alone is sufficient to render joinder of all Class members impractical, particularly given their dispersion throughout the United States. See, e.g., Cypress v. Newport News General & Nonsectarian Hosp. Ass'n, 375 F.2d 648, 653 (4th Cir. 1967) (class of 18 satisfied numerosity requirement); Brady v. Thurston Motor Lines, 726 F.2d 136 (4th Cir. 1984) (class of 74 persons satisfied numerosity requirement); Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir. 1985) (affirming certification of class of "more than 90 geographically dispersed plaintiffs"); Grice v. PNC Mortg. Corp. of Am., 1998 WL 350581, *3 (D. Md. May 21, 1998) (certifying class of 125 members from four states). However, the numerosity of the Class is even plainer when one considers that the Supporting Institutions' initial offering purchases account for only about half of the total $550 million Bond issues.[10] It is therefore reasonable to assume that the Supporting Institutions' clients and funds constitute approximately half of the Class, which means the total number of Class members is approximately 438. There can be no legitimate dispute that the "numerosity" prong of Rule 23(a) is satisfied. See, e.g., Southeast Hotel Properties, 151 F.R.D. at 601 (class of over 400 members "scattered across the United States" satisfies numerosity requirement); Kitchens v. U.S. Shelter Corp., 1983 WL 1380, *1 (D.S.C. Oct. 13, 1983) (numerosity

---

[10]  Of the more than $316 million in principal amount of unregistered Bonds purchased by the Supporting Institutions, about $270 million were purchased in the initial offerings. The rest were purchased in the secondary market, but prior to registration of the Bonds.

requirement satisfied where "there were potentially 282 members in twelve different states making

joinder of all members impracticable").[11]

**B.**    **The Lead Plaintiffs Are Adequate Class Representatives,**
         **Whose Claims Are Typical of Those of Other Class Members**

The defendants' next avenue attack is on the Lead Plaintiffs' adequacy to represent the Class.

The defendants assert that the Lead Plaintiffs are inadequate because they are subject to unique

defenses that render them atypical of other Class members.  Of course, the purpose of the adequacy

and typicality requirements is to ensure that the interests of absent Class members are protected.  See

Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 726 (11th Cir. 1987) (purpose of adequacy

requirement is "to protect the legal rights of absent class members"); Stevelman v. Alias Research,

Inc., 2000 WL 888385, *3 (D. Conn. June 22, 2000) ("As with the typicality requirement, '[t]he

purpose of the adequacy requirement ... is to protect the legal rights of absent class members who

are bound by the resulting judgment.'") (citation omitted); In re Ford Motor Co. Bronco II Product

Liability Litig., 177 F.R.D. 360, 367 (E.D. La. 1997) (purpose of typicality and adequacy

requirements is "ensuring that the interests of the absent class members are protected"); Simpson,

149 F.R.D. at 99 ("the typicality requirement overlaps with the adequacy requirement since it ensures

---

[11] Even if one were to accept the defendants' argument and treat the Custodian Banks as the Class members, the Class would be sufficiently numerous and geographically dispersed to render joinder impractical.  The Bank of Nova Scotia's documents identify 46 Custodian Banks, which are headquartered throughout the United States, including New York, Massachusetts, Pennsylvania, Illinois, Ohio, Michigan, North Carolina, Tennessee, and California.  See Exhibits 1-5 to the Outside Directors' Memorandum. Joinder under these circumstances would surely be impractical.  See Stewart v. Abraham, 275 F.3d 220, 226-227 (3d Cir. 2001) ("generally if the named plaintiff demonstrates that the potential number of plaintiffs exceeds 40, the first prong of Rule 23(a) has been met"); Kilgo v. Bowman Transp., Inc., 789 F.2d 859, 878 (11th Cir. 1986) (affirming finding that joinder would be impractical for class of 31 individuals from Georgia, Florida and Alabama); Kohl v. Association of Trial Lawyers of America, 183 F.R.D. 475, 484 (D. Md. 1998) (finding numerosity where class consisted of 35 individuals from Florida, Washington, New Jersey, Virginia, the District of Columbia, and Maryland).  See also 1 Newberg on Class Actions § 3.05, at 3-25 (3d ed.1992) (suggesting that any class consisting of more than forty members "should raise a presumption that joinder is impracticable").

that the absent class members will be adequately represented").

Not only have no Class members raised any concerns about SSRIT's or AHIT's adequacy or typicality, but the institutions managing the investments of at least 219 Class members – constituting roughly half of the Class, and including pre- and post-registration purchasers of 2008 and 2009 Bonds -- affirmatively support certification of the Class with SSRIT and AHIT as Class representatives. See Andrews Decl. ¶ 6; Barclay Decl. ¶ 6; Bevacqua Decl. ¶ 6; Bohnsack Decl. ¶ 6; Harker Decl. ¶ 5; Hasset Decl. ¶ 5; Kelly Decl. ¶ 6; Kuersteiner Decl. ¶ 4; McNamara Decl. ¶ 6; Phansalkar Decl. ¶ 6; Shanahan Decl. ¶ 6. The defendants' purported concerns about AHIT's and SSRIT's adequacy and typicality are clearly nothing more than a litigation tactic, borne not of any desire to protect absent Class members, but rather of the defendants' desire to minimize or eliminate their own liability to those Class members.

Moreover, the defendants' challenges to the Lead Plaintiffs' typicality simply are not well-founded. "Properly considered, 'a plaintiffs' claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his claims are based on the same legal theory.'" South Carolina Nat'l Bank, 139 F.R.D. at 329. "Allegations that the plaintiffs' securities purchases arose out of the defendants' common course of conduct satisfy the typicality requirement." Id. Here, there is no question that the Bond purchases by the Lead Plaintiffs and all Class members arose out of the same course of conduct by the defendants – i.e., misstatements of the Company's financial condition which caused the Bond prices to be (at best) artificially inflated throughout the Class Period.[12] Nonetheless, the defendants seek to defeat class

---

[12] Lead Plaintiffs believe the evidence will show that the defendants' conduct did more than inflate the price of the Bonds, but actually created a market for the Bonds where none would have existed if the true facts were disclosed.

certification by arguing that the Lead Plaintiffs will encounter individual reliance and causation issues, or that they will be subject to unique defenses due to their sophistication.

While the existence of a potentially unique defense <u>can</u> render a plaintiff atypical, "it is not the rule that the Court must always deny class certification whenever a potential defense is raised." <u>Simpson</u>, 149 F.R.D. at 101 n.5 (citing <u>Ross v. Bank South, N.A.</u>, 837 F.2d 980, 991 (11th Cir.), <u>vacated on other grounds</u>, 848 F.2d 1132 (1988)).  <u>See also</u> <u>Cheney v. Cyberguard</u>, 2002 WL 31630172, *10 (S.D. Fla. Aug. 14, 2002).  Rather, such defenses will only destroy a plaintiff's typicality if they threaten to distract that plaintiff from the common issues.  <u>See</u> <u>Koos v. First Nat'l Bank</u>, 496 F.2d 1162, 1165 (7th Cir. 1974); <u>McAdams v. Massachusetts Mut. Life Ins. Co.</u>, 2002 WL 1067449, *5 (D. Mass. May 15, 2002); <u>ABT v. Mazda Am. Credit</u>, 1999 WL 350738, *3 (N.D. Ill. May 19, 1999).  The defendants' assertion of "unique" defenses against the Lead Plaintiffs are weak, at best.  There is no reason to believe – and certainly the Supporting Institutions are not concerned – that the Lead Plaintiffs will be so distracted by any arguable defenses that they cannot adequately represent the Class.

### 1.    <u>Lead Plaintiffs are not subject to any unique reliance issues.</u>

First, the defendants claim that the Lead Plaintiffs are subject to individualized reliance issues that render their claims atypical from those of other Class members.  They are wrong for at least two reasons.  First, the Lead Plaintiffs and all members of the Class share the same interest in establishing that class-wide reliance can be presumed under the fraud-on-the-market and/or the fraud-created-the-market theory.  Second, even absent such a presumption, the claims of the Lead Plaintiffs and all of the Class members are all based on their reliance on the Company's false and misleading financial information.  Even if the Lead Plaintiffs received that information from different sources than other Class members, their claims are typical because the underlying

misrepresentations are the same.

"The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's [securities] is determined by the available material information regarding the company and its business.... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements." Basic Inc. v. Levinson, 485 U.S. 224, 241-42 (1988) (citation omitted).   The fraud-created-the-market theory (also known as the "fraud on the undeveloped market" theory) is a corollary to the fraud-on-the-market theory, providing for a presumption of reliance in the absence of an open and developed market – e.g., for newly issued securities – "if the plaintiffs prove that the security was not entitled to be marketed to the public, i.e., that had the truth been fully disclosed, the security could not have been sold at any price." South Carolina Nat'l Bank, 139 F.R.D. at 331-32.

With regard to those Bonds purchased after the initial offering, the Amended Complaint alleges: "At all relevant times, the market for the Bonds was an efficient market that promptly digested current information with respect to the Company from all publicly-available sources and reflected such information in the Bonds' prices.  Plaintiffs and the other Class members relied on the integrity of the market price of the Bonds."  Am. Compl. ¶ 286.[13]  As further alleged, the defendants disseminated numerous public statements during the Class Period – including in SEC filings, registration statements, offering memoranda, press releases, road shows, and analyst

---

[13] Thus, the Director Defendants are incorrect when they state that the Lead Plaintiffs failed to allege facts in their complaints to support the fraud-on-the-market theory.

conference calls – which materially misrepresented the Company's financial results.[14]  All of these statements were false and misleading because they were based upon figures in the Company's financial statements which ultimately had to be restated.  Only three months after the Company's disclosure of potential accounting irregularities in those financial statements, it missed nearly $60 million in debt payments and filed for Chapter 11 bankruptcy protection.  See Am. Compl. ¶¶ 4, 221, 222.  Given this fact and the magnitude of the misstatements, there can be no real question (and Plaintiffs will submit expert testimony) that the misstatements inflated the price of the Bonds during the Class Period.  This evidence will be the same for the Lead Plaintiffs and all Class members.

With regard to the initial offerings of the Bonds, Plaintiffs intend to prove that, absent the fraud, there would have been no market for these Bonds and the offerings could never have taken place.  See, e.g., Declaration of Michelle Freitag Robson in Support of Plaintiffs' Motion for Summary Judgment, ¶¶ 6, 8 (attached as Ex. A); Declaration of Michael Rolnick in Support of Plaintiffs' Motion for Summary Judgment, ¶¶ 5, 8 (attached as Ex. B).  In South Carolina National Bank, this Court recognized the availability of the fraud-created-the-market theory to establish reliance by purchasers of newly issued bonds.  139 F.R.D. at 332 ("[e]very court which has considered the theory with respect to newly-issued ... bonds has approved it").  Accord Shores v. Sklar, 647 F.2d 462, 469-71 (5th Cir. 1981); T.J. Raney & Sons v. Fort Cobb, Okla. Irrigation Fuel Auth., 717 F.2d 1330, 1333 (10th Cir. 1983); Ross v. Bank South, N.A., 885 F.2d 723, 729 (11th Cir. 1989).  More importantly for purposes of the present motion, the Court recognized that there are

---

[14]  Despite the defendants' best efforts to portray the offering memoranda and road shows as "private" statements that would not support a "fraud-on-the-market" presumption, those statements were widely disseminated to institutional investors.  Moreover, the false financial information in the offering memoranda was the very same false financial information that appeared in the Company's public filings, including its Form 10-K and 10-Q filings.  No one can seriously dispute the public nature of those documents.  Thus, the false and misleading information in the offering memoranda and road shows was in the public domain, and should be presumed to have affected the pricing of the Bonds.

13

no individual issues precluding class certification where the plaintiffs allege a presumption of reliance:

> Due to the nature of the claims asserted in this case, the reliance of individual class members is not even at issue because the plaintiffs have alleged a "fraud-on-the-market" as to the after-market or secondary market trading here, and a "fraud on the undeveloped market" (also known as "fraud created the market") as to the original issue or so-called "primary market."
>
> *      *      *
>
> ... Because they are entitled to a presumption of reliance, individual issues of reliance cannot predominate over the numerous common issues.

South Carolina v. Nat'l Bank, 139 F.R.D. at 331-33. See also Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 723 (11th Cir. 1987) (claims based on a "fraud-created-the-market" theory are "especially suited for class action treatment, as it makes virtually irrelevant the possibility that the various purchasers may have relied on different representations").

Although the defendants argue that these presumptions of reliance are unavailable in this case, that is a fact-intensive issue which will likely require expert testimony, and which should not be determined at the class certification stage. See Kirkpatrick, 827 F.2d at 722; Simpson, 149 F.R.D. at 100-101. For class certification purposes, it is sufficient that the Lead Plaintiffs have the same interest in establishing these presumptions as the rest of the Class. See Sharp v. Coopers & Lybrand, 70 F.R.D. 544, 548 (E.D. Pa. 1976), aff'd, 649 F.2d 175 (3d Cir. 1981) ("the determination of whether each member of the class must prove reliance is itself a question common to the class"); Simpson, 149 F.R.D. at 101 (typicality requirement is satisfied even where the lead plaintiff "may be more likely [than other class members] to have the fraud on the market presumption rebutted by the defendants," since "he would still have the same interest as other class members in establishing the fraud on the market theory"); Shamberg v. Ahlstrom, 111 F.R.D. 689, 697 (D.N.J. 1986)

14

("whether individual reliance is a necessary element or whether a fraud on the market theory will eventually apply is itself a question which is common to and typical of the entire class") (citing In re Data Access Sys. Sec. Litig., 103 F.R.D. 130, 140 (D.N.J. 1984)); In re Honeywell Int'l Inc. Sec. Litig., 2002 WL 31525571, *9 (D.N.J. Nov. 14, 2002) (certifying a class where there was "every indication ... that the fraud on the market issue ... [would] be central to the litigation," and that "the applicability of the presumption [would] itself be a prominent question in the case--one common to all class members"); In re T2 Medical, Inc. Shareholder Litig., 1993 WL 594003, *8 (N.D. Ga. Nov. 16, 1993) ("to the extent that the efficiency of the market is actually at issue, that question is itself common to the members of the class"). The Lead Plaintiffs have the same incentive and interest as the rest of the Class in establishing the applicability of the "fraud-on-the-market" and "fraud-created-the-market" presumptions, and are therefore typical of the other Class members.[15]

Even if the Court were ultimately to find that reliance cannot be presumed, the Lead Plaintiffs are still typical of other Class members. First, there is no question that the Lead Plaintiffs and all others who purchased Bonds in the initial offering did so in reliance on the offering memoranda. Those documents were disseminated to prospective purchasers of the Bonds for the express purpose of inducing them to buy into the initial offering. Therefore, there are no unique reliance issues with respect to the initial offering purchases. With respect to purchases in the secondary market, even if the Lead Plaintiffs relied upon specific documents or communications that other Class members did not, all of those documents and communications conveyed the same false and misleading

---

[15] PwC erroneously suggests that the Lead Plaintiffs would not qualify for the fraud-on-the-market presumption because they purchased most of their Bonds in the initial offering, when there was no developed market. First, the fraud-created-the-market presumption applies to purchases in the undeveloped market, so the Lead Plaintiffs certainly qualify for that presumption. Second, the Lead Plaintiffs did not purchase all of their Bonds in the initial offering, but also purchased many Bonds in the aftermarket. Thus, even if the fraud-on-the-market presumption only applies to aftermarket purchasers, it applies to the Lead Plaintiffs.

information – i.e., gross overstatements of the Company's financial results. From the offering

memoranda, to the road shows, to the registration statements, to the SEC filings, to the press

releases, to the analyst conference calls, all were false and misleading because they incorporated

financial information from the Company's financial statements which were ultimately restated.[16]

In addition, all of the misstatements stemmed from a common fraudulent scheme by the defendants.

The Lead Plaintiffs, like the rest of the Class, had no knowledge of this scheme or that any of the

Company's financial statements were misstated. Under these circumstances, even if there is no

presumption of reliance, the Lead Plaintiffs are typical of the Class members because they all relied

on substantially the same misstatements. See In re Safety-Kleen Corp. Stockholders Litig., No. 3:00-

CV-736-17, Order Granting Class Certification (D.S.C. June 18, 2002) (the fact that the lead

plaintiffs relied on different sources of information does not make them atypical, when the

underlying information was the same as that relied on by all Class members); Kirkpatrick, 827 F.2d

at 724 (the possibility that the named plaintiffs received information from a different source than

other class members does not preclude class certification, where the claims "essentially involve

allegations that the defendants 'committed the same unlawful acts in the same method against the

entire class'"); Green v. Wolf Corp., 406 F.2d 291, 299 (2d Cir. 1968) ("Because it appears that the

faulted misstatements alleged in the first two prospectuses [upon which Green did not rely] are also

present in the third prospectus [upon which Green relied], it would be logical and efficient to permit

---

[16] The defendants misleadingly suggest that the Lead Plaintiffs were the only Class members to participate in the road shows and conference calls. In fact, the road shows were conducted for institutional investors across the country, and the conference calls were attended by institutional investors as well as analysts who issued research reports to investors based on the information conveyed in the calls. See, e.g., Am. Compl. ¶¶ 110-111 (referring to "nationwide road show" that "made stops from Boston to Los Angeles... with many stops in between to a number of the Institutional Investors and other Class members"), ¶181 (conference call "was attended by CRMC and State Street Research, among other Institutional Investors and Class members, and ... was reported in analyst reports which were distributed to Class members and the investing public").

Green to represent all the purchasers, at least with respect to the common misrepresentations").

### 2.    Lead Plaintiffs' sophistication does not render them atypical.

The fact that the Lead Plaintiffs are sophisticated investors who purchased the Bonds via two-step offerings also does not make them unique or atypical.  High yield securities are frequently purchased by institutional investors and other sophisticated investors.  Indeed, each of the Supporting Institutions which purchased the Bonds for their clients is a sophisticated investor, and most of them purchased Bonds in the first step of the two-step offering.[17]  Thus, if there were "unique" defenses that applied to sophisticated investors, those defenses would be common to most Class members.

At a more basic level, however, the fact that an investor is sophisticated does not give rise to unique defenses.[18]  Indeed, the defendants' theory flies in the face of the Private Securities Litigation Reform Act ("PSLRA"), which expresses a preference for the appointment of sophisticated institutional investors as lead plaintiffs. See Gluck v. CellStar Corp., 976 F. Supp. 542, 548 (N.D. Tex. 1997) ("By expressing a strong preference for institutional investors to be Lead Plaintiffs, Congress rejected typicality and adequacy objections" based on institutional investors'

---

[17] PwC incorrectly asserts that the Lead Plaintiffs have not established that any other Class members purchased Bonds via the same type of two-step transaction as the Lead Plaintiffs. See PwC's Brief, at 9-10. Because the Class encompasses all of the initial offering purchasers of the Bonds, and because the only way the Bonds were originally issued was through the two-step offering, PwC's argument falls of its own weight. In any event, most of the Supporting Institutions have produced documents in response to the defendants' subpoenas which establish that they purchased Bonds in one or both of the initial offerings.

[18] See Danis v. USN Communications, Inc., 189 F.R.D. 391, 399 n.4 (N.D. Ill. 1999) ("Even if [plaintiffs] were sophisticated investors, this would not render their claims atypical"); Weikel v. Tower Semiconductor Ltd., 183 F.R.D. 377, 393 (D.N.J. 1998) ("Because a particular investor is sophisticated or engages in speculation does not mean the fraud on the market theory is inapplicable or the investor is an inappropriate class representative"); In re SciMed Life Sec. Litig., 1992 WL 413867, at *2 (D. Minn. Nov. 20, 1992) ("sophistication is not a unique defense precluding the typicality requirement of class representation"); In re MDC Holdings Sec. Litig., 754 F. Supp. 785, 802 (S.D.Cal.1990) ("differences in investor sophistication do not prevent class certification"); In re Gulf Oil/Cities Serv. Tender Offer Litig., 112 F.R.D. 383, 387-88 (S.D.N.Y.1986) (sophistication does not render plaintiffs' claims atypical); McFarland v. Memorex Corp., 96 F.R.D. 357, 363 (N.D. Cal.1982) ("The various degrees of knowledge of the different purchasers do not affect plaintiffs' ability to represent the class.").

sophistication).

Essentially, the defendants argue that sophisticated investors are atypical because they have access to information that other investors do not. However, the Lead Plaintiffs have sworn in their verified interrogatory answers that they had no non-public information about the Company. See Ex. C to PwC's brief, p. 13 (Request No. 11); Ex. D to PwC's brief, p. 14 (Request No. 11). The Lead Plaintiffs relied on the same false and misleading representations of the Company's financial results as the rest of the Class members. The Lead Plaintiffs' sophistication does not make them atypical under these circumstances, since "it is established that [i]t makes no difference if you are the most or least knowledgeable investor in the market if facts are omitted or misrepresented in financial statements ... [i]t is impossible to arrive at a sound decision whether or not to invest if material facts are omitted or misrepresented." Rubenstein v. Collins, 162 F.R.D. 534, 538 (S.D. Tex. 1995) (rejecting argument that sophisticated investor could not serve as class representative) (quoting Rifkin v. Crow, 80 F.R.D. 285, 286 (N.D.Tex.1978)). See also Blackie v. Barrack, 524 F.2d 891, 905 (9th Cir.1975) ("Differences in sophistication, etc., among purchasers have no bearing in the impersonal market fraud context, because dissemination of false information necessarily translates through market mechanisms into price inflation which harms each purchaser identically."); Priest v. Zayre Corp., 118 F.R.D. 552, 555 (D. Mass. 1988) (rejecting argument that institutional investor could not be class representative, where its "investment decisions depended on information readily available to other investors and were not based on the type of knowledge available only to an institutional investor, or one who had direct contact with corporate officers.").

18

### 3.    Lead Plaintiffs are not subject to any unique causation-related defenses to their Section 11 claims.

PwC also asserts that the Lead Plaintiffs are subject to a unique "lack of causation" defense on their Section 11 claims.  PwC claims that, because the Lead Plaintiffs purchased some Bonds before the registration statement became effective, they will have difficulty proving that their post-registration statement purchases were "related to the registration statement."  PwC confuses causation with reliance.  Lack of causation is an affirmative defense to a Section 11 claim, which requires the defendant to prove that some or all of a plaintiff's damages were caused by factors "other than the depreciation in value of [the] security resulting from ... part of the registration statement ... not being true or omitting to state a material fact ..." 15 U.S.C. § 77k(e).  There can be no real dispute in this case that it was the disclosure of the misstatements in the financial statements (which were included in the registration statements) that caused the Bond price to drop, resulting in damage to Lead Plaintiffs and the Class.  The Lead Plaintiffs' interest in defeating any challenges to this causal connection is the same as that of other Class members. PwC's argument goes more to the issue of reliance – i.e., whether the Lead Plaintiffs will be able to prove that their post-registration purchases were made in reliance on the registration statements as opposed to pre-registration factors.  Unfortunately for PwC – and no doubt the reason PwC couched its argument in terms of causation – reliance is <u>not</u> an element of the Class's Section 11 claims.[19]  Thus, the Lead Plaintiffs are not subject to any atypical defenses under Section 11.

---

[19]    Plaintiffs asserting Section 11 claims are not required to prove reliance unless "such person acquired the security after the issuer has made generally available to its security holders an earning statement covering a period of at least twelve months beginning after the effective date of the registration statement." 15 U.S.C. § 77k(a).  This requirement is not triggered until a <u>single</u> earnings statement is issued that covers a full twelve-month period beginning after the date of the registration statement.  <u>See</u>, <u>e.g.</u>, In re JDN Realty Corp. Sec. Litig., 182 F. Supp. 2d 1230, 1245 & n.9 (N.D. Ga. 2002); Gould v. Marlon, 1987 WL 34631, *8 n.2 (D. Nev. Aug. 29, 1987); In re Data Access Sys. Sec. Litig., 103 F.R.D. 130, 145 (D.N.J. 1984).  That did not happen during the Class Period in this case, so the Class need not prove reliance.

### 4.    The fact that Lead Plaintiffs did not purchase registered 2009 Bonds does not make them atypical or inadequate.

The Lead Plaintiffs possess all of the claims possessed by the rest of the Class, with the exception of Section 11 claims based on post-registration purchases of the 2009 Bonds.  The Lead Plaintiffs are nonetheless adequate Class representatives with respect to the Class's Section 11 claim, because they have other claims -- including a Section 18 claim -- that involve substantially the same elements of proof as the Section 11 claim.

In light of the Court's ruling that Section 11 claims are available only to post-registration purchases, the Lead Plaintiffs' Section 11 claim based on their 2009 Bond purchases has been dismissed.  However, the Lead Plaintiffs still have Section 18 and Rule 10b-5 claims based on their pre-registration purchases of the same Bonds.  To succeed on their Section 18 claims, the Lead Plaintiffs and the Class will have to show that they purchased 2009 Bonds in reliance on the Form 10-K filings which contained materially false fiscal 1997 and 1998 financial statements and audit opinions.  These are the very same financial statements and audit opinions that were contained in the registration statement for the 2009 Bonds, and that therefore form the basis for the Class's Section 11 claims based on those bonds.  Indeed, all of the elements of a Section 11 claim are subsumed within the elements of a Section 18 claim.[20]  The Lead Plaintiffs therefore have every incentive to

---

[20]  Section 18 requires proof of a material false or misleading statement in an SEC filing under the Securities Exchange Act of 1934 (the "1934 Act"), upon which plaintiffs relied in their purchase of a security. 15 U.S.C. § 78r; Magna Inv. Corp. v. John Does One Through Two Hundred, 931 F.2d 38, 40 (11th Cir. 1991).  Section 11 also requires proof of a material false or misleading statement, except the misstatement or omission must be in a registration statement under the Securities Act of 1933 rather than a filing under the 1934 Act.  Here, there is no dispute that the very same financial statements and audit opinions that were contained in the Company's Form 10-K filings were contained in the registration statement for the 2009 Bonds.  Moreover, while Section 11 provides auditors with an affirmative defense if they had reasonable grounds to believe (and did believe) the statements to be true, Section 18 similarly provides for an affirmative defense if a defendant proves that it "acted in good faith and had no knowledge that [the] statement was false or misleading." 15 U.S.C. § 78r.  Thus, the elements of the class's Section 11 claim for the 2009 Bonds will require precisely the same proof as Plaintiffs' Section 18 claims (indeed less,

prove the Class's Section 11 claim for the 2009 Bonds, because by doing so they will also prove their own Section 18 claims. Accord In re U.S. Fin. Sec. Litig., 64 F.R.D. 443, 454 (S.D. Cal. 1974) ("The Section 11 violation, if it exists, will be proved in the course of proving the Section 10(b) violation, if it exists") (citation omitted). Thus, SSRIT and AHIT should be permitted to pursue Section 11 claims for the Class based on the 2009 Bonds even though they themselves do not possess such claims.[21] See Ruiz v. Stewart Associates, Inc., 171 F.R.D. 238, 242 (N.D. Ill.1997) ("the representatives' claims need not be identical to the class members'; rather, it is sufficient if they are substantially similar"); Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 1992 WL 212226, *6 (M.D. Pa. July 31, 1992) ("The representative's claims 'only need be sufficiently similar to allow the court to conclude that (1) the representative will protect the interests of the class, and (2) there are no antagonistic interests between the representative and the proposed class'").

### 5.    SSRIT's March 8, 2000 purchase does not make it atypical.

Finally, the fact that SSRIT purchased 2008 Bonds on March 8, 2000 – two days after the initial announcement of potential accounting irregularities – does not render SSRIT atypical or preclude class certification. First, SSRIT also purchased 2008 Bonds and 2009 Bonds prior to the March 6 announcement, and therefore shares the same interests as all pre-March 6 purchasers. Second, under the fraud-created-the-market theory, post-March 6 purchasers are in the same position as all other Class members – i.e., they were damaged because they purchased securities for which there should never have been a market. Moreover, although there was partial disclosure of adverse facts on March 6, Plaintiffs will present evidence that it was an incomplete disclosure, and that the

---

since Section 11 does not require proof of reliance).

[21]    Several of the Supporting Institutions that have been monitoring this litigation are post-registration purchasers of the 2009 Bonds. They are comfortable that the Lead Plaintiffs are adequately representing their interests. See, e.g., Bevacqua Decl. ¶ 6; Bohnsack Decl. ¶ 6; Harker Decl. ¶ 5.

Bond prices remained artificially inflated through March 9, 2000 (the end of the Class Period) due to the same fraudulent conduct that caused harm to the pre-March 6 purchasers. SSRIT is therefore not atypical. See Cheney, 2002 WL 31630172, at *10 ("although some factual differences exist between [the lead plaintiff] and other members of the class, the court does not find that the [lead plaintiff's] purchase after the revelation of fraud bars a finding of typicality" where he also purchased prior to the revelation and where all class members alleged a common course of fraudulent conduct).[22]

*          *          *

For all of the foregoing reasons – including the Supporting Institutions' overwhelming show of support for the Lead Plaintiffs  – this Court should reject the defendants' challenges to the Lead Plaintiffs' adequacy and typicality.

**C.    Common Questions Of Law Or Fact Predominate**

      **1.    Reliance Does Not Predominate Over the Common Issues Relating to Plaintiffs' Section 18 Claim**

In another attempt to defeat class certification, the defendants latch on to the fact that the plaintiffs' Section 18 claims require individualized proof of reliance, and argue that the Class cannot be certified because this individual issue "predominates" over the common legal and factual issues under Rule 23(b)(3). The defendants' argument runs counter to the purposes Section 18 is intended to serve, and is contrary to the weight of authority in cases involving individual issues of reliance.

The predominance inquiry "involves an analysis of the substantive elements of plaintiffs' claims and the requisite proof on these issues and an inquiry into the form the trial on the issues

---

[22]  Even if SSRIT's March 8, 2000 purchase gives rise to unique defenses against SSRIT, there is no risk that these defenses would overwhelm the common issues. SSRIT's co-Lead Plaintiff, AHIT, did not make any post-March 6, 2000 purchases and can therefore provide a "check" on the degree of attention devoted to post-March 6 issues.

22

would take." <u>Anderson v. Bank of the South, N.A.</u>, 118 F.R.D. 136, 150 (M.D. Fla. 1987). The

central issue with respect to all of the Class members' Section 18 claims is the defendants'

dissemination of materially false and misleading statements in the Company's Form 10-K filings.

The proof on the issues of falsity, materiality, the defendants' states of mind, and the impact of the

false statements on the market for the Bonds, will be the same for all Class members because the

defendants engaged in the same course of conduct, and disseminated the same Form 10-K filings to

all of them. Reliance is the <u>only</u> element of plaintiffs' Section 18 liability case that is not common

to all Class members, and it should not preclude class certification:[23]

> The need to show individual reliance has not precluded class
> treatment in cases where standardized written misrepresentations
> have been made to class members ... In such cases, the courts have
> uniformly found it appropriate to certify a securities class on the
> common liability issues and to defer consideration of individual
> reliance by class members until after disposing of the common class
> questions.

<u>See</u> <u>Schneider v. Traweek</u>, 1990 WL 132716, at *14-15 (C.D. Cal. July 31, 1990) (quoting 4

NEWBERG ON CLASS ACTIONS 2d (1985) § 22.47) (footnotes omitted). <u>See also</u> <u>Walco Inv. v.</u>

<u>Thenen</u>, 168 F.R.D. 315, 334 (S.D. Fla. 1996) (Rule 23(b)(3) "just requires common issues to

<u>predominate</u>, thereby logically implying that the existence of <u>some</u> individual issues will not destroy

common issue predominance.") (emphasis in original); <u>Sharp</u>, 70 F.R.D. at 547 (certifying class

despite potential for individual issues of reliance, since "Rule 23(b)(3) only requires a predominance

of common questions, not a unanimity of them").

---

[23] The director defendants also suggest that there are individualized damages issues that preclude
class certification. However, it is well-settled that "the necessity for calculation of damages on an individual
basis should not preclude class determination when common issues which determine liability predominate."
<u>Bogosian v. Gulf Oil Corp.</u>, 561 F.2d 434, 456 (3d Cir. 1977). <u>See also</u> <u>South Carolina Nat'l Bank</u>, 139
F.R.D. at 331 ("courts uniformly hold that class actions may be appropriate even though there are differences
in the amount of damages suffered by the individual class members").

A number of courts have certified classes in cases involving Section 18 claims, finding that the single individual issue of reliance does not predominate over the many common issues. In Simpson, for example, the court certified a class for purposes of the plaintiffs' Section 18 and state law fraud claims, holding that "the question of whether Defendants ... made material misrepresentations, and if so, whether they were made intentionally or recklessly or negligently are common to the entire class and predominate over individual issues of reliance." 149 F.R.D. at 102. Similarly, in In re MDC Holdings Securities Litigation, the court stated that "individual issues of actual reliance do exist [with respect to the plaintiffs' Section 18 claim]... however, this does not mean that individual issues predominate over common ones." 754 F. Supp. at 806. The court certified a class, concluding that there were "numerous common questions of fact" and a "common course of wrongdoing based on the same misrepresentations," such that common issues predominated over the individual issue of reliance. Id. Further, the court recognized that "[t]he alternative would be to unleash thousands of individual suits into the judicial system, and risk that many plaintiffs would be unable to seek redress because of economics." Id. at 807.

In State of Wisconsin Investment Board v. Ruttenberg, C. A. No. 99-BU-3097-S, mem. op. at 16-18 (N.D. Ala. July 3, 2001), the court followed the holdings in Simpson and In re MDC Holdings and certified a class for purposes of the plaintiffs' Section 18 claims. See Ex. C to Lead Plaintiffs' opening brief, at 16-18. The court concluded that the individual issue of reliance did not predominate over the common issues, and also that considerations of judicial economy would be furthered by allowing the plaintiffs to pursue their Section 18 claims as a class action. Id. The court

noted that the reliance issue could be determined by way of "mini-trials" after the common issues had been resolved.[24] Id. at 18.

As the defendants' memoranda indicate, there are a few courts that have reached the opposite conclusion and declined to certify classes for purposes of Section 18 claims.[25] However, certification of Section 18 classes is the approach that is most consistent with the purposes behind Section 18 and Rule 23(b)(3), and with case law in other contexts where individual proof of reliance is required.

First, the objective of Section 18 is to "encourag[e] use of and reliance upon records filed with the S.E.C."[26] In an effort to ensure full and honest disclosure in SEC filings, Congress afforded an express private right of action to investors who purchase securities in reliance on false or misleading statements in documents filed with the SEC, making Section 18 one of the few provisions of the Securities Exchange Act of 1934 that provides an express private right of action.[27] Congress also provided that, unlike Rule 10b-5 claims, an investor need not establish scienter in order to

---

[24] Other courts – including this one – have similarly held that individual reliance issues can be determined by way of separate hearings once the common issues are resolved. See, e.g., South Carolina Nat'l Bank, 139 F.R.D. at 333; Green, 406 F.2d at 301; Ridings v. Canadian Imperial Bank, 94 F.R.D. 147, 151 (N.D. Ill. 1982); Sharp, 70 F.R.D. at 547.

[25] The defendants make much of the fact that the Lead Plaintiffs' counsel authored an article several years ago that indicated that individual reliance issues may preclude class certification in Section 18 cases. Of course, it is the case law, and not counsel's commentary, which should guide this Court's decision. In any event, an update of that article, which advocates the result reached in the cases that have certified Section 18 classes (including the 2001 decision in State of Wisconsin Investment Board v. Ruttenberg, in which Grant & Eisenhofer was lead counsel for the plaintiff class), is scheduled for publication at the end of this year. A copy of the galley print is attached hereto as Exhibit C. This update was written before the Lead Plaintiffs received the defendants' briefs in opposition to class certification in this case.

[26] Ross v. A.H. Robins Co., 607 F.2d 545, 556 (2d Cir. 1979); Wachovia Bank & Trust Co. v. National Student Marketing Corp., 650 F.2d 342, 357 (D.C. Cir. 1980) (quoting same).

[27] The only other section that provides an express private right of action is Section 9(e), 15 U.S.C. § 78i(e) (relating to manipulation of securities prices). Section 16(b), 15 U.S.C. § 78p(b) (relating to insider short-swing profits) provides for a derivative action if the issuer fails to bring an action for short swing profits.

25

recover under Section 18. To deny class certification in Section 18 cases would be to deny investors

what is, for many of them, the only economically feasible means of pursuing this important remedy.

Congress cannot have intended to legislate an express remedy which is nearly worthless to most

investors. Indeed, prior to the Supreme Court's decision that reliance can be presumed on a class-

wide basis for Rule 10b-5 claims under the fraud-on-the-market theory, the courts recognized that

"[t]he policies served by the securities laws would be in part eviscerated if the reliance requirement

precluded class certification." In re United Energy Corp. Solar Power Modules Tax Shelter Inv. Sec.

Litig., 122 F.R.D. 251, 255 (C.D. Cal. 1988). See also Sharp, 70 F.R.D. at 547 ("[t]o deny class

action status because of the reliance requirement would in large part eviscerate the policies served

by rule 10b-5") (citing Green, 406 F.2d at 301).

     As discussed above, several courts have certified classes in Section 18 cases, in recognition

that the single individual issue of reliance does not predominate over the numerous common issues.

The same result has been reached outside the Section 18 context as well. For example, many courts

have certified classes for the pursuit of state law fraud claims, even though they may require

individualized proof of reliance, when the remaining factual and legal elements are common to all

class members. See, e.g., Kirschner, 139 F.R.D. at 83 (citing cases); Alexander v. Centrafarm

Group, 124 F.R.D. 178, 186 (N.D. Ill. 1988); Keyser v. Commonwealth Nat. Fin. Corp., 121 F.R.D.

642, 649-50 (M.D. Pa. 1988); In re ORFA Sec. Litig., 654 F. Supp. 1449, 1461-62 (D.N.J. 1987);

United Energy, 122 F.R.D. at 255-56; Simpson, 149 F.R.D. at 102. Even more compelling are the

numerous decisions – including a decision from this Court and at least three Circuit Court decisions

– in which class certification was found to be appropriate for Rule 10b-5 claims despite the existence

of individual issues of reliance (either because those cases were decided prior to the Supreme Court's

recognition that reliance may be presumed for such claims, or because the presumption was found

26

not to apply). See, e.g., South Carolina Nat'l Bank, 139 F.R.D. at 333; Kirkpatrick, 827 F.2d at 724-25; Eisenberg, 766 F.2d at 786-87; Green, 406 F.2d at 300-01; Southeast Hotel Properties, 151 F.R.D. at 605; United Energy, 122 F.R.D. at 255; Helfand v. Cenco, Inc., 80 F.R.D. 1, 8-9 (N.D. Ill. 1977); Schneider, 1990 WL 132716 at *15; Sharp, 70 F.R.D. at 547; Seiden v. Nicholson, 69 F.R.D. 681, 686 (N.D. Ill. 1976); Feldman v. Lifton, 64 F.R.D. 539, 548 (S.D.N.Y. 1974); Walco, 168 F.R.D. at 333-34.

As this Court stated in South Carolina National Bank: "[M]ost courts have held that a requirement that the issue of reliance must be individually proved will not prevent the certification of a class action, since to rule otherwise would preclude class actions in securities fraud cases and hamper enforcement of the federal securities laws." 139 F.R.D. at 331 (quoting 4 H. Newberg, Newberg on Class Actions § 22.46 at 94 (2d ed. 1985)). The defendants have offered no reason – nor can they – why a different result should be reached for Section 18 claims. If anything, the case for class certification is stronger for Section 18 claims than for Rule 10b-5 claims, since Congress provided an express private right of action for violations of Section 18, whereas the right of action under Rule 10b-5 is only an implied right of action.

**2.    Common Issues Predominate With Respect to Plaintiffs' Rule 10b-5 Claims**

The defendants also argue that Plaintiffs' Rule 10b-5 claims involve individual issues of reliance which predominate over the common issues. As discussed above, however, there are no individual issues of reliance relating to Plaintiffs' Rule 10b-5 claims. Even if such individual issues did exist, the common issues relating to the Class's Rule 10b-5 claims would still predominate, including the nature of the defendants' accounting manipulations, the impact of those manipulations on the Company's reported financial results, the materiality and falsity of the defendants' statements,

and the defendants' scienter.  As previously discussed, numerous courts, including this one, have certified class actions involving Rule 10b-5 claims despite the potential existence of individual reliance issues, where, as here, the plaintiffs alleged a common course of fraudulent conduct by the defendants.  See, e.g., South Carolina National Bank, 139 F.R.D. at 333 (certifying Rule 10b-5 class, stating "[e]ven if individual issues of reliance should arise, it is more appropriate to determine the common issues in one proceeding, which may be followed by separate hearings regarding any individual issues").

**D.      There Is No Need For Subclasses**

The so-called "Initial Purchasers" argue that, if class certification is to be granted, the Court should divide the Class into subclasses, purportedly to promote efficiency.  In particular, these defendants suggest that the claims based on initial offering purchases should be separated from the claims based on aftermarket purchases, due to purported differences in their theories of reliance. This is simply another variation on the other defendants' argument that there are individualized issues of reliance.  In fact, there is no need for subclasses, and creating them would be anything but efficient.

As previously discussed, all members of the Class – including both initial offering and aftermarket purchasers – should be afforded a presumption of reliance under the fraud-created-the-market theory.  If that presumption applies to the entire Class, there is obviously no need for subclasses.

Alternatively, the Initial Purchasers argue that the fraud-on-the-market presumption would apply only to aftermarket purchases, leaving the initial offering purchasers without a presumption of reliance.  Even if that were true, it would not necessitate subclasses.  If individual proof of reliance is required by some – or even all – of the Class members, this would simply mean that

28

individual determinations would have to be made on that issue once the common issues are resolved. All of the Class members would still have the same interests regarding the common issues that are tried on a Class-wide basis, and there would be no need for subclasses. See In re VMS Sec. Litig., 136 F.R.D. 466, 478 (N.D. Ill. 1991) (because individual issues of reliance do not preclude class certification, differences in theories of reliance do not create need for subclasses).

The Initial Purchasers' effort to create a divergence of interests between initial offering and aftermarket purchasers is also factually flawed. They argue that, unlike initial offering purchasers, aftermarket purchases have "no factual basis to allege direct reliance against the Initial Purchasers." See Initial Purchasers' Brief, at 7. That is not correct. Until the registration statement was filed, the aftermarket purchasers of the Bonds consisted primarily (if not exclusively) of institutional investors who had already received the offering memoranda and made purchases in the initial offering.[28] If individual proof of reliance is required, those aftermarket purchasers can therefore establish reliance on the offering memoranda. Likewise, the registration statement was nearly identical in substance to the offering memoranda. As a result, those who purchased post-registration, in reliance on the registration statement, can also establish reliance on statements by the Initial Purchasers. Creating subclasses would serve no useful purpose, and would merely make the prosecution of this case more complicated and costly for the plaintiffs.

The final footnote of the Initial Purchasers' brief provides a window into the real motivation behind their request for subclasses: i.e., they want to have a new class representative appointed for the aftermarket purchasers. This clever attempt to divide and conquer the Class should be rejected, because it is completely unnecessary. Even if the initial offering purchasers' interests differed from

---

[28] Every one of the Institutional Investors who purchased unregistered Bonds in the aftermarket had previously purchased Bonds in the initial offering.

29

those of aftermarket purchasers – which they do not – each of the Lead Plaintiffs made purchases in the initial offering and in the aftermarket, and thus they are well-positioned to represent all members of the Class. In fact, the Supporting Institutions – most of whom also made purchases both in initial offerings and in the aftermarket – have uniformly expressed their support for certification of the Class with SSRIT and AHIT as Class representatives.

## CONCLUSION

For all of the foregoing reasons, the Lead Plaintiffs respectfully request that the Court issue an Order certifying the action to proceed as a class action pursuant to Fed. R. Civ. P. 23(b)(3), certifying the Lead Plaintiffs as Class representatives, and certifying Lead Counsel as Class Counsel.

Dated:  November 26, 2002

MCCUTCHEN, BLANTON, RHODES & JOHNSON, LLP
Pope D. Johnson, III
Federal I.D. No. 2206
P.O. Drawer 11209
Columbia, SC  29211-1209
(803) 799-9791
Local Counsel for the Plaintiff Class

GRANT & EISENHOFER, P.A.
Stuart M. Grant
Megan D. McIntyre
Diane Zilka
1201 N. Market Street, Suite 2100
Wilmington, DE 19801
(302) 622-7000
Lead Counsel for the Plaintiff Class

30

A

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

|  |  |
|---|---|
| IN RE SAFETY-KLEEN CORP. BONDHOLDERS LITIGATION | ) ) ) ) |

Consol. Case No. 3-00-1145 17

## DECLARATION OF MICHELLE FREITAG ROBSON IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

STATE OF CALIFORNIA    )
                                             )    ss.
COUNTY OF LOS ANGELES    )

Michelle Freitag Robson, for her declaration pursuant to 28 U.S.C. § 1746, deposes and says as follows:

1.      I am Vice President of Capital Research Company ("CRC"). CRC is a wholly owned subsidiary of Capital Research and Management Company ("CRMC"). CRC provides investment research and analysis, including specific investment recommendations, to CRMC. American High Income Trust ("AHIT") is a Massachusetts business trust which invests primarily in debt securities of public and private companies, and which is managed by CRMC. I am, and have been since 1994, the person responsible for making investment decisions for a portion of the AHIT portfolio.

2.      AHIT made the following purchases of 9.25% senior notes due 2008 (the "2008 Bonds"), which were issued by LES, Inc.:  $11,500,000 principal amount on May 21, 1998; $1,000,000 principal amount on August 26, 1998; $375,000 principal amount on August 27, 1998; $250,000 principal amount on September 1, 1998; $250,000 principal amount on October 16, 1998; $1,000,000 principal amount on April 21, 1999; and $5,000,000 principal amount on April 27, 1999. The decision to purchase the 2008 Bonds listed above were made either by me, or by portfolio counselors for AHIT, based on my recommendation to purchase, as follows:  I personally made the following decisions to purchase the 2008 Bonds for my portion of the AHIT

portfolio: $2,500,000 on May 21, 1998; $750,000 on August 26, 1998; $250,000 on September 1, 1998; $250,000 on October 16, 1998; and $1, 250,000 on April 27, 1999.

Based on my recommendations to purchase the 2008 Bonds, the CRMC portfolio counselors made the following purchases of the 2008 Bonds: $9,000,000 on May 21, 1998; $250,000 on August 26, 1998; $375,000 on August 27, 1998; $1,000,000 on April 21, 1999 and $3,750,000 on April 27, 1999.

3.    A copy of my analysis and recommendation is attached hereto as Exhibit A. This analysis was prepared during the course of deciding whether to recommend the purchase of the Bonds for AHIT.

4.    On May 10, 1999, AHIT purchased $4,750,000 principal amount of Safety Kleen Corporation ("Safety Kleen") 9.25% senior notes due 2009 (the "2009 Bonds"). I made the decision to purchase $2,750,000 of the 2009 Bonds for my portion of the portfolio. Based on my recommendations to purchase the 2009 Bonds, the CRMC portfolio counselors purchased $2,000,000 of the remaining bonds.

5.    Prior to each purchase of 2008 Bonds and 2009 Bonds for AHIT, I obtained and reviewed Safety Kleen's most recently filed Form 10-K. For the purchases from May 21, 1998 through October 16, 1998, that was the Form 10-K for the fiscal year ended August 31, 1997 (fiscal 1997). For the purchases in April and May of 1999, it was the Form 10-K for the fiscal year ended August 31, 1998 (fiscal 1998). Prior to each purchase, I had read the financial statements that were contained in the most recently filed 10-K, including the income statement, balance sheet, and statement of cash flows, as well as the notes to the financial statements. I used the information in the 10-Ks to evaluate Safety Kleen's creditworthiness and the value of its debt securities. I also used the information in the 10-Ks to calculate EBITDA and certain standard financial ratios including a leverage ratio and coverage ratio. All of this information factored into my recommendation to purchase the bonds.

6.    I also looked at the auditor's opinions in the 10-Ks, and confirmed that they were unqualified opinions before purchasing and recommending the purchase of the bonds. If the

auditor's opinions had not been unqualified, I would not have purchased or recommended the purchase of the bonds for AHIT.

7.    Each of my decisions to purchase and recommend the purchase of the 2008 Bonds and the 2009 Bonds for AHIT was made in reliance on the completeness and accuracy of the information contained in Safety Kleen's Form 10-K, including the company's annual financial statements, the notes to the financial statements, and the auditor's opinion.

8.    I have reviewed Safety Kleen's restated financial statements. These restatements include material changes to Safety Kleen's revenue, net income, and EBITDA, among other figures. Safety Kleen's financial condition, including its revenue, net income/loss and EBITDA figures, were extremely important to my decisions to purchase the 2008 Bonds and the 2009 Bonds. I did not know Safety Kleen's true financial condition (as reflected in the restated financial statements) when I made my investment decisions. If I had known the truth, I either would not have purchased or recommended the purchase of Safety Kleen bonds at all, or would have purchased or recommended them for purchase only at substantially discounted prices.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Executed in Los Angeles, California on August 20, 2002.

Michelle Freitag Robson

3

B

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

|  |  |  |
|---|---|---|
| IN RE SAFETY-KLEEN CORP. | ) | Consol. Case No. 3-00-1145 17 |
| BONDHOLDERS LITIGATION | ) | |

### DECLARATION OF MICHAEL ROLNICK IN SUPPORT OF PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Michael Rolnick, for his declaration pursuant to 28 U.S.C. § 1746, deposes and says as follows:

1.    I have been employed as an investment analyst with State Street Research & Management Company ("SSRMC") since 1997.  SSRMC provides investment management services to State Street Research High Income Fund (the "Fund"), which is a series of State Street Research Income Trust.  As a securities analyst with SSRMC, I analyze potential investments in debt securities on behalf of the Fund, and I monitor the Fund's existing investments in debt securities.  For each of the names (i.e., companies) I cover, I make recommendations to the Fund's portfolio manager to buy, sell, or hold the securities, and I discuss those recommendations with the portfolio manager.  After the initial purchase, I also monitor the companies' financial performance and discuss my findings with the portfolio manager.  The portfolio manager makes the ultimate investment decisions on behalf of the Fund, but does so in reliance on my recommendations and analysis.

2.    I have been the debt securities analyst covering Safety Kleen Corporation ("Safety Kleen") for the Fund since the Spring of 1999.  The Fund's first purchase of Safety Kleen debt securities was on May 11, 1999, when it purchased $5,345,000 principal amount of Safety Kleen 9.25% senior notes due May 15, 2009 (the "2009 Bonds") in the initial offering.  I made the

recommendation to purchase these securities. A month later, on June 18, 1999, the Fund

purchased $670,000 principal amount of 2009 Bonds in the secondary market. On July 27, 1999,

the Fund purchased another $1,020,000 principal amount of 2009 Bonds. On each occasion, the

portfolio manager made the purchase in reliance on my initial recommendation and on my

continued monitoring of Safety Kleen's financial condition.

   3.  On December 9, 1999, the Fund purchased $785,000 principal amount of LES,

Inc. 9.25% senior notes due June 1, 2008 (the "2008 Bonds"). On March 8, 2000, the Fund

purchased an additional $3,300,000 principal amount of 2008 Bonds. Again, the portfolio

manager purchased these securities in reliance on my initial recommendation and on my

continued monitoring and analysis of Safety Kleen's financial condition, which included my

review of Safety Kleen's Form 10-K filings.

   4.  Before recommending the purchase of the 2009 Bonds for the Fund, I obtained

and reviewed Safety Kleen's Form 10-K filing for the fiscal year ended August 31, 1998 (fiscal

1998). As part of my continued monitoring of Safety Kleen, I also obtained and reviewed Safety

Kleen's Form 10-K filing for the fiscal year ended August 31, 1999 (fiscal 1999) when it was

issued. Prior to each purchase of the 2008 Bonds and 2009 Bonds, I had read the financial

statements in the most recently filed 10-K, including the income statement, balance sheet, and

statement of cash flows, as well as the notes to the financial statements. I specifically read and

relied upon the financial data in the 10-Ks, including the revenue, operating income, and cash

flow figures. I used the information in the 10-Ks to evaluate Safety Kleen's creditworthiness, the

value of its debt securities, how well the integration of its acquired companies was going, and

whether it was meeting its own projections. I also used the information in the 10-Ks to calculate

EBITDA, free cash flow, cash flow growth, operating margins, changes in working capital, and

certain standard financial ratios (including a leverage ratio and coverage ratio). All of this information factored into my recommendations to purchase the bonds.

5.     I also looked at the auditor's opinions in the 10-Ks for fiscal 1998 and 1999, and confirmed that they were unqualified opinions before purchasing the bonds. If the auditor's opinions had not been unqualified, I would not have recommended that the Fund purchase Safety Kleen securities in the first place, and I would have advised the portfolio manager not to purchase additional Safety Kleen securities.

6.     Attached as Exhibit A to this affidavit is a copy of Safety Kleen's Form 10-K filing for the year ended August 31, 1999. This is the copy that I printed out and reviewed while monitoring Safety Kleen's financial performance, which was prior to the Fund's purchases of 2008 Bonds. The underlining and other handwritten notations on this 10-K were made by me during the course of that review, and highlight some of the information in the 10-K that I considered in my analysis, such as the company's operating results (pp. 18-20), EBITDA (pp. 29, 49), liabilities (p. 30), receivables (pp. 24, 31, 37), cash flow (p. 31), depreciation and amortization (pp. 33-34), restructuring charges (p. 41), and landfill closure costs and how they were accounted for (pp. 9, 22-23, 33, 40-41). I no longer have a copy of Safety Kleen's fiscal 1998 10-K, but I am certain that I reviewed it as well before recommending the purchase of the 2009 Bonds.

7.     Each of the decisions to purchase the 2008 Bonds and the 2009 Bonds for the Fund was made in reliance on the completeness and accuracy of the information contained in Safety Kleen's most recently filed Form 10-K, including the company's annual financial statements, the notes to the financial statements, and the auditor's opinion.

8.      I have reviewed Safety Kleen's restated financial statements for fiscal 1998 and

fiscal 1999.  These restatements include material changes to Safety Kleen's revenue, net income,

and EBITDA, among other figures.  Safety Kleen's financial condition, including its revenue, net

income/loss and EBITDA figures, were extremely important to my recommendations to purchase

the 2008 Bonds and the 2009 Bonds, and to the decisions to purchase those securities.  I did not

know Safety Kleen's true financial condition (as reflected in the restated financial statements)

when I made those recommendations.  Had I known the truth, I would have recommended that

the Fund either not purchase Safety Kleen securities at all, or that it purchase them only at

substantially discounted prices.

I declare under penalty of perjury that the foregoing is true and correct to the best of my

knowledge.  Executed in Boston, Massachusetts on August 28, 2002.


_____
Michael Rolnick


4

C

NOV-06-2002  17:29    SECURITIES WEEK    212 439 3898    P.02/08

# THE REVIEW OF
# SECURITIES & COMMODITIES REGULATION

### AN ANALYSIS OF CURRENT LAWS AND REGULATIONS AFFECTING THE SECURITIES AND FUTURES INDUSTRIES

?????, 2002

## CLASS CERTIFICATION AND
## SECTION 18 OF THE EXCHANGE ACT

*In a Recent Split of Authority, Several Courts Have Certified Classes of Investors in Section 18 Cases After Finding That Individual Issues of Reliance Did Not Predominate Over Common Issues of Falsity and Defendants' Good Faith. The Authors Approve These Holdings, Arguing that to Refuse Certification in Such Cases Would Effectively Deprive Individual Investors of the Express Remedy Provided by Congress.*

By Stuart M. Grant and Megan D. McIntyre*

In recent years, there has been a split of authority as to whether actions pursuant to Section 18 of the Securities Exchange Act of 1934, 15 U.S.C. § 78r, may be certified as class actions. Some courts have been reluctant to permit class certification, reasoning that individualized issues of reliance preclude class-wide treatment of such claims. Other courts have certified classes in actions involving Section 18 claims, concluding that the legal and factual issues that are common to all class members predominate over any individual issues of reliance, thus making class treatment appropriate.

In 2000, one of us published an article discussing the virtues of Section 18 as a remedy for institutional investors who suffer damages as a result of their reliance on false statements in SEC filings.[1] That article indicated that class actions were unavailable for Section 18 claims, which has historically been the general rule. However, several cases — including a recent 2001 decision — have reached the opposite result and certified plaintiff classes for the pursuit of Section 18 claims. This article is intended to update and modify the prior Section 18 article with respect to the issue of class certification, and to discuss why class-wide treatment of Section 18 claims is critical to preserving the remedy of Section 18 for individual investors. Indeed, to deny investors the ability to pursue Section 18 claims in class actions is to effectively deny any remedy for Section 18 violations to the majority of investors who are injured by them.

* STUART M. GRANT and MEGAN D. McINTYRE are partners in the Wilmington, Delaware law firm of Grant & Eisenhofer, P.A. Their email addresses are sgrant@gelaw.com and mmcintyre@gelaw.com, respectively. Special thanks to Jennifer Thoma DeZayas who provided substantial assistance in researching and writing earlier drafts of this article.

1.  See Jay W. Eisenhofer and Stuart M. Grant, "Institutional Investors and Section 18 of the Exchange Act," The Review of Securities & Commodities Regulation (March 14, 2000).

### IN THIS ISSUE

● *Class Certification and Section 18 of the Exchange Act*

??????, 2002

## SECTION 18 AND RELIANCE

Section 18 of the Exchange Act provides for liability for the making of material false or misleading statements in documents filed with the SEC.[2] It affords a remedy to investors who purchase securities in reliance on such false or misleading statements, making it one of the few provisions of the Securities Exchange Act of 1934 that provides an express private right of action to investors.[3]

2. Section 18 reads, in pertinent part: "Any person who shall make or cause to be made any statement in any application, report, or document filed pursuant to this chapter or any rule or regulation thereunder or any undertaking contained in a registration statement as provided in subsection (d) of section 78o of this title, which statement was at the time and in the light of the circumstances under which it was made false or misleading with respect to any material fact, shall be liable to any person (not knowing that such statement was false or misleading) who, in reliance upon such statement, shall have purchased or sold a security at a price which was affected by such statement, for damages caused by such reliance, unless the person sued shall prove that he acted in good faith and had no knowledge that such statement was false or misleading." 15 U.S.C. § 78r(a).

3. The only other section that provides an express private right of action is Section 9(e), 15 U.S.C. § 78i(e) (relating to manipulation of securities prices). Section 16(b), 15 U.S.C. § 78p(b) (relating to insider short-swing profits) provides for a derivative action if the issuer fails to bring an action for short swing profits.

In order to prevail on a claim under Section 18, an investor must establish: (1) a false or misleading statement; (2) contained in an SEC filing; (3) that is material; (4) on which the investor relied; (5) in connection with the purchase or sale of securities.[4] Section 18 is an important remedy for investors because, unlike Rule 10b-5, it does not require a showing of scienter. Instead, Section 18 places the burden on defendants to establish as an affirmative defense that they acted in "good faith and had no knowledge that [the] statement was false or misleading" in order to avoid liability.[5]

Reliance is a crucial element in the establishment of a Section 18 claim. Indeed, most courts have held that, unlike Rule 10b-5 which permits reliance to be presumed through a fraud-on-the-market theory,[6] Section 18 requires proof of a plaintiff's "actual knowledge of and reliance upon" the false statements or misrepresentations.[7]

4. 15 U.S.C. §78r; *Magna Inv. Corp. v. John Does One Through Two Hundred*, 931 F.2d 38, 39 (11th Cir. 1991).
5. 15 U.S.C. §78r; *Magna Inv. Corp.*, 931 F.2d at 39-40.
6. *Basic Inc. v. Levinson*, 108 S.Ct. 978, 992, 485 U.S. 224, 247 (1988).
7. *Ross v. A.H. Robins Co. Inc.*, 607 F.2d 545, 552 (2d Cir. 1979). *See also Heit v. Weitzen*, 402 F.2d 909, 916 (2d Cir. 1968); In re Genentech, Inc. Sec. Litig., 1989 WL 106834 at *4-5 (N.D. Cal. 1989); *Rich v. Touche Ross & Co.*, 415 F. Supp. 95, 102 (S.D.N.Y. 1976).

→ italicize

*Standard & Poor's*

A Division of The McGraw-Hill Companies

Published 22 times a year by Standard & Poor's, a division of The McGraw-Hill Companies. Executive Office 55 Water Street, New York, New York 10041. Editorial Office, 299 Park Avenue 16th floor, New York, New York 10171. Subscription rates: $898 per year in U.S., Canada and Mexico; $960 elsewhere (air mail delivered). Subscribers to both *The Review of Securities & Commodities Regulation* and *The Review of Banking and Financial Services* who receive both publications at the same address are eligible for a $250 discount. In addition, a 15% discount is available for qualified academic libraries and universities. General Editor: Michael O. Finkelstein. Associate Editor: Sarah Strauss Himmelfarb. Copyright © 2002 by Standard & Poor's. ISSN 10884-2426. Reproduction in whole or in part prohibited except by permission. All rights reserved. Officers of The McGraw-Hill Companies: Harold W. McGraw III, Chairman, President and Chief Executive Officer; Kenneth M. Vittor, Executive Vice President and General Counsel; Robert J. Bahash, Executive Vice President and Chief Financial Officer; Frank D. Penglase, Senior Vice President, Treasury Operations. Information has been obtained by *The Review of Securities & Commodities Regulation* from sources believed to be reliable. However, because of the possibility of human or mechanical error by our sources, *The Review of Securities & Commodities Regulation* does not guarantee the accuracy, adequacy, or completeness of any information and is not responsible for any errors or omissions or for the results obtained from the use of such information.

*General Editor*
Michael O. Finkelstein

*Associate Editor*
Sarah Strauss Himmelfarb

*Board Members*
Jay Baris
Kramer Levin Naftalis
  & Frankel LLP,
New York, N.Y.

Kenneth J. Bialkin
Skadden, Arps, Slate,
Meagher & Flom
New York, N.Y.

Arthur M. Borden
Rosenman & Colin
New York, N.Y.

Alan R. Bromberg
Jenkins & Gilchrist
Dallas, TX

Roberta Karmel
Kelley Drye & Warren
New York, N.Y.

Richard M. Phillips
Kirkpatrick & Lockhart
San Francisco, CA

A. Robert Pietrzak
Sidley Austin Brown & Wood, LLP
New York, N.Y.

Irving M. Pollack
Dilworth Paxson PLLC
Washington, D.C.

Norman S. Poser
Brooklyn Law School
Brooklyn, N.Y.

Thomas A. Russo
Lehman Brothers
New York, N.Y.

Carl W. Schneider
Elkins Park, PA

Edmund R. Schroeder
Cadwalader, Wickersham & Taft
New York, N.Y.

Stephen F. Selig
Brown, Raysman, Millstein,
  Felder, & Steiner
New York, N.Y.

???????, 2002

In other words, "constructive" rather than "actual" or "eyeball" reliance generally will not satisfy the requirements of Section 18.[8]

### Class Certification

The costs of litigation and the stamina of corporate defendants make class actions appealing to plaintiffs in federal securities law cases, because it allows them to pursue claims that would be economically impractical to pursue on an individual basis. It is the rare investor — typically only institutions and the wealthiest of individual investors — whose potential recoveries would justify the substantial costs of bringing an individual securities lawsuit.

Rule 23 of the Federal Rules of Civil Procedure permits plaintiffs to pursue federal claims on a class action basis, provided that certain requirements are met. Of particular importance in the Section 18 context is the requirement that there exist issues of law and fact that are common to the class, and that such common issues predominate over any individual issues.[9] Generally, the existence of a "common nucleus of operative fact" is enough to establish commonality.[10] There is a "common nucleus of operative fact" where "defendants have engaged in standardized conduct towards members of the proposed class."[11]

Because Section 18 claims involve false and/or misleading statements in SEC filings — which are widely disseminated to investors in an identical form — such claims typically involve several common legal and factual issues. These include: the false or misleading nature of the statement; the materiality of the statement; whether the statement was made in connection with the purchase or sale of securities; and the refutation of any affirmative defenses regarding the defendant's state of mind. These questions can generally be determined on a class-wide basis, eliminating the need for individual trials.

Not all issues inherent in a Section 18 claim may be established on a class-wide basis, however. In particular, the requirement of actual reliance necessitates individual determinations of each class member's reliance. The question is whether the existence of this individualized issue is sufficient to preclude class certification of Section 18 claims — i.e., whether it predominates over the questions of law and fact that are common to all class members. As discussed below, the courts are divided on that question.

### THE SPLIT OF AUTHORITY

Some courts have rejected class certification in Section 18 actions due to the strict requirement of individual reliance.[12] These courts have held that the common questions do not predominate over the individual questions of reliance. For example, in Beebe v. Pacific Realty Trust, the District Court for the District of Oregon acknowledged that "the [Section 18] claim embodies common questions of law and fact as to the materiality of any omissions or misrepresentations," but denied class certification because "as to proof of individual reliance, plaintiff does not meet the commonality requirement."[14] Likewise, in Elster v. Alexander, the District Court for the Northern District of Georgia held that Section 18 claims "are inappropriate for treatment as class actions because they present substantial and predominant individual questions."[15] The court also expressed reluctance to undertake the perceived "judicial nightmare" of resolving the individual issues separately from the class issues.[16]

*Conversely*
Other courts, ~~on the other hand,~~ have held that individual issues of reliance do not predominate over common issues, and thus do not preclude class certification in Section 18 actions. In Simpson v. Specialty Retail Concepts,[17] for example, the court certified a class for purposes of the plaintiffs' Section 18 and state law fraud claims, holding that "the question of whether Defendants ... made material misrepresentations, and if so, whether they were made intentionally or recklessly or negligently are common to the entire class and predominate over individual issues of reliance."[18] Similarly, in the case of In re MDC

---

8. See Ross, 607 F.2d at 552; Heit, 402 F.2d at 916; In re Digi International Inc., Sec. Litig., 6 F. Supp. 2d 1089, 1103 (D. Minn. 1998) (following "the majority of courts which have held that mere constructive reliance" is insufficient under Section 18(a)") (citations omitted). "Eyeball reliance" is generally used to describe a reading, by the investor, of the document containing the false statement or misrepresentation. Gross v. Diversified Mortg. Investors, 438 F. Supp. 190, 195 (S.D.N.Y. 1977).
9. See Fed. R. Civ. P. 23; Simpson v. Specialty Retail Concepts, 149 F.R.D. 94, 98 (M.D.N.C. 1993).
10. Elliots v. Chicago Housing Authority, 2000 WL 263730 at *9 (N. D. Ill. 2000) (citations omitted).
11. Id. (citation omitted).

12. Beebe v. Pacific Realty Trust, 99 F.R.D. 60, 70 (D. Ore. 1983); Elster v. Alexander, 76 F.R.D. 440, 442 (N.D. Ga. 1977).
13. Elster, 76 F.R.D. at 442.
14. Beebe, 99 F.R.D. at 70.
15. Elster, 76 F.R.D. at 442.
16. See id. at 443.
17. 149 F.R.D. 94 (M.D.N.C. 1993).
18. Id. at 102 (citation omitted).

*[handwritten: change to single quotation mark]*

*[handwritten: adjust all subsequent footnote numbers]*

*Holdings Securities Litigation,*[19] the court stated that "individual issues of actual reliance do exist [with respect to the plaintiffs' Section 18 claim]... however, this does not mean that individual issues predominate over common ones."[20] The court certified a class, concluding that there were "numerous common questions of fact" and a "common course of wrongdoing based on the same misrepresentations," such that common issues predominated over the individual issue of reliance.[21] Further, the court recognized that "[t]he alternative would be to unleash thousands of individual suits into the judicial system, and risk that many plaintiffs would be unable to seek redress because of economics."[22]

More recently, in a July 2001 decision in *State of Wisconsin Investment Board v. Ruttenberg,*[23] the court followed the holdings in *Simpson* and *In re MDC Holdings* and certified a class for purposes of the plaintiffs' Section 18 claims. The court concluded that the individual issue of reliance did not predominate over the common issues, and also that considerations of judicial economy would be furthered by allowing the plaintiffs to pursue their Section 18 claims as a class action.[24] As the court noted, the reliance issue could be determined by way of "mini-trials" with respect to each shareholder after the common issues had been resolved.[25]

### THE BETTER APPROACH: PERMITTING CLASS CERTIFICATION

Because of the plethora of common legal and factual issues that will exist in most putative Section 18 class actions, the class action is by far the superior means of adjudicating those issues. There is ample precedent, both in the federal securities context and elsewhere, for the bifurcation of issues so that common issues may be determined in a class action, followed by separate, individual proceedings to determine individualized issues. In fact, as discussed in this section, permitting class certification on the common issues of Section 18 claims may be the only way to ensure that Congress's intent when enacting Sec-

tion 18 — to provide an express remedy to investors injured by violations of that statute — is not frustrated.

### Application of Rule 23(b)

While Rule 23(b) requires commonality of legal and factual issues, it does not require that all questions of fact and law be common to all class members in order for a class to be certified. Instead, it "just requires common issues to *predominate,* thereby logically implying that the existence of *some* individual issues will not destroy common issue predominance."[26]

STET

The predominance inquiry under Rule 23(b)(3) "involves an analysis of the substantive elements of plaintiffs' claims and the requisite proof on these issues and an inquiry into the form the trial on these issues would take."[27] The central issue with respect to the typical Section 18 claim is the existence of fraudulent conduct by the defendants which resulted in the dissemination of materially false and misleading statements in the company's SEC filings. The proof on these issues will be the same for all class members, because the defendants will have engaged in the same course of conduct, and disseminated the same statements (by way of SEC filings), to all of them. Reliance is usually the only element of the plaintiffs' liability case that is not common to all class members. As one commentator has stated:

> The need to show individual reliance has not precluded class treatment in cases where standardized written misrepresentations have been made to class members ... In such cases, the courts have uniformly found it appropriate to certify a securities class on the common liability issues and to defer consideration of individual reliance by class members until after disposing of the common class questions.[28]

As discussed above, several courts have certified classes in Section 18 cases, in recognition that the single individu-

---

19. 754 F. Supp. 785 (S.D. Cal. 1990).
20. *Id.* at 806.
21. *Id.*
22. *Id.* at 807.
23. Civil Action Nos. CV-99-BU-3097-S and CV-99-BU-3129-S, mem. op. at 16-18 (N.D. Ala. July 3, 2001).
24. *Id.*
25. *Id.* at 18.

26. *Walco Investments, Inc. v. Thenen,* 168 F.R.D. 315, 334 (S.D. Fla. 1996) (emphasis in original).
27. *Anderson v. Bank of the South,* N.A., 118 F.R.D. 136, 150 (M.D. Fla. 1987) (citation omitted).
28. *See Schneider v. Traweek,* No. CV88-0905 RG (KX), 1990 WL 132716, at *14-15 (C.D. Cal. 1990) (quoting 4 NEWBERG ON CLASS ACTIONS 2d (1985) § 22.47) (footnotes omitted).

al issue of reliance does not predominate over the numerous common issues.[29]  The same result has been reached outside the Section 18 context as well.

For example, there are numerous cases in which class certification was granted on Section 10(b) claims despite the existence of individual issues of reliance (either because those cases were decided prior to the Supreme Court's recognition that reliance may be presumed for such claims, or because the presumption was found not to apply).[30]  As the Third Circuit held in one such case:

> The presence of individual questions as to the reliance of each investor does not mean that the common questions of law and fact do not predominate over questions affecting individual members as required by *Rule 23(b)(3)* ... In rejecting such a contention, the Second Circuit stated, "Carried to its logical end [this argument] would negate any attempted class action under Rule 10b-5, since ... reliance is an issue lurking in every 10b-5 action." *Green v. Wolf Corp.*, 406 F.2d [291,] 301 [(2d Cir. 1968)].  Rather than eliminate securities class actions, it would be more efficient to order separate trials, if necessary, limited to the issue of reliance.[31]

This reasoning is equally applicable to Section 18 claims, and perhaps even more so in light of the fact that Congress provided an express private right of action for

violations of Section 18, whereas the right of action under Rule 10b-5 is only an implied right of action.

Many courts have also certified classes for the pursuit of pendent state law fraud claims, even though they may require individualized proof of reliance, when the remaining factual and legal elements are common to all class members.[32]

### Legislative Intent

The objective of Section 18 is to "encourag[e] use of and reliance upon records filed with the S.E.C."[33]  In furtherance of that objective, Section 18 provides an *express private right of action* to persons who purchase or sell securities in reliance upon a false or misleading statement filed with the SEC.[34]  This is one of only two sections of the Exchange Act that provide an express private right of action for investors.  Thus, Congress obviously found it important to provide a means for investors to recoup losses they sustain through reliance on a company's SEC filings.  By providing for such a cause of action, Congress not only gave investors an express remedy, but sent a message to issuers that full and honest disclosure in their SEC filings is critical.

A substantial number of the investors who suffer losses in reliance on false or misleading SEC filings are individuals for whom the pursuit of an individual Section 18 claim would be impractical and cost-prohibitive given the relative amounts of their losses compared to the cost of bringing such an action.  Thus, if courts were to conclude that individual reliance issues bar class certification of Section 18 claims as a matter of law, only the institutional investor (and perhaps in rare cases the exceedingly wealthy individual investor) would have the resources, and the economic incentive, to pursue Section 18 claims.  Congress cannot have intended to legislate an express remedy which is nearly worthless to the individual investor.

*[handwritten: pages 3-4]*

29. See supra Part IV.  See also *Helfand v. Cenco, Inc.*, 80 F.R.D. 1, 8-9 (N.D. Ill. 1977) (certifying class action that included Section 18 claims).

*[handwritten: italicize]*

30. See, e.g., *Green v. Wolf Corp.*, 406 F.2d 291, 300-01 (2d Cir. 1968); *Feldman v. Lifton*, 64 F.R.D. 539, 548 (S.D.N.Y. 1974); *In re United Energy Corp. Solar Power Modules Tax Shelter Investments Sec. Litig.*, 122 F.R.D. 251, 255 (C.D. Cal. 1988) ("[t]he policies served by the securities laws would be in part eviscerated if the reliance requirement precluded class certification.") (citations omitted); *Helfand*, 80 F.R.D. at 8-9; *Eisenberg v. Gagnon*, 766 F.2d 770, 786-87 (3rd Cir. 1985); *Lubin v. Sybedon Corp.*, 688 F. Supp. 1425, 1460 (S.D. Cal. 1988); *Schneider*, 1990 WL 132716 at *15; *Seiden v. Nicholson*, 69 F.R.D. 681, 686 (N.D. Ill. 1976); *Walco*, 168 F.R.D. at 333-34.

*[handwritten: [move Eisenberg cite to before Feldman]]*

31. *Eisenberg*, 766 F.2d at 786.  See also *Lubin*, 688 F. Supp. at 1460 (where plaintiff "has alleged that each investor relied [sic] upon precisely the same misrepresentations and omissions ... it would defy common sense to find that class certification is defeated by the possibility of individual questions appertaining to one of the elements of one of the case's causes of action").

*[handwritten: average]*

32. See, e.g., *In re Kirschner Med. Corp. Sec. Litig.*, 139 F.R.D. 74, 83 (D. Md. 1991) (citing cases); *Alexander v. Centrafarm Group, N.V.*, 124 F.R.D. 178, 186 (N.D. Ill. 1988); *Keyser v. Commonwealth Nat. Fin. Corp.*, 121 F.R.D. 642, 649-50 (M.D. Pa. 1988); *In re ORFA Sec. Litig.*, 654 F. Supp. 1449, 1461-62 (D.N.J. 1987); *In re United Energy Corp.*, 122 F.R.D. at 255-56; *Simpson*, 149 F.R.D. at 102.

33. *Ross v. A.H. Robins Co.*, 607 F.2d 545, 556 (2d Cir. 1979); *Wachovia Bank and Trust Co. v. National Student Marketing Corp.*, 650 F.2d 342, 357 (D.C. Cir. 1980) (quoting same).

34. See 15 U.S.C. § 78r(a).

NOV-06-2002  17:30        SECURITIES WEEK                    212 438 3898    P.07/08

Prior to the Supreme Court's decision that reliance can be presumed on a class-wide basis for Rule 10b-5 claims under the fraud-on-the-market theory, the courts recognized that "[t]he policies served by the securities laws would be in part eviscerated if the reliance requirement precluded class certification."[35] The importance of allowing class certification is even greater for Section 18 claims, because Section 18 provides an express right of action whereas Section 10(b) provides only an implied right of action.

Moreover, if class certification were not permitted for Section 18 claims, then most investors would be forced to seek remedies through a Rule 10b-5 claim, for which there is no individual reliance requirement and for which class certification is universally permitted. Because Rule 10b-5 requires proof of a defendant's scienter whereas Section 18 does not, this places an unfair burden on plaintiffs. Essentially, denial of class certification on Section 18 claims sets up a system whereby different investors must satisfy different burdens of proof in order to recover for the same wrongdoing: institutions and wealthy individuals can bring individual Section 18 actions and need not establish the defendant's state of mind, while the rest of the investor community is relegated to the pursuit of class action claims under Rule 10b-5, which requires proof of scienter.

### Dealing with Individual Issues of Reliance

It is indisputable that "a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management."[36] Many courts, both in the Section 18 context and elsewhere, have exercised this discretion to certify classes for purposes of determining common issues, and to hold separate individual trials or create subclasses to deal with individual issues.[37] While individual proceedings regarding reliance

may be time-consuming, they are far less burdensome to the court and the parties than the alternative of individual proceedings as to all elements of each class member's Section 18 claim. This is particularly true when one considers that the individualized proceedings do not even become necessary unless and until all of the common issues are resolved in favor of the plaintiffs. As one court explained in the Rule 10b-5 context:

> If separate hearings are ultimately required on the issues of reliance and/or damages, some additional time and effort will be required ... but it should not be overwhelming. In any case, with the presence of a common core which predominates, considerations of judicial efficiency and economy, overall expense and uniformity will be furthered by permitting this case to proceed as a class action.... If plaintiff's case is as weak as defendant insists, then this case provides it an economical vehicle for establishing its innocence as to all members of the class. For it is only if plaintiff prevails on all of the common issues that the need will arise for split trials on whatever individual issues remain.[38]

### CONCLUSION

In summary, there is relatively little case law on the issue of class certification for Section 18 claims, and the case law that exists is severely divided. Some courts hold that the need to prove reliance on an individual basis necessarily precludes class certification, while others permit class certification because the single individual issue of reliance does not predominate over the many issues common to all class members. In light of Congress's express provision of a private remedy for Section 18 violations, and the fact that most investors will be without such a remedy if class

---

35. In re United Energy Corp., 122 F.R.D. at 255. See also Sharp v. Coopers and Lybrand, 70 F.R.D. 544, 547 (E.D. Pa. 1976) ("[t]o deny class action status because of the reliance requirement would in large part eviscerate the policies served by rule 10b-5.") (citing Green, 406 F.2d at 301).

36. Gardco Mfg., Inc. v. Herst Lighting Co., 820 F.2d 1209, 1212 (Fed. Cir. 1987); see also Fed.R.Civ.P. 42.

37. See, e.g., State of Wisconsin Investment Board v. Ruttenberg, mem. op. at 18 ("[t]his Court, after the principal common practice issues are resolved, can hold mini-trials on the issue of individual reliance with respect to each shareholder.") (citation
*(footnote continued on next column...)*

*(footnote continued...)*
omitted); Ridings v. Canadian Imperial Bank of Commerce Trust Co. (Bahamas) Ltd., 94 F.R.D. 147, 151 (N.D. Ill. 1982) ("[i]f necessary, the Court may order separate hearings on the individual questions of reliance after determination of the common questions of law and fact.") (citation omitted); Sharp, 70 F.R.D. at 547 ("[i]f at trial it is determined that individual proof of reliance is required ... then separate hearings can be held to determine which members of the class in fact relied on defendant's letter. This is the approach which the vast majority of courts faced with this problem have advocated.") (citing cases).

38. Sharp, 70 F.R.D. at 548 (citations and footnote omitted).

actions are unavailable, the certification of classes in Section 18 cases appears to be consistent with Congressional intent and the purposes behind the statute. Moreover, even assuming that every investor would have the economic wherewithal and incentive to bring individual Section 18 actions, judicial economy and efficiency are far better served by the use of a class action to determine the questions that will be common to all investors — such as the falsity and materiality of the defendants' statements, and the viability of an affirmative "good faith" defense — than individual actions would be. By permitting Section 18 claims to proceed as class actions on all issues except reliance, and then holding individual mini-trials to determine reliance *if* the common issues are resolved in the plaintiffs' favor, the courts can promote judicial economy as well as preserve the important remedies provided by Section 18. ◼

[insert long dashes]

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served upon each of the following counsel by overnight delivery on November 26, 2002.

John P. Linton, Esquire
Manton Grier, Esquire
HAYNESWORTH SINKLER BOYD, P.A.
160 East Bay Street
P.O. Box 340
Charleston, SC 29402
**Local Counsel for Laidlaw, Inc., James R. Bullock and Leslie W. Haworth**

Stephen G. Morrison, Esquire
William Simpson, Esquire
NELSON, MULLINS,
    RILEY & SCARBOROUGH, LLP
Keenan Building
1330 Lady Street, 3rd Floor
P.O. Box 11070
Columbia, SC 29211
**Local Counsel for Robert W. Luba, John W. Rollins, Jr., Henry Tippie as Personal Representative of the Estate of John W. Rollins, Sr., David E. Thomas, Jr., Henry B. Tippie, James L. Wareham, and Grover C. Wrenn**

John N. Gallo, Esquire
Eric Mattson, Esquire
Erin Kelly, Esquire
SIDLEY & AUSTIN
10 South Dearborn Street
Chicago, IL 60603
**Counsel for James R. Bullock**

Terence H. Campbell, Esquire
COTSIRILOS, TIGHE & STREICKER, LTD.
33 N. Dearborn Street, Suite 600
Chicago, IL 60602
**Counsel for Leslie W. Haworth**

Everett A. Kendall, II, Esquire
SWEENY, WINGATE & BARROW, PA
1515 Lady Street
P.O. Box 12129
Columbia, SC 29211
**Local Counsel for PricewaterhouseCoopers, LLP**

Paul R. Humphreys
292 Douglas Ridge Green S.E.
Calgary, Alberta
CANADA    T2Z 3A7
***Pro Se* Representation**

M. Byron Wilder, Esquire
Alan R. Struble, Esquire
GIBSON, DUNN & CRUTCHER, LLP
2100 McKinney Avenue, Suite 1100
Dallas, TX 75201
**Counsel for PricewaterhouseCoopers, LLP**

Charles P. Summerall, IV, Esquire
David McCormack, Esquire
BUIST, MOORE, SMYTHE & McGEE, P.A.
Five Exchange Street
P.O. Box 999
Charleston, SC 29402
**Local Counsel for TD Securities (USA) Inc., Nationsbanc Montgomery Securities and Raymond James & Associates, Inc.**

James P. Rouhandeh, Esquire
James McClamay, Esquire
Alice Paucker, Esquire
DAVIS, POLK & WARDELL
450 Lexington Avenue
New York, NY 10017
**Counsel for TD Securities (USA) Inc., Nationsbanc Montgomery Securities and Raymond James & Associates, Inc.**

Wilmot B. Irvin, Esquire
Rebecca Guental Fulmer, Esquire
LAW OFFICES OF WILMOT B. IRVIN
1522 Lady Street
P.O. Box 7816
Columbia, SC 29202
**Counsel for Defendant Michael J. Bragagnolo**

Peter L. Murphy, Esquire
917 Calhoun Street
Post Office Box 1428
Columbia, SC 29202
**Counsel for Defendant Kenneth Winger**


Megan D. McIntyre